**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAYSHORE FORD TRUCK SALES, INC., a Delaware corporation; MOTOR CITY TRUCKS, INC., a Delaware corporation; COLONY FORD TRUCK CENTER, INC., a Rhode Island corporation, individually and on behalf of all other persons similarly situated,<br><br>     Plaintiffs,<br>v.<br><br>FORD MOTOR COMPANY,<br><br>     Defendant. | Civil Action No.: 99cv741 (JLL)<br><br><br><br>**AMENDED OPINION[1]** |

**LINARES**, District Judge.

This matter comes before this Court on a motion for class certification by Plaintiffs, Bayshore Ford Truck Sales, Inc. ("Bayshore"), Motor City Ford Trucks, Inc. ("Motor City") and Colony Ford Truck Center, Inc. ("Colony") (collectively, "Plaintiffs").  Plaintiffs commenced this action against Defendant, Ford Motor Company ("Defendant" or "Ford"), on February 18, 1999, alleging, inter alia, violations of the Federal Automobile Dealers Day in Court Act ("ADDCA"), breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment, accounting and violation of the Plaintiffs' respective home state

---

[1] This Amended Opinion has been filed to reflect a minor factual error, and in no way affects the analysis or substantive aspects of the original Opinion filed on September 7, 2006.

franchise statutes.

In December 2005, this Court granted Plaintiffs' motion for summary judgment on the breach of contract claim finding in relevant part that "[Defendant's] failure to supply heavy trucks to Plaintiffs in the absence of termination by [Defendant] in accordance with the terms of the contract, was a breach of the [Dealer] Agreement." (Dec. 2005 Opinion at 18, docket no. 99-107 "Opinion"). The Court also granted Defendant's motion for summary judgment on Plaintiffs' ADDCA, bad faith, unjust enrichment and accounting claims. (Opinion at 24). Of these claims, only the claim for breach of contract and violation of the respective home state franchise statutes remain.

Plaintiffs now seek class certification only on their claim for breach of contract and not on their franchise act claim. This Court originally had jurisdiction over this case pursuant to 28 U.S.C. 1331 based on the ADDCA claim, 15 U.S.C. 1221-1225, and supplemental jurisdiction over the other claims pursuant to 28 U.S.C. 1367. Although the sole federal claim, the ADDCA claim, was dismissed in this Court's December 2005 Opinion, the Court retained jurisdiction over the remaining common law claims. For the reasons set forth below in its Findings of Fact and Conclusions of Law, the Court has determined that class certification is appropriate and should therefore be approved.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case have already been laid out extensively by this Court in its December 2005 opinion granting Plaintiffs summary judgment on their breach of contract claim, are largely undisputed, and as such need not be reiterated in full for purposes of the present motion. The relevant facts will be incorporated when appropriate into the legal discussion. In summary,

Plaintiffs and all members of the proposed class were Ford heavy truck franchisees who each sold and serviced Ford heavy trucks prior to Ford's decision to sell its heavy truck business in 1997 to Freightliner, and, who subsequently entered into franchise agreements with Sterling, a franchise division of Freightliner.  As such, Plaintiffs' seek to certify the following class definition:

> Those entities or individuals who held a Ford Heavy Duty Truck Sales and Service Agreement and who subsequently entered into an HN-80 (Sterling) Franchise Agreement.  Excluded from the class are Defendant and its subsidiaries, affiliates, officers, directors, and employees, and the immediate family members of such persons.

The relationship between Ford and each individual heavy truck dealer was embodied in a Ford Heavy Duty Truck Sales and Service Agreement ("SSA") which was drafted by Ford and is standardized for all heavy truck dealerships.[2]  The SSA was to "continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof."  (LaRobardier Certif. at Tab 1 p. 0004).   In addition, the Ford-dealer relationship is also subject to individual state Dealer Acts which govern various aspects of the dealer-manufacturer relationship.  (Decl. of Gerald Ducharme ¶¶ 10, 11).

In 1995, Ford decided to launch a new Ford heavy truck, the HN-80 and required its dealers to become certified to service the three different HN-80 engines.  The HN-80 sales were

---

[2]Although each member of the putative class held a heavy truck SSA with Ford, Defendant also states, and Plaintiffs do not contest, the fact that members of the putative class also held various combinations of SSAs with Ford (and other manufacturers) for other product lines and car or truck makes.  (Def. Br. Opp. 6, 7).  In addition, members of the putative class were categorized according to whether they were "truck centers" or "combination dealers" and further broken down into four different types of product lines (Full line, all Ford trucks, Commercial Lights and Medium Duty Trucks) and  seven different types of dealerships (Ford/Sterling only, Ford only, Ford/Sterling and others, Ford and others, neither Ford or Sterling, Sterling and others and Sterling only).  (Leyes Decl. Ex. A)

disappointing, and in 1996, Ford's losses totaled $131 million, which prompted Ford to sell its

heavy truck business to Freightliner for $300 million in 1997.

Ford informed its dealers of the sale and that, as part of the agreement, they would be

given the opportunity to obtain a new heavy truck franchise with Freightliner.[3]  On July 28, 1997,

"Ford stopped accepting heavy truck orders from its heavy truck dealers." (Pls.' Stmt. Pursuant to

Local Civ. R. 56.1, p.5 (Nov. 30, 2004)).  However, Ford never terminated or sought to terminate

the SSAs with any of the Plaintiffs even though under the terms of the SSA, it could terminate

them at will.  After unsuccessful negotiation attempts with Ford by the heavy truck dealers in

1997, Plaintiffs commenced an action against Ford on February 18, 1999 asserting, among other

claims, common law breach of contract under Michigan law.  Plaintiffs subsequently moved for

summary judgment on their breach of contract claim, which was granted by this Court on

December 7, 2005.

Although the parties disagree about the exact number of members in the putative class, it

consists of over 140 parties, dispersed throughout 45 states nationwide.[4]  The dealerships in the

putative class are all individual businesses that vary in size, management styles, profits, location

and customer bodies; however, all suffered the same breach of the SSA by Ford.  Since Ford

announced its decision to exit the heavy truck business, only four dealers filed individual claims

_____

[3]See fn. 3 below, showing that it is unclear exactly how many Ford heavy truck
dealerships were actually accepted as Sterling franchises, but that the number exceeds 140.

[4]Plaintiffs claim that there were 164 Ford Heavy Truck dealers at the time the sale to
Freightliner was announced in February 19, 1997.  (Pls. Br. at 12).  However, Defendant claims
only 149 of the former Ford Heavy Truck dealers actually signed the Sterling franchise
agreement, and therefore argue that the putative class consists of at most 149, not 164, former
Ford Heavy Truck dealers.  (Def. Br. Opp. at 24).

against the Company.  (Def. Br. Opp. at 25).

Plaintiffs presently move for class certification on their breach of contract claim.  The three named Plaintiffs', Bayshore, Colony and Motor City, represent three different types of class members that suffered different impacts from the Ford contract breach.  Bayshore, located in Delaware, is a high-volume truck center that sells every kind of truck produced by Ford, has a SSA with Mitsubishi for heavy trucks and sells medium and heavy trucks through its franchise agreement with Sterling and its "financial statements show that it benefitted more than the other named Plaintiffs from Sterling's product line additions."  (Def. Br. Opp. at 9).  Colony, located in Rhode Island, is a medium-volume truck center that sells every kind of truck produced by Ford, has a SSA with Sterling through which it sells medium and heavy trucks, and "its total volume of truck sales increased following the Ford-Freightliner sale."  (Def. Br. Opp. at 11).   Motor City, located in Michigan, the third named Plaintiff, is a low-volume seller that does not sell light trucks.  Motor City did receive approval for a Sterling franchise in connection with the Ford-Freightliner sale.[5]  Motor City's truck sales have declined following the Ford-Freightliner sale. (Def. Br. Opp. at 12).

## LEGAL DISCUSSION

### A.  Class Certification

Class certification "enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues."  General Motors Corp. Pick-Up Truck Fuel Tank

---

[5] The Court notes that it inadvertently indicated that Motor City had *not* received approval for a Sterling franchise in connection with the Ford-Freightliner sale in its original Opinion. Having been notified of this error by the parties, the Court hereby amends its September 7, 2006 Opinion accordingly.

Prods. Liab. Litig. ("GM Trucks"), 55 F.3d 768, 783 (3d Cir. ), cert. denied, 516 U.S. 824

(1995).  Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3), which

provides that in order to maintain a class action, the Court must first determine that the

prerequisites of Fed. R. Civ. P. 23(a) are satisfied, in addition to the requirements of 23(b)(3).

> Rule 23(a) mandates a showing of (1) numerosity; (2) commonality; (3) typicality;
> and (4) adequacy of representation: "One or more members of a class may sue or be
> sued as representative parties on behalf of all only if (1) the class is so numerous that
> joinder of all members is impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class, and (4) the representative parties will
> fairly and adequately protect the interests of the class.

Georgine v. Amchem Prods., 83 F.3d 610, 624 (3d Cir. 1996) (quoting Fed. R. Civ. P. 23(a)).

In addition, Rule 23(b)(3) requires a finding "that the questions of law or fact common to

the members of the class predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for the fair and efficient adjudication of

the controversy."  Fed. R. Civ. P. 23(b)(3).  Here, Plaintiffs seek certification on the issue of

contract liability.

Plaintiffs bear the burden of establishing that the proposed class should be certified.

Curley v. Cumberland Farms Dairy, Inc., 728 F. Supp. 1123, 1128 (D.N.J. 1989).  The Court is

required to spell out its findings of fact so as to establish each of the Rule 23 requisites.  See In re

the Prudential Ins. Co. of Am. ("Prudential I"), 962 F. Supp. 450, 508 (D.N.J. 1997), aff'd, 148

F.3d 283 (3d Cir. 1998) ("Prudential II"), cert. denied, 525 U.S. 1114 (1999).  "In a borderline

case, the Court should allow class certification: 'the interests of justice require that in a doubtful

case . . . any error, if there is to be one, should be committed in favor of allowing a class action.'"

Id. (quoting Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir.) (citations omitted), cert. denied,

474 U.S. 946 (1985)).  For the following reasons, this Court finds that class certification is appropriate.

### 1.        Numerosity

Rule 23(a)(1) provides that the proposed class must consist of members that are so "numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility but only the difficulty or inconvenience of joining all members of the class."  Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 406 (D.N.J. 1990) (quoting Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964). In addition, geographic dispersion of class members is a factor the court will consider in determining practicability of joinder.  See Prudential I, 962 F. Supp. 450, 510 (D.N.J. 1997) (citing  Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985) (holding numerosity requirement satisfied where class consisted of "more than 90 geographically dispersed plaintiffs").  Similarly, this Court has held that  "[t]o meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members."  Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 229 (D.N.J. 2005)  (quoting Prudential I, 962 F. Supp. at 507).   Joinder of a class that numbers in the hundreds will normally be found impracticable, although the numerosity requirement is usually satisfied with much smaller classes. See Prudential I, 962 F. Supp. at 510 (citing 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.05, at 3-25).

Here, Plaintiffs argue that joinder of all Class Members is impracticable because there are at least 140 Class Members dispersed throughout 45 states.  While Ford concedes that geographic dispersion is a significant factor that courts look to in determining the practicability of joinder, it

argues that this factor is not dispositive in this case.  First, Ford contends that since the members

of the proposed Plaintiff class are all easily identified and since only five dealers from five states

other than New Jersey filed this lawsuit, geographic dispersion is not an impediment to joinder.

Ford cites to Liberty Lincoln Mercury v. Ford Mktg. Corp., 149 F.R.D. 65, 74 (D.N.J. 1993) and

Block v. First Blood Assocs., 125 F.R.D. 39, 42 (S.D.N.Y. 1989) as support for this proposition.

However, both cases, aside from not being binding on this Court, are readily distinguishable from

the case at bar.  In Liberty, all members of the proposed class were located in New Jersey,

making geographic dispersion a non-issue; whereas, here, the proposed class consists of over 140

dealerships dispersed throughout 45 states, making geographic dispersion an important factor in

determining the practicability of joinder.   In addition, in Block, the proposed class consisted of

57 proposed class members, only 25 of which demonstrated an interest in being part of the class

action.  Ford argues this is analogous to the case at bar since only four former dealerships have

filed claims against it regarding the Freightliner sale, thereby demonstrating a lack of interest by

the other proposed class members in pursuing this litigation.  However, the Court finds this

argument unpersuasive.

In Block, the court relied on record evidence of proposed member disinterest, since of the

almost 60 letters mailed to proposed class members to determine their interest in joining the class

action, only 25 demonstrated an interest while 20 other letters were undeliverable.  Here, no such

evidence of member disinterest exists, in fact, just the opposite is true.  Ford does not contest that

Plaintiffs attempted - as a group -  to negotiate with Ford in 1997 when news of the Freightliner

sale broke, prior to initiating this class action. Nor does Ford contest Plaintiffs' statements that "a

large number of dealers have participated in the litigation in numerous and significant ways,

including making financial contributions." (Pls.' Reply Br. at 11).  These facts demonstrate an interest in pursuing the litigation as a class, which would explain why individual lawsuits have not been initiated.

Secondly, Ford cites to <u>Liberty</u> and argues that here the class action device is inappropriate since each proposed class member has the individual capability to assert a claim on their own and obtain individual redress.  Ford argues that the dealers' "legal and business sophistication," make them less suitable for class certification.  (Def. Opp. Br. at 25).

However, if the Court were to adopt Ford's view, it would undermine the utility of the class action device and the judicial economy it provides our court system, not to mention engage the Court in a plaintiff-by-plaintiff inquiry into whether each individual class member has enough of a claim to warrant individual adjudication.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." <u>Amchem v. Prods. v. Windsor</u>, 521 U.S. 591, 617 (1997).  In addition, this Court refuses to assume that each dealership in this proposed class, has the capability to pursue individual litigation against Ford, especially when some dealerships are relatively small.  Furthermore, there are strength in numbers, and the Court can not find error with Plaintiffs' strategic attempt to maximize their bargaining power against Ford Motor Company, by pursuing their claims as a unified group, so long as the requirements of Fed. R. Civ. P. 23(a)(1) are satisfied, which the Court finds that they are.

While the Court understands that the burden of establishing class certification falls on

Plaintiffs, Ford has provided no evidence to undermine Plaintiffs' showing that numerosity is established and therefore the Court finds that the numerosity requirement of Fed. R. Civ. P. 23(a)(1) is satisfied.

### 2.        Commonality and Predominance

It is customary in Rule 23(b)(3) class actions for courts to jointly apply the Rule 23(a)(2) commonality requirement and the Rule 23(b)(3) predominance test. See Varacallo, 226 F.R.D. at 230.  This approach has been approved by the Third Circuit.  See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004) ("the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement. . . .  Accordingly, we analyze the two factors together. . . ." (citations omitted)); Georgine v. Amchem Prods., 83 F.3d 610, 626 (3d Cir. 1996).

Under Rule 23(a)(2), commonality is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). Similarly, all claims or facts do not have to be common to all class members; "the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Prudential I, 148 F.3d at 310; Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

However, for a class that is certified under Rule 23(b)(3), which the Plaintiffs are here seeking, the Court must also find that these common questions predominate over individual issues.  Prudential I, 962 F. Supp. at 510-11.  "To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication."  Id. at 511 (citing 1 Herbert

Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 4.25, at 4-81 to 4-86).  Courts have readily

held that even a few common issues can satisfy this requirement where their resolution will

significantly advance the litigation.  <u>Id.</u> (gathering authority).   Similarly, "[i]n cases where it is

alleged that the defendant . . . engaged in a common course of conduct, courts have found that

conduct to satisfy the commonality and predominance requirements."  <u>Varacallo</u>, 226 F.R.D. at

231.  In addition, the need to calculate "damages on an individual basis should not preclude class

[certification] when the common issues which determine liability predominate."  <u>Holmes v.

Pension Plan of Bethlehem Steel Corp.</u>, 213 F.3d 124, 137 (3d Cir. 2000); <u>see</u> <u>also</u> <u>Bogosian v.

Gulf Oil Corp.</u>, 561 F.2d 434, 456 (3d Cir. 1977).

      Nowhere in Ford's opposing brief  does it contest that commonality is satisfied, instead, it

argues that common issues do not predominate over individual ones.[6]  Ford first argues that "fact

of damage" is an essential element in establishing a cause of action for breach of contract, and

that here a fact of damage finding would have to be proven individually for each class member,

thereby precluding a finding of predominance since those individual determinations would

predominate over any common issues.  (Def. Opp. Br. at 14).  Defendant is mistaking liability in

antitrust cases with liability for breach of contract *under Michigan law*.  While antitrust cases

may require proof of damage to establish liability, no such requirement exists to establish

---

      [6]  Nonetheless, the Court has undertaken its own commonality analysis, and finds that it is
satisfied.  To establish commonality under Rule 23(a)(2), the Court must find that proof of
liability can be established for the class as a whole through common proof.  Here, Ford's
common course of conduct in selling its heavy truck line to Freightliner without terminating its
heavy truck SSAs, caused a nationwide breach which established Ford's liability for breach of
contract to each member of the proposed Plaintiff class.  Since the factual and legal
determinations necessary to prove a breach of contract claim as to one member of the Plaintiff
class is the same as to all members, commonality is satisfied.

liability for breach of contract under Michigan law.[7]

It has been long established under Michigan law (which has adopted the Restatement (Second) of Contracts) that proof of a breach of contract establishes liability for the breach and automatically entitles the breach victim to damages - regardless of whether actual damages are suffered or are insubstantial.  See Greenstine v. Srere, 192 N.W. 676, 679-80 (Mich. 1923) (where valid contract was breached without legal justification, defendant was liable for nominal damages even though plaintiff mitigated and substantial damages were not suffered); Litvin v. Joyce, 44 N.W.2d 867, 868-69 (1950)  (where district judge's jury instructions were clearly erroneous because they  informed the jury that if no damage was suffered in a breach of contract claim, no cause of action existed; the court held that breach of a valid contract gave plaintiff a cause of action as a matter of law); Kolton v. Nassar, 99 N.W.2d 362, 364-65 (1959) (citing comment in Restatement (Second) of Contracts § 328: "A breach of contract always creates a right of action; but a breach sometimes occurs without causing any harm.  In other cases the breach may cause extensive harm . . . [i]n all of these cases, the plaintiff can get judgment for nominal damages."); Hoover Invs., Inc. v. City of Charlotte, 2006 U.S. Dist. LEXIS 20776, at *5-6 (D. Mich. April 18, 2006) ("where a right of action for breach exists, but no harm was caused by the breach . . . judgment will be given for nominal damages . . .").

Citing Wilson v. Cont'l Dev. Co., Ford next contends that under Michigan law, individual claims predominate because each Plaintiff must prove causation and injury in a breach of contract action.  112 F. Supp. 2d 648, 663 (W.D. Mich. 1999).  In Wilson, the court explained

---

[7] The issue before the Court is liability for breach of contract under Michigan law, therefore the Court makes no determination one way or another regarding Defendant's assertions on the requirement of proving "fact of damage" in an antitrust case.

that "[u]nder Michigan law, to recover on a breach of contract theory, a plaintiff must prove (1) that a contract existed between the parties; (2) the terms of the contract; (3) that defendants breached the contract; and (4) that the breach caused plaintiff injury."  Id.  Thus, it is true that in order to recover damages on the breach of contract Plaintiffs will have to demonstrate that the breach caused their injury.  As this Court has already explained, Michigan law makes clear that actual harm is not required to establish liability for a  breach of contract claim under Michigan law; in fact, once a breach is found, the victim is entitled to a remedy as a *matter of law*.  See § 346 Restatement (Second) of Contracts ("The injured party has a right to damages for any breach by a party against whom the contract is enforceable....[i]f the breach *caused no loss* or if the *amount of the loss is not proved* . . . a small sum fixed without regard to the amount of loss will be awarded as nominal damages." (emphasis added)).  Nevertheless, the necessity of proving causation and injury only goes to the question of damages.  As the Court has reiterated numerous times, under Michigan law, a breach of contract establishes liability for the breach and entitles the victim to a remedy, therefore Ford's repeated assertions that "an individualized finding of liability" is required or an individualized assessment of "the merits of each individual's claims" precludes a finding of predominance are without merit.  (Def. Opp. Br. at 16).  There are simply no individualized issues affecting a liability determination, which has already been made by this Court, that would be an impediment in establishing predominance.

Ford next argues that individual issues also predominate because "[i]ndividual evidence of impact, causation and mitigation will be required to establish that a given dealer actually was caused any injury by Ford's ceasing production of heavy trucks without formally terminating the SSAs." (Def. Opp. Br. at 15).  In addition, Ford asserts that calculating lost profits damages is too

individualized an effort and therefore inappropriate for class treatment because numerous tangible and intangible variables would need to be quantified and would vary from dealer-to-dealer, thereby resulting in a predominance of individualized issues.  As mentioned above, the need to calculate individual damages does not preclude class certification when common issues that establish liability predominate, as they do here.  See Holmes, 213 F.3d at 137; Bogosian, 561 F.2d at 456.

Although this Court concludes that common issues establishing liability predominate, the Court is mindful that the need to calculate individual damages could predominate.

> In some cases, individual damages, or a right to recover, must be demonstrated by absent class members, rather than by the named plaintiff on behalf of the class as a whole. This requirement will not preclude a class action, but it may create management difficulties when the class is large.

3 Herbert Newberg & Alba Conte, Newberg on Class Actions § 9:53 (4th ed. 2006) (footnotes omitted).  When a court is ruling on whether to certify a class, it should consider whether an expert "has identified a generally accepted methodology for determining impact which is applicable to the class, whether this methodology uses evidence common to all class members and whether his opinion has probative value."  Nichols v. Smithkline Beecham Corp., 2003 U.S. Dist. LEXIS 2049, at *13 (D. Pa. 2003).

Plaintiffs' expert, Dr. Ernest Manuel, Jr.,[8] proposes the use of a regression analysis using dealer level data to determine damages on a class-wide basis.  The Third Circuit has widely

_____

[8]Dr. Manuel has over twenty years experience providing economic analysis and management consulting services to the motor vehicle industry and his studies have encompassed dealerships in over thirty-five states and in several foreign countries.  (Decl. of Dr. Ernest H. Manuel, Jr. 2:1-3:5 ("Manuel Decl.")).  In addition, Dr. Manuel has provided extensive testimony on various motor vehicle industry issues; he has participated in over forty motor vehicle industry cases alone in the past four years.  (Manuel Decl. Tab 2).

-14-

accepted the use of regression analysis as a statistical tool used to calculate damages so long as the expert provides support for his conclusions of common impact; however, the support required need not be the type of specific evidence that would be used for trial but must only be adequate to establish injury on a class-wide basis.  See Weisfeld v. Sun Chem. Corp., 84 Fed. Appx. 257, 262 (3d Cir. 2004).  "Generally speaking, regression analysis seeks to define statistically the [causal] relationship between a dependent variable [i.e., a dealer's sales of Class 8 Ford trucks] and one or more independent variables [i.e., a time trend variable, Freightliner acquisition variable, etc]."  Id. at 261.  Regression analysis is a commonly used tool of economic study and is an accepted method of determining damages in cases where impact must be found on a class-wide scale.  See e.g., Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993).

Dr. Manuel concludes that it is possible to calculate damages, both before and after mitigation, for all plaintiffs on a class-wide scale to a reasonable degree of certainty.  (Decl. of Dr. Ernest H. Manuel, Jr. ("Manuel Decl.") at 42).  The conclusion of Dr. Manuel is that,

> . . . our model will pool each dealer's annual sales to obtain a panel data set of approximately 160 dealers across several years of time.  These panel data will be used to estimate a relationship between each dealer's sales and local market opportunity, while controlling for individual-specific characteristics (like whether or not the dealer has more than one heavy truck franchise).  Each dealer's historical sales effectiveness will also be employed to proxy for any market discrepancies (like registrations occurring in markets when the actual sales might be occurring elsewhere) or individual dealer performance issues.  Thus, we will develop a model that efficiently uses the pooled dealer information to obtain best estimates of lost new heavy truck unit sales by each dealer, and we will then apply dealer-specific grosses and operational relationships where needed to minimize the potential for error in deriving lost profit estimates.

(Supplemental Decl. of Dr. Ernest H. Manuel, Jr. ("Manuel Supplemental Decl.") at 16).  His

-15-

declarations demonstrate extensive economic analysis and investigation, similarly, he effectively

supported his determinations with supporting data in the form of charts, graphs, exhibits and

formulas.  The Third Circuit has found similar expert determinations adequate to support class

certification.  See In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 189-90 (D.N.J. 2003)

(where expert's declaration adequate and class certification granted since expert provided

evidence to support his conclusion that class-wide damages could be proven); c.f. Weisfeld, 84

Fed. Appx. at 267 (where expert's declaration that class-wide damages could be proven was

inadequate and class certification was denied because expert provided no studies or findings in

support of his determination, but merely relied on bare conclusions).  Similarly, Dr. Manuel

provides support that he can not only control common variables among the dealers, but can also

statistically control, through regression analysis, differences in dealer size, type, location and

product mix.  (Manuel Decl. at 30-33).

> Defendant's expert, Dr. David P. Kaplan[9] concludes that there is no reliable way to

determine Plaintiffs' damages on a class-wide basis:

> [i]n my opinion, any analysis of alleged lost profits . . . must be considered on a
> dealer-by-dealer basis and [the models proposed by plaintiffs' experts are] not an
> adequate substitute for any such analysis.  Alleged lost profits here, as with
> purported price erosion, simply cannot be determined on any class wide basis.
> Rather the particular circumstances of each proposed class member . . . must be
> investigated individually . . . .

(Kaplan Decl. at 27).

> At the class certification stage, the Court is not required to conclude that the Plaintiff

---

[9]Dr. Kaplan has an extensive background in economics and economic analysis.  (Decl. of
Dr. David P. Kaplan, Ex. 1 ("Kaplan Decl.")).  In addition, he has published and presented
extensively on legal issues and has also testified in several class certification actions in the area
of damages.  (Id.).

could prove common impact, but must decide whether Plaintiffs' "attempt to prove [class-wide] injury would predominantly involve common legal and factual questions." Id. at 262. "Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." Klay v. Humana, Inc., 382 F.3d 1241, 1260 (11th Cir. 2004) (footnotes omitted).

Therefore, after considering the thorough expert declarations provide by the parties, the Court finds that, for Plaintiffs' breach of contract claim, Plaintiffs can attempt to prove on a class-wide basis: (1) that the SSA's were breached; (2) evidence related to Ford's historical market share; and (3) using a regression analysis obtain an estimate of expected market share and lost unit sales for each dealer.[10]  In contrast, the only issues that would require an individualized analysis, separate and apart from the class-wide regression analysis, are: (1) mitigation by the dealers of their damages; (2) each dealer's profit margins for the final calculation of damages; and (3) other external factors.  In any event, given that liability can and has been established on a class-wide basis, and the fact that part of the damages can also be decided on a class-wide basis, any of the individualized damages calculations that Dr. Kaplan identifies do not predominate over the common issues.

Accordingly, the Court finds that issues, of law or fact, common to the class predominate over individual issues, as required under Rules 23(a)(2) and 23(b)(3), and that the requirements of commonality and predominance are satisfied.

_____

[10]While this may require inputing dealer specific data, the computation occurs on a class-wide basis.

-17-

**3.      Superiority**

In addition to predominance, Rule 23(b)(3) also requires that "a class action [be] superior

to other available methods for the fair and efficient adjudication of the controversy."  Fed. R.

Civ. P. 23(b)(3).  In making its superiority determination, the Court will consider four non-

exclusive factors:

> (1) the interest of individual members of the class in individually controlling the
> prosecution of the action; (2) the extent of litigation commenced elsewhere by
> class members; (3) the desirability of concentrating claims in a given forum; and
> (4) the management difficulties likely to be encountered in pursuing the class
> action.

See Fed. R. Civ. P. 23(b)(3); Prudential I, 962 F. Supp. at 522.

Ford first argues that superiority is not established because Plaintiffs are businesses with

the financial and legal capabilities to represent their own interests in litigation and that the

possibility of individually obtaining substantial damage awards renders the class mechanism

inappropriate.  (Def. Opp. Br. 20-21).  However, neither the ability to independently bring suit

nor the substantiality of the damage award binds this Court's superiority analysis.  As the

Supreme Court, in Amchem, stated, "the text of 23(b)(3) does not exclude from certification

cases in which individual damages run high . . . ."  Amchem, 521 U.S. at 709.

Contrary to Ford's argument, Plaintiffs had a strong interest in proceeding in this

litigation as a group, as is evidenced by the very few individual actions brought thus far and the

group's attempts at negotiations with Ford in 1997.  Ford's argument that "the small number of

lawsuits filed . . . indicates that a class action is unnecessary" (Def. Opp. Br. 21) demonstrates, if

anything, that a _dis_interest exists among the class members in individually controlling this

litigation.  The declaration of Gerald C. Turnauer, the owner of Bayshore, demonstrates this

-18-

unity.  He asserts the following:

> 4.      When Ford announced in February 1997 that it was selling its heavy truck business to Freightliner there was great concern among the heavy truck dealers. As a member of the Dealer Council, I participated in numerous meetings, discussions and negotiations directly with Ford regarding the impact the sale was going to have on the dealer body.  I was one of four dealers appointed by Ford to be on the Transition Team representing the dealers' interests in the transition from Ford to Freightliner.

> 5.      At or about this time, a significant number of heavy truck dealers, including Bayshore, retained Eric Chase of the Bressler, Amery & Ross law firm to represent them in connection with issues arising out of the sale.

> 6.      The negotiations over issues arising out of the sale of Ford's heavy truck business were not fully resolved with Ford and the proposed class action was filed in early 1999.

> 7.      Throughout the course of this litigation I have remained in contact with a large number of the approximately 160 dealers who may become members of the class if it is certified.  These dealers understand that a class action case has been filed, with the objective of obtaining a certified class and a recovery on their behalf.

> 8.      In addition to the proposed class representative plaintiffs, many other dealers have actively participated in this litigation, including financial participation supporting some of the costs of litigation.  I have often communicated with absent class member dealers and their input concerning this litigation has played an important role in my conduct as a proposed class representative plaintiff.  A large majority of the many dealers I have communicated with have expressed their support for obtaining a recovery by means of this proposed class action.  It is my understanding that a large percentage of the dealers are relying on this case to protect their interests in lieu of filing individual cases.

(Turnauer Decl. ¶¶4-8).

Although neither the proposed class nor the alleged harm is particularly concentrated in

New Jersey, this litigation has been concentrated in this forum since February 18, 1999, and this

Court has already made several rulings in relation to this litigation.  Indeed, the Court elected to

retain supplemental jurisdiction over the common law claims in light of the extensive litigation

before this Court.  Although Defendant now argues "There is no reason, however, why the unnamed dealers' claims require a federal forum, or why the federal judiciary's resources should be absorbed by numerous dealers' state law claims," at no time has Defendant ever argued that this Court should <u>not</u> retain supplemental jurisdiction.  To the contrary, when Defendant previously moved for summary judgment, Defendant did not ask this Court to decline to exercise supplemental jurisdiction if its request to dismiss the single federal claim was granted.

In addition, the discovery required to prosecute the liability issues has already been accomplished in this forum and no other breach of contract claims are proceeding anywhere else (Pls. Br. at 25), therefore, for the sake of judicial economy, it is logical to concentrate all claims in this forum rather than concentrating them in a forum unfamiliar with the nature of the litigation and the parties.  <u>See</u> <u>Klay</u>, 382 F.3d 1241 (noting the value and economy of concentrating litigation in forum where several rulings were already made).  "Class adjudication of this matter will achieve an appreciable savings of effort, time, and expense, and will promote uniformity of decision on the issues resolved and to which the parties will be bound."  <u>Varacallo</u>, 226 F.R.D. at 234.

Although Ford argues that there is a predominance of individual issues related to the analysis of damages which could potentially result in a multitude of mini-trials, a court in its superiority analysis is not required to determine whether the class action will create significant management problems, but rather whether certification could create relatively more management problems than any other alternative.  <u>Klay</u>, 382 F.3d at 1273 (emphasis added).  Here, the most likely alternatives to a class action, are either a complex joinder of the parties or the simultaneous adjudication of over 140 different litigations across the nation.  Either of these options would be

inefficient and redundant because they would involve the same Defendant and course of conduct, similar injuries to each Plaintiff, and the same legal issues being adjudicated.  This would provide no benefit toward federal or state judicial economy and as a whole would needlessly inundate our judicial system with repetitious adjudication.  Similarly, allowing individual actions, would most likely preclude dealerships from bringing their meritorious claims against Ford for breaching the SSA when the cost of doing so may exceed the recovery they might receive, and they may be barred under their state's applicable statute of limitations.  This would effectively undermine the fundamental purpose of the class action device, which, as the Supreme Court has put it, vindicates "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  Amchem, 521 U.S. at 617.  As the Seventh Circuit has concisely stated: "A class action solves [the problem that small recoveries do not provide incentive to bring solo action] by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."  Id. (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).

With respect to Defendant's footnote mentioning the state franchise law claims that Plaintiffs are not seeking to certify, the Court agrees that if each class member were to litigate those claims individually it would vitiate against class certification.  However, at this time only the named Plaintiffs have put forth such claims,[11] and any attempt by other class members to raise them at this time would no doubt be met with a motion to dismiss on statute of limitations grounds.  Inasmuch as that would be the likely course of those claims, the Court is not persuaded

---

[11]The Court assumes that Plaintiffs have not moved for class certification on the basis of those claims because Courts frequently refuse to certify classes where the laws of multiple states are implicated.

that the state franchise law claims preclude a finding of superiority.

The Court therefore determines that superiority, as required by Rule 23(b)(3), has been satisfied and that proceeding as a class action would be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### 4. Typicality

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). In essence, "[t]he typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." General Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980). "Typicality lies where there is a strong similarity of legal theories or where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant." Prudential I, 962 F. Supp. at 518 (citations omitted). In addition, "factual differences between the claims of the putative class members do not defeat certification." Prudential II, 148 F.3d at 311 (quoting Baby Neal, 43 F.3d at 56).

Ford argues that typicality is not satisfied because the claims of each putative class member are factually unique and "proof of the representatives' claims would not necessarily prove all the proposed class members' claims . . . ." (Def. Opp. Br. at 29 (quoting Brooks v. Southern Bell Tel. & Tel. Co., 133 F.R.D. 54, 58 (S.D. Fla. 1990)). However, courts in this jurisdiction have specifically held that "wrongful conduct that aggrieves both the named plaintiffs and the putative class members is sufficient to satisfy the typicality requirement *despite varying fact patterns* underlying the individual claims." Prudential I, 962 F. Supp. at 518

-22-

(emphasis added); see also Weisfeld, 210 F.R.D.at 140; Baby Neal, 43 F.3d at 58.  Therefore, the relevant typicality inquiry concerns Ford's conduct, not the factual differences of each potential class members' claim.  Here, the class representatives and all putative class members suffered injury by Ford's breach of the SSA,[12] the conduct of breaching the SSA was not unique or different as to the named representatives or to any class member but was simply an across-the-board breach that occurred when Ford exited the heavy truck business.

Ford further argues that typicality is not satisfied since all putative class members, including the class representatives are subject to individual defenses.  The Third Circuit has held that "[t]o defeat class certification, a defendant must show some degree of likelihood [that] a unique defense will play a significant role at trial."  Beck v. Maximus, 2006 U.S. App. LEXIS 19898, at *22 (3d Cir. Aug. 4, 2006).  Therefore, typicality is defeated when the proposed class representative is subject to a unique defense that has the likelihood of becoming the main focus of the litigation thereby distracting attention from the issues common to the class.  Id.; see also Zenith Laboratories, Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976) (typicality not met where class representative could assert res judicata based on disposition of its counterclaims in an earlier suit which would not be applicable to the class as a whole); Koos v. First Nat'l Bank, 496 F.2d 1162, 1165 (7th Cir. 1974) (noting that if case proceeded as class action, representative's efforts would have been devoted to unique problems regarding a defense only they were subject to and would have resulted in less attention to the issue which would be controlling for the rest of the class).

---

[12] As has been stated earlier in this Opinion, under Michigan law, the victim of a breach has a right to damages, as a matter of law, even if the breach caused no loss, in which case nominal damages would will awarded.

Some of the "unique" defenses Ford sets forth for the named Plaintiffs, which it claims make their claims atypical of the class, concern damage mitigation and include: (1) increasing sales of other trucks, (2) taking into account benefits received from being released from Ford's long-term land lease, (3) attaining contracts Freightliner or another manufacturer, and (4) land sales. (Def. Opp. Br. at 28). While the Court finds that these defenses are undoubtedly specific to each individual dealer, they are defenses typical of the other class members as well and, as such, do not subject the named Plaintiffs' to a defense that could not also be made to the claims of the other class members.

Ford also argues, albeit in a footnote, that the franchise law claims that were raised by the named Plaintiffs must be resolved before the claims of the class can be fully resolved -- which if certified would require the application of 45 state franchise laws. The Court finds this argument to be without merit. Though it is correct that claims that require the application of varying state laws would make it difficult to find that the Plaintiffs have claims typical of the proposed class, Brooks v. Southern Bell Tel. & Tel. Co., 133 F.R.D. 54, 58 (S.D. Fla. 1990), Plaintiffs are not attempting to certify the state franchise law claims.

In addition, Ford's other argument in that footnote, is also without merit. Ford asserts that "It is also not clear that each class member's contract law claim would be subject to Michigan law, as some state franchise laws, such as New York's, preclude the application of a choice of law provision in a motor vehicle franchise agreement. N.Y. VTL § 463(t)." (Def. Opp. Br. at 29 n.15). Having reviewed section § 463(2)(t)[13] of the New York Vehicle and Traffic Law,

---

[13]     2. It shall be unlawful for any franchisor: . . .
(t) To require or attempt to require by the terms of the franchise that any dispute arising out of or in connection with the interpretation, performance or

the Court is not persuaded by Defendant's brief argument that it would be applicable to the present SSAs.  This law was enacted in 1992, making it unlawful for a franchisor to include a choice of law provision in a franchise agreement, with certain exceptions.  NY CLS Veh & Tr § 463(2)(t).  It appears that this law does not apply to a new franchise relationship after 1992, the renewal of an existing franchise where there was already a preexisting venue clause, or an agreement between parties to an existing franchise agreement where a new line of vehicles is being added.  Id.  Since Defendant has not identified whether any of the SSAs of the New York class members would be subject to this statute, and there are only a handful of New York franchises at issue here, the Court cannot conclude that Ford's apparent belated attempt to revive this Court's analysis of the breach of contract liability issue is necessary.  Moreover, Ford has not identified the law of any other state that would preclude this Court from applying the choice of law set forth is the SSA, i.e., Michigan law.

---

nonperformance of the parties to the franchise or in any way related to the franchise be determined through the application of any other state's laws or in a federal court sitting in a state other than New York or in a state court of a state other than the state of New York; provided, however, that the provisions of this paragraph shall not apply to:

(1) any new franchise agreement entered into between a franchisor and any individual or entity which has not previously been granted a franchise by such franchisor and which franchise provides for the operation of the business pursuant to such franchise at a location or dealership point not then being used in the operation of such business; or

(2) any renewal of an existing franchise between a franchised motor vehicle dealer and a franchisor which contains a preexisting venue clause; or

(3) a franchise between a franchised motor vehicle dealer or its assignee and a franchisor which franchise grants to such franchised motor vehicle dealer or its assignee rights related solely to a new line and make of automobile manufactured or distributed by such franchisor.

NY CLS Veh & Tr § 463(2)(t).

As a result, the Court finds that typicality as required by 23(a)(3) is satisfied and the named Plaintiffs' claims and defenses are typical of those common to the class.


###### 5. Adequacy of Representation

As for the adequacy of representation factor, Rule 23(a)(4) requires that "the representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts look at two factors: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." Prudential I, 962 F. Supp. at 519. A party challenging the Class' representation has the burden to prove that the representation is not adequate. Id.; Varacallo, 226 F.R.D. at 233.

Ford does not contest that Plaintiffs' counsel is qualified and experienced to handle this litigation. Although Defendant does not challenge the adequacy of class counsel in representing this class, the Court has thoroughly examined their qualifications and determines that they have significant experience in class actions and complex civil litigation to adequately represent Plaintiffs in this matter. (See Am. Decl. of William A. Kershaw ("Kershaw Decl.")). Class counsel have also displayed their diligent and competent representation in this matter over the past seven years, and the Court sees of no reason why they should not continue to do so.

Ford does, however, raise issue with the second factor, namely whether the named Plaintiffs have interests antagonistic to those of the class. As the Court in Amchem noted, the adequacy "inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent" and does not mandate that the interests of all class members be aligned.

521 U.S. at 626.  Defendant makes three arguments in support of its assertion that Plaintiffs are not adequate class representatives: (1) there are inherent intra-class conflicts that preclude certification of a class to establish lost profits based on "business not done;" (2) intra-class conflicts between dealers with varying relationships with Ford preclude a finding of adequacy; and (3) unique defenses applicable to each named Plaintiff preclude adequacy.

Ford has not persuaded the Court that the named representatives have an interest in selecting the liability theory which will give them maximum recovery at the expense of the other class members.  Ford erroneously contends that the liability theory here is premised on a "business not done" theory which inherently causes intra-class conflicts and precludes a finding of adequacy, since, in a limited market, one plaintiff's attempts to maximize its own recovery will inherently conflict with the interest of the others.  Ford cites in support of this theory, antitrust cases involving class certification, where the competitive foreclosure of a limited market, necessitates that damages be measured by the amount of business "not done" and fact of damage itself is necessary for liability.  See Chestnut Fleet Rentals, Inc. v. Hertz Corp., 72 F.R.D. 541, 548 (E.D. Pa. 1976).  However, this case involves a breach of contract claim and antitrust principles are not applicable.  As set forth above, under Michigan law, liability is established when an unlawful breach has taken place, which occurred here when Ford failed to provide heavy trucks without first terminating each dealer SSA.  When Ford stopped providing heavy trucks, without terminating the SSA, and a breach was found, liability was established as a matter of law.  Similarly, the named Plaintiffs' interests are aligned with those of the other class members since each and every class member suffered the same breach caused by the same Defendant as a result of the same course of conduct.  The underlying legal theories are the same

and there is no reason to conclude that the named Plaintiffs have any interests antagonistic to those of the class members.  Any dissatisfied class members that decide this action will not provide them with the damages they would individually prefer to seek have the option of opting out of this 23(b)(3) class and pursue their own claims individually.

Defendant's next argument is that different class members with different product lines and different contractual relationships with Ford "have inherently antagonistic interests in the effect of this lawsuit on Ford's finances."  (Def. Opp. Br. at 27).  Ford continues by stating:  "A dealer who buys the majority of its products from Ford may be highly concerned regarding the financial impact of this case on Ford, and particularly if the message to Ford is that 'No good deed goes unpunished.'" (Def. Opp. Br. at 28).  Any class members sympathetic to the financial impact this class action may have on Ford, can opt-out of the class.

The last argument against a finding of adequacy is that the named Plaintiffs may be subject to differing mitigation of damages defenses.  "[W]hen named plaintiffs are subject to unique defenses which could skew the focus of the litigation, district courts properly exercise their discretion in denying class certification.  Alaska v. Suburban Propane Gas Corp., 123 F.3d 1317, 1321 (9th Cir. 1997).  In this Ninth Circuit case, relied on by Ford, the court affirmed the district court's denial of class certification on the basis that the facts showed "the bargaining power wielded by the named plaintiffs (which included the State of Alaska and some corporations) might have given them opportunities to avoid injury altogether and this, in turn, would have provided the defendants with a defense to the claim of antitrust injury."  Id.  Here, this is not an antitrust case and liability has been establish.  Any differences in the mitigation by the named Plaintiffs and the class members can be taken into account in an objective damages

calculation.  The fact that one class member may receive a larger award is not a bar to adequacy

when "it does not go to the very subject matter of the suit."  <u>Jenson v. Continental Fin. Corp.</u>,

404 F. Supp. 806, 811 (D. Minn. 1975).

 The Court concludes that the named Plaintiffs' interests are aligned, and are not

antagonistic to the unnamed class members.  Consequently, the Court finds that Ford has not met

its burden of establishing that the representation is not adequate.  In sum, the Court finds that

Class Counsel is more than adequate to represent this Class, and the named Plaintiffs are

appropriate Class Representatives with no interests antagonistic to those of the Class.  Therefore,

the Court determines that adequacy as required under Rule 23(a)(4) is satisfied.

 Accordingly, the Court will grant Plaintiffs' motion for class certification, based upon the

following class definition:

> **Those entities or individuals who held a Ford Heavy Duty Truck Sales and Service Agreement and who subsequently entered into an HN-80 (Sterling) Franchise Agreement.  Excluded from the class are Defendant and its subsidiaries, affiliates, officers, directors, and employees, and the immediate family members of such persons.**

 For the reasons given above, the Court will grant Plaintiffs' Motion for Class

Certification. The Court will enter an appropriate order.


Date:  November 17, 2006

        /s/ Jose L. Linares     
       JOSE L. LINARES,
       UNITED STATES DISTRICT JUDGE