# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

BAYSHORE FORD TRUCK SALES, )
INC., a Delaware corporation; MOTOR )   HON. JOSE L. LINARES
CITY TRUCKS, INC., a Delaware )   Civil Action No. 99-741
corporation; COLONY FORD TRUCK )
CENTER, INC., a Rhode Island )
corporation; individually and on )
behalf of all others similarly situated, )
　 )
     Plaintiffs, )
　 )
v. )
　 )   Return Date: August 17, 2009
　 )
FORD MOTOR COMPANY, )   Oral Argument Requested
　 )
     Defendant. )   (Document Filed Electronically)
　 )

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANT FORD MOTOR COMPANY'S
## MOTION FOR SUMMARY JUDGMENT AS TO THE CLASS

---

DAY PITNEY LLP
P.O. Box 1945
Morristown, New Jersey 07962
(973) 966-6300

HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600

Attorneys for Defendant
Ford Motor Company

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ......................................................................................... 4

    A.    Factual Background............................................................ 4

    B.    Procedural Background ...................................................... 7

SUMMARY JUDGMENT STANDARD .................................................... 9

ARGUMENT ............................................................................................. 10

I.    FORD DID NOT BREACH THE HEAVY TRUCK
AGREEMENTS WHEN IT CEASED PRODUCTION OF
HEAVY TRUCKS WITHOUT IMPOSING TERMINATION
ON ITS HEAVY TRUCK DEALERS. ......................................... 10

    A.    Ford Did Not Breach Its Heavy Truck Agreements. .......... 11

        1.    The Plain Language ................................................ 11

        2.    *Fette & Causeway* ................................................ 12

    B.    Ford Had No Obligation to Impose Termination on Its
Heavy Truck Dealers. ....................................................... 15

    C.    Ford Met Its Contractual Duty to the Class Members by
Continuing to Provide Them with Company Products. ...... 19

II.    PLAINTIFFS HAVE PROVIDED NO ADMISSIBLE
EVIDENCE THAT THEY SUFFERED ANY LOSSES AS A
RESULT OF FORD'S DECISION TO SELL ITS HEAVY
TRUCK BUSINESS TO FREIGHTLINER WITHOUT
TERMINATING ALL ITS DEALERS ......................................... 23

CONCLUSION .......................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>:

*Atlantic City Racing Ass'n v. Sonic Fin. Corp.*,
90 F. Supp. 2d 497 (D.N.J. 2000) ................................................................9, 10

*Buono Sales, Inc. v. Chrysler Corp.*, 449 F.2d 715 (3d Cir. 1971) ........................14

*Culver v. Castro*, 126 Mich. App. 824 (1983)...................................................20, 21

*Fette Ford, Inc. & Causeway Ford, Inc. v. Ford Motor Co.*,
Civil Action No. 97-4311 (D.N.J. Sept. 15, 2000), *aff'd in
relevant part*, No. 00-2951 (3d Cir. Sept. 26, 2001) ...................7, 13, 14, 15, 18

*Forge v. Smith*, 458 Mich. 198 (1998)...................................................................20

*Jim Barnett Motors, Inc. v. Ford Motor Co.*,
355 F.2d 502 (5th Cir. 1966) ...........................................................................12

*Joerger v. Gordon Food Serv., Inc.*, 568 N.W. 2d 365
(Mich. Ct. App. 1997).......................................................................................24

*Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co.*,
931 F. 2d 1112 (6th Cir. 1991) .........................................................................14

*Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc.*, 249 N.J. Super. 487,
592 A.2d 647 (1991)..........................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ....................................9

*Mich. Elec. Employees Pension Fund v. Encompass
Elec. & Data, Inc.*, 556 F. Supp. 2d 746 (W.D. Mich 2008).............................20

*Murray v. Wolverine Pipe Line Co.*, No. 267121, 2005 WL 3556148
(Mich. Ct. App. Dec. 29, 2005) .........................................................................24

*Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238 (3d Cir. 1999)..............9

*Serbin v. Bora Corp.*, 96 F.3d 66 (3d Cir. 1996).......................................................9

## TABLE OF AUTHORITIES—Continued

Page

*Soc'y of St. Vincent de Paul v. Mt. Hawley Ins. Co.*,
  49 F. Supp. 2d 1011 (E.D. Mich. 1999) ......................................................11, 20

*St. Joseph Equip. v. Massey-Ferguson, Inc.*, 546 F. Supp. 1245
  (W.D. Wis. 1982).............................................................................................11, 12

*Wimsatt Bldg. Materials Corp. v. Breest*,
  No. 218434, 2001 WL 721365 (Mich. Ct. App. March 2, 2001)......................24

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage
  Capital, Inc.*, 274 F.3d 1085 (6th Cir. 2001) ......................................................20

## **RULES**:

Fed. R. Civ. P. 56(c).........................................................................................9

## PRELIMINARY STATEMENT

Defendant Ford Motor Company ("Ford") seeks summary judgment against the plaintiff class on two grounds.

1.      First, Ford moves for summary judgment on the plaintiffs' breach-of-contract claim because there was no breach here.  Recognizing that the Court has previously granted the three named plaintiffs summary judgment on this issue, Ford respectfully submits that under controlling law and the plain language of the relevant contracts, Ford did not breach its Heavy Truck Sales and Service Agreements (the "Heavy Truck Agreements") with its heavy truck dealers by arranging for them to stay on as Freightliner/Sterling dealers and allowing them to retain their Ford heavy truck franchises at the same time.  To the contrary, the Heavy Truck Agreements allowed Ford to do just that.  The Heavy Truck Agreements also specifically empowered Ford to do exactly what it did here—stop manufacturing heavy trucks.  Indeed, another Court in this District has held, and the Third Circuit has affirmed, that Ford was entitled to summary judgment under exactly the same breach-of-contract theory advanced by the plaintiffs here, under exactly the same Heavy Truck Agreements.

In fact, with respect, this Court's prior holding that Ford had a duty to impose termination on its dealers when it stopped manufacturing heavy trucks is contrary not only to the terms of the Heavy Truck Agreements but to the business realities of the dealers as well.  Under the Heavy Truck Agreements, both the dealers and Ford were empowered to terminate the Heavy Truck Agreements at any time.  A few dealers did just that after Ford announced the sale of its heavy truck business to Freightliner Corporation, and they received exactly the same termination benefits they would have been entitled to had Ford imposed termination.  But the vast majority of dealers chose to remain as Ford heavy truck dealers for years, selling the Sterling version of the very same heavy truck they had

sold under the Ford brand and also providing warranty service and parts for the many thousands of Ford trucks already on the road. Termination by Ford would have meant these many dealers would have been forced to forego the opportunity to sell the Sterling version of the HN-80 and to continue providing the service and parts they were authorized to sell as Ford heavy truck dealers.

And there were other benefits as well for those dealers who chose to remain. Under the applicable Michigan law, the dealers' Heavy Truck Agreements must be read together with the rights and obligations of the other contracts between the dealers and Ford. When reading the multiple contracts between the class members and Ford together, it becomes clear that Ford satisfied its obligation to provide "Company Products" to the class members when it provided the dealers with Ford medium trucks and, in many cases, light trucks, cars, and SUVs. Indeed, as many class members admitted in their recent depositions, dealers realized a major benefit from Ford's decision to sell its heavy truck business, because Ford was then able to manufacture and provide the dealers with additional product for which their customers were clamoring—"Super Duty" trucks, utility and heavy-duty pick-up trucks that were very popular during the purported damages period in the late 1990's and early 2000's. The Freightliner sale was a successful effort by Ford to close a declining product line and turn its resources to making other products for which demand was growing. For these reasons, Ford did not breach the Heavy Truck Agreements with its dealers when it enabled them to continue their Ford heavy truck franchises while also selling the HN-80 with Freightliner/Sterling.

2.     Second, and relatedly, Ford moves for summary judgment on plaintiffs' alleged damages, because the class has provided no admissible evidence that they suffered any damage at all from Ford's alleged breach. To the contrary, plaintiffs' own evidence proves what Ford has been saying all along—that its heavy truck dealers were better off as a result of the Freightliner sale. As

explained more fully in Ford's *Daubert* motion, plaintiffs' expert, Dr. Ernest H. Manuel, Jr., said at the class certification stage that the right way to measure lost profits damages was to conduct a regression to assess the number of trucks that Ford's heavy truck dealers would have sold had Ford continued in the heavy truck business.  He has now submitted his regression, and for all its faults it reveals that the dealers would have sold fewer trucks with Ford than they actually sold with Freightliner/Sterling.  That is, dealers made more money with Freightliner/Sterling than they would have with Ford.

That is true even before accounting for the vast profits dealers made selling the significantly larger volume of Super Duty trucks that Ford was able to produce by reconfiguring the production capacity in Ford's Louisville manufacturing facility that had been devoted to manufacturing heavy trucks.  While plaintiffs' expert purported to account for the dealers' actual sales of Sterling HN-80's after the Freightliner sale, he failed even to address the dealers' actual sales of these additional Super Duty units.

At the end of the day, plaintiffs' own expert has demonstrated that the plaintiffs were better off for Ford's decision to sell its losing heavy truck business to Freightliner.  Because his regression results showed the dealers benefited as a result of the Freightliner transition, Dr. Manuel adopted a completely new approach for "estimating" the sales dealers would have made if Ford had continued in the heavy truck business, an approach based solely on two documents he never even mentioned when he told the Court he would use the regression for this purpose.  Because Dr. Manuel's regression proves the dealers were better off for the Freightliner deal, and because this new "two document" approach is inadmissible under *Daubert*, the class has absolutely no credible evidence that they suffered any damage at all, even if Ford's decision not to impose termination on its dealers had been a breach.

3

For these reasons, and those detailed below, the Court should grant Ford summary judgment on Plaintiffs' breach-of-contract claim.

**BACKGROUND**

**A.     Factual Background**

The facts relevant to plaintiff's breach-of-contract claim are not in dispute. By the mid-1990's, Ford's heavy truck business had been losing millions of dollars each year dating back into the 1980's.  *See* Ford D.N.J. Civ. R. 56.1 Statement ("SOF") ¶ 1.  In an effort to turn that around, Ford spent hundreds of millions of dollars to develop and launch the "HN-80," its first new heavy truck line in more than twenty years.  *See id.*  But the effort failed.  In 1996, Ford's heavy truck losses grew to $131 million, $94 million worse than the previous year and Ford's worst performance in five years.  *See id.* ¶ 2.

During this same time period, the demand for Ford's "Super Duty" truck lines (model lines F-250 through F-550) began to outstrip Ford's ability to produce and supply the trucks to its authorized dealers.  *See id.* ¶ 3.  These smaller commercial utility trucks, used for heavy towing and various commercial applications, were fast becoming one of Ford's best-selling vehicle lines; dealers were clamoring for additional units to sell, *see id.*, and the Super Duty line was highly profitable for Ford and its dealers.  *See id.*  But Super Duties were manufactured at Ford's Kentucky Truck Plant ("KTP") in Louisville, a facility that also produced the HN-80 and that had very limited extra production and assembling capacity.  *See id.*  As a result, Ford was unable to meet the growing demand for its Super Duty models because much of the KTP facility was occupied making the HN-80 that was failing in the marketplace.  *See id.*

Ford's heavy truck dealers had the authority to sell one or more of these popular and profitable Super Duty truck lines under their Ford Truck Sales and Service Agreements (the "Truck Agreements"), which, in general, authorized the

4

dealers to sell new trucks below the Ford 850 series designation.  *See id.* ¶ 4.
These Truck Agreements were interrelated with the dealers' Heavy Truck
Agreements in various ways, including, for example, with respect to the definition
of a "Dealer's Locality."  *See id.* ¶ 6.

There is no dispute about the state of Ford's heavy truck business in 1996
and 1997.  Before the possibility arose of selling its heavy truck assets to
Freightliner, the then-head of Ford's heavy truck division, James Donaldson,
investigated Ford's options for curbing its losses in the heavy truck business.  *See
id.* ¶ 7.  If Ford had not sold its heavy truck assets, Ford might have stayed in the
heavy truck business for a time, but would necessarily have taken drastic actions to
cut its losses.  For example, Ford believed it likely would have had to increase its
wholesale pricing for its heavy trucks and limit its investment in engineering
product improvements and innovations to the HN-80.  *See id.* ¶ 8.  Ford believed
that these same actions, however, would almost surely have resulted in further
declines in Ford's heavy truck sales volumes, with varying but significant negative
effects on its heavy truck dealers.  *See id.*

Rather than continue in an inevitably declining heavy truck business, Ford
decided to begin negotiations to sell its heavy truck assets to Freightliner in
January 1997.  *See id.* ¶ 9.  When it announced that sale on February 19, 1997,
Ford also explained to its heavy truck dealers that production of the HN-80 would
be transitioned to Freightliner, and that all dealers in good standing would be
allowed not only to retain their Ford franchises, but would also be offered a
franchise agreement by a Freightliner subsidiary (which became Sterling Truck
Corporation) to continue selling the HN-80 line after the transition.  *See id.* ¶ 10.
Indeed, Ford made that an express condition of the sale to Freightliner.  *See id.*

¶ 11.   As James Donaldson stated:

> I had a lot of friends in the Dealer Body, and I wanted to look them in the eye and say: Your franchise will be stronger and worth more in the long run after this deal goes through than it will be continuing the way we are.  I believed that then, I believe it now, and I think all my actions will attest to that . . . .

*Id.* ¶ 12.  Freightliner at that time had an excellent reputation in the industry.  *See id.* ¶ 13.  Ford also provided substantial financial incentive programs and subsidies to assist dealers with the transition to Freightliner.  *See id.* ¶ 14.

Ford's heavy truck dealers also remained Ford dealers, something that brought significant benefits.  The dealers would continue to sell the Ford heavy trucks they had in stock and to provide warranty service and parts for the Ford heavy trucks then on the road.  *See id.* ¶ 15.  Ford also anticipated that dealers authorized to sell Ford vehicles under the Ford Sales and Service Agreement (the "Car Agreement") would continue selling Ford cars, SUVs, and certain light trucks, and that all of the heavy truck dealers would continue selling Super Duty trucks and medium trucks under their Truck Agreements.  *See id.* ¶ 16.  It informed the dealers that their existing product offerings would not be affected by the Freightliner sale, and in several dealers' cases, Ford was even able to augment their authorized product lines.  *See id.* ¶ 16, 19-21.

As a result of the Freightliner sale, Ford was able to increase production of its sought-after Super Duty trucks and make them available for sale by authorized dealers, including the class member dealers in this case.  *See id.* ¶¶ 17-18.  Also as a result of the increased production of Super Duty trucks, Ford was able to implement its "commercial truck strategy," thereby authorizing dealers in certain markets to sell additional Super Duty truck lines, even though they had not previously had that right.  *See id.* ¶ 19-21.

**B.    Procedural Background**

Fully two years later, despite the many benefits of the Freightliner sale, counsel representing three heavy truck dealers commenced this case in February 1999.  In the ten years since, five of plaintiffs' original seven claims have been dismissed by this Court, and plaintiffs themselves have abandoned a sixth.

This was not the only litigation to arise from Ford's transition out of the heavy truck business.  In December 2000, this case was stayed pending the resolution of *Fette Ford, Inc. & Causeway Ford, Inc. v. Ford Motor Co.*, Civil Action No. 97-4311 (D.N.J. Sept. 15, 2000) (unpublished), *aff'd in relevant part*, No. 00-2951 (3d Cir. Sept. 26, 2001) (unpublished) ("*Fette & Causeway*"). 1/ There, the district court granted summary judgment in Ford's favor on a breach-of-contract claim bought by two other heavy truck dealers substantially identical to the last remaining claim in this case, and the Third Circuit affirmed.

Ford filed a motion for summary judgment in this case on January 24, 2005, at which time counsel for the three named plaintiffs also cross-moved for partial summary judgment as to liability on their breach-of-contract claim.  In a December 8, 2005 order (the "Summary Judgment Order"), the Court granted Ford's motion for partial summary judgment on the named plaintiffs' ADDCA, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment, and accounting claims.  But contrary to the holding in *Fette & Causeway*, the Court upheld the named plaintiffs' breach-of-contract claim.  *See* Summary Judgment Order at 10-11.  Specifically, the Court held that "as a matter of law, Ford's failure to supply heavy trucks to Plaintiffs, in the absence of termination by Ford in accordance with the terms of the contract, was a breach of

---

1/      For the Court's convenience, copies of the unpublished *Fette & Causeway* opinions issued by both the district court and the Third Circuit are attached hereto as Exhibits A and B.

the [Heavy Truck] Agreement." *Id.* at 18.  The Court made no determination, however, about whether this alleged breach by Ford caused any injury to the named plaintiffs or to any other Ford heavy truck dealer.

On June 13, 2006, the named plaintiffs moved for partial summary judgment on behalf of the entire proposed class on their breach-of-contract claim.  But the class had not been certified.  Several months later, on September 8, 2006, the Court granted class certification, defining the class as "[t]hose entities or individuals who held a Ford Heavy Duty Truck Sales and Service Agreement and who subsequently entered into an HN-80 (Sterling) Franchise Agreement."  Class Certification Order at 29.  On October 6, 2006, the Court denied without prejudice the named plaintiffs' original motion for partial summary judgment on behalf of the proposed class, pending notice to the newly certified class and the close of the opt-out period.

In numerous letters to the Court throughout 2007 and 2008, plaintiffs urged the Court to deem their original summary judgment motion re-filed, without additional briefing.  The Court denied plaintiffs' request in a July 14, 2008 Letter Opinion and Order, instructing the parties to file new motions for summary judgment by May 15, 2009, 2/ after limited absent class member discovery, including responses from some class members to interrogatories and document requests issued by Ford and depositions of ten percent of the class concerning their individual damages claims.  While Ford has raised significant concerns with class members' compliance with their discovery obligations, the record has been

---

2/      By agreement of the parties and with this Court's permission, this original May 15, 2009 deadline for summary judgment motions and motions on expert-related issues was moved to June 5, 2009.

sufficiently developed such that Ford now can move for summary judgment as to the class. 3/

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment "shall be rendered . . . if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As this Court has recognized, summary judgment must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Atlantic City Racing Ass'n v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 501-502 (D.N.J. 2000) (quoting *Lawrence v. Nat'l Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir. 1996)).  After the moving party establishes the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  In fact, the party opposing summary judgment must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir. 1996) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment.  *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir. 1999).  "Thus, if the non-

---

3/      As agreed at the May 20, 2009 status conference with Magistrate Judge Cecchi, Ford is concurrently filing a Motion for Summary Judgment as to the Claims of Thirty-Six Class Members who executed binding releases of all claims against Ford.  Ford has filed these summary judgment motions separately because they present unique, stand-alone legal issues and therefore separate briefing should assist the Court and the parties in addressing these issues in a logical manner.

movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Atlantic City*, 90 F. Supp. 2d at 501-502 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)).

## ARGUMENT

### I.   FORD DID NOT BREACH THE HEAVY TRUCK AGREEMENTS WHEN IT CEASED PRODUCTION OF HEAVY TRUCKS WITHOUT IMPOSING TERMINATION ON ITS HEAVY TRUCK DEALERS.

Ford is entitled to summary judgment on the class members' breach-of-contract claim for no less than three reasons. First, as a matter of law, Ford did not breach the Heavy Truck Agreements when it decided to cease production of its last declining heavy truck line and transition the line to Freightliner. Second, nothing in the Agreements imposed on Ford a legal duty to unilaterally terminate its heavy truck dealers instead of enabling them to transition to selling the Freightliner/Sterling HN-80 and to continue servicing and selling parts for Ford heavy trucks already in operation. Indeed, discovery has shown (and plaintiffs' own expert has confirmed) that a decision by Ford to impose termination would have significantly compromised future revenue streams of the class members. According to plaintiffs' expert, approximately two-thirds of most dealers' profits came not from selling new trucks, but from such "downstream" operations. *See* SOF ¶ 26. Third, under the applicable Michigan law, even if Ford had a perpetual obligation to provide dealers with Company Products to sell, Ford fully satisfied any such obligation by providing smaller trucks (including a higher production volume of the highly popular Super Duty line), SUVs (like the Ford Excursion), medium trucks, and in some cases cars.

**A.    Ford Did Not Breach Its Heavy Truck Agreements.**

1.    The Plain Language

Under Michigan law, a court analyzing a contract claim must give effect to the parties' intent as discerned from the contract's language. *See, e.g*, *Soc'y of St. Vincent de Paul v. Mt. Hawley Ins. Co.*, 49 F. Supp. 2d 1011, 1016 (E.D. Mich. 1999).

Here, the pertinent language from the Heavy Truck Agreements at issue comes from two paragraphs. In Paragraph 1(a) of the Agreements, the term "COMPANY PRODUCTS" is defined as "(1) new trucks and chassis of series 850 or higher designations and (2) parts and accessories therefor, as from time to time are offered for sale by [Ford] to Authorized Ford Heavy Duty Truck dealers as such for resale . . . ." SOF ¶ 23. Paragraph 13 of the Agreements then goes on to provide that Ford "may discontinue any HEAVY DUTY TRUCK or other COMPANY PRODUCTS at any time without liability to the Dealer[s]." *Id.* Because the Heavy Truck Agreements expressly allow Ford to discontinue "*any* HEAVY DUTY TRUCK or other COMPANY PRODUCTS *at any time*," Ford is expressly authorized under the Agreements to discontinue *all* lines of heavy duty trucks, without liability to its dealers.

Other courts have found similar clauses unambiguous and granted summary judgment on behalf of manufacturers who have ceased production of certain products. In *St. Joseph Equip. v. Massey-Ferguson, Inc.*, 546 F. Supp. 1245 (W.D. Wis. 1982), a dealer of construction equipment brought several claims—including for breach of contract—against a manufacturer that had ceased producing and marketing construction machinery due to substantial annual losses and declining market share. 546 F. Supp. at 1246. In granting summary judgment to the manufacturer on plaintiff's breach-of-contract claim, the court observed that "it requires little analysis to conclude that such disposition is warranted." *Id.* at 1250.

The court summarily disposed of plaintiff's claim that the manufacturer's decision to stop importing and producing construction machinery was a breach of the relevant dealership agreement because the "clear wording of the agreement authorized such conduct." *Id.* The "clear wording" to which the court referred read, in relevant part: "The Company reserves the right . . . to discontinue or replace Products without incurring any obligation or liability whatsoever to Dealer . . . ." *Id.*

That language is virtually identical to Paragraph 13's provision authorizing Ford to "discontinue any HEAVY DUTY TRUCK or other COMPANY PRODUCTS at any time without liability to the Dealer[s]." Both unambiguously grant the manufacturer the right to cease production of any of its product lines at any time without incurring liability to the dealers. No further analysis is needed. As the *St. Joseph* court stated, "it is clear as a matter of express contractual language that under the terms of the Dealership Agreement [the manufacturer] had the authority to do as it did in this case and therefore the contract was not breached." *Id.* at 1251. Other courts have reached the same conclusion in similar situations, 4/ and of course one has found no breach on exactly the same facts presented here.

         2.   *Fette & Causeway*

As this Court is aware, two other Ford heavy truck dealers previously sued Ford in the District of New Jersey, presenting exactly the same claim as plaintiffs

---

4/    For example, in *Jim Barnett Motors, Inc. v. Ford Motor Co.*, 355 F.2d 502 (5th Cir. 1966), an Edsel dealer brought a breach-of-contract claim against Ford when it ceased production of Edsels because of poor public acceptance. The court upheld the district court's grant of summary judgment for Ford on the breach-of-contract claim, finding that even though Ford terminated production of a full product line, it did not breach the dealer's contract for sale of those products. *See* 355 F.2d at 502.

do here—that Ford breached its Heavy Truck Agreements by not contractually terminating its heavy truck dealers when it ceased production of the HN-80 and sold the assets of its heavy truck division to Freightliner.  In that case, the Court agreed with Ford that the plain language in Paragraphs 1(a) and 13 of the Heavy Truck Agreements allowed Ford to "discontinue" the HN-80 "HEAVY DUTY TRUCK . . .  at any time without liability to the Dealer[s]."  *See Fette & Causeway*, Civil Action No. 97-4311 at 38. 5/

Focusing first on the "time to time" language used to define the term "COMPANY PRODUCTS" in the Heavy Truck Agreements, the Court found that that phrase indicated that "Ford's obligation to continue providing particular trucks [was] not perpetual, but last[ed] only 'from time to time.' "  *Id.*  The Court then focused on Paragraph 13's authorization allowing Ford to "discontinue *any* HEAVY DUTY TRUCK or other COMPANY PRODUCTS *at any time* without liability to the Dealer[s]."  *Id.* (emphasis added).  The Court concluded that it was

---

5/      In ruling against Ford in its Summary Judgment Order, this Court distinguished *Fette & Causeway* on the theory that it applied New Jersey law, and not Michigan law.  *See* Summary Judgment Order at 14.  Again with respect, the *Fette & Causeway* court never explicitly stated that it was applying New Jersey law rather than Michigan law when interpreting the Heavy Truck Agreements. And it did not need to, since New Jersey law is substantively no different than Michigan law.  Here in New Jersey, as in Michigan, the plain language of a contract controls, and a court must enforce that language as written.  *See Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc.*, 249 N.J. Super. 487, 493, 592 A.2d 647, 650 (1991).  Indeed, plaintiffs recognize that the rules of contract interpretation are "uniform[]" across the states.  *See* Reply Br. in Supp. of Pls.' Mot. for Partial Summ. J. on Behalf of Proposed Class (Dkt. No. 164) at 11 (*citing Klay v. Humana, Inc.*, 382 F.3d 1241, 1263 (11th Cir. 2004)).  Thus, even if the *Fette & Causeway* court applied New Jersey law, that does not warrant a different result here— whether Michigan or New Jersey law is applied, the Heavy Truck Agreements were not violated when Ford sold its heavy truck business to Freightliner without imposing termination on its dealers.

"axiomatic that Ford's contractual right to cease making *any* of its trucks encompasses its right to cease making *all* of its trucks." *Id.* (emphasis added).

Significantly, the Court also held in *Fette & Causeway* that the Heavy Truck Agreements' notice requirements for termination were "not implicated" by the Freightliner sale. *Id.* That was so, the Court explained, because Ford's Heavy Truck Agreements remained very much alive after the Freightliner sale. As the Court noted, Ford remained obligated under the Heavy Truck Agreements "for warranty work performed by dealers on Ford heavy trucks," and those continuing warranty obligations made it perfectly sensible for Ford not to "fully or formally terminate the [Heavy Truck Agreements]" when it sold its heavy truck business to Freightliner. *Id.* In other words, the Court in *Fette & Causeway* recognized that because the dealers continued to reap benefits from the Heavy Truck Agreements after Ford stopped making heavy trucks (these benefits are discussed in more detail in Section I.B. below), the contracts between the parties continued in force and Ford had no obligation to impose termination on its dealers. 6/

---

6/      In contrast to this on-point precedent, this Court's earlier Summary Judgment Order relied on two cases that are inapposite. In *Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co.*, 931 F. 2d 1112 (6th Cir. 1991), the contract language at issue was materially different than the language at issue here. There, the contract only gave the defendant International Harvester the ability to make shifts in its farm equipment product lines, rather than discontinue those lines entirely. *See* 931 F.2d at 1120. In addition, the plaintiff franchisee in *Karl Wendt* was also left without a single company product to sell by International Harvester, and did not qualify for a replacement franchise. *See id.* at 1114. As explained in more detail below, here Ford continued to supply each of the class member dealers with other Ford products, all dealers retained their right to provide warranty service and parts for Ford heavy trucks, and every single class member obtained a replacement franchise with Freightliner/Sterling to sell the very same HN-80 line they had sold with Ford.

In *Buono Sales, Inc. v. Chrysler Corp.*, 449 F.2d 715 (3d Cir. 1971), the court never addressed whether Chrysler retained obligations, such as paying

14

**B.   Ford Had No Obligation to Impose Termination on Its Heavy Truck Dealers.**

This Court's decision granting the named plaintiffs summary judgment on their breach-of-contract claim was not based on any notion that Ford breached its Heavy Truck Agreements by simply stopping its production of heavy trucks. Rather, the Court read the Agreements to require Ford to impose a "proper termination of the Agreements" on the dealers, and that "Ford's failure to supply heavy trucks to plaintiffs, in the absence of termination by Ford in accordance with the terms of the contract, was a breach of the Agreements."  Summary Judgment Order 17-18.

Respectfully, such a reading of the Heavy Truck Agreements is simply inconsistent with the plain language of the Agreements.  The contract was written so that if any dealer thought that its relationship with Ford was no longer worthwhile with the transition of the HN-80 to Freightliner, the dealer had the unfettered right to choose to terminate its Heavy Truck Agreement on its own. There is no language whatsoever in the Heavy Truck Agreements that required Ford to impose an unwelcome termination on dealers who wanted to continue.

There is no dispute about any of this.  Under the terms of Paragraph 17(a) of the Heavy Truck Agreements, a "Dealer may terminate or not renew this agreement at any time at will by giving the Company at least thirty (30) days prior written notice thereof."  SOF ¶ 24.  Paragraph 21 of the Heavy Truck Agreements then entitles the dealers to the same termination benefits—consisting of reimbursement for unsold heavy trucks, genuine parts, special tools and equipment,

---

dealers for warranty work.  That distinction is significant because here, Ford unquestionably remained obligated under the Heavy Truck Agreements for warranty work performed by its dealers, which the Court in *Fette & Causeway* held was critical.

and signage—no matter if termination is initiated by Ford or by the dealer. *See id.* ¶ 25.  Nothing in these paragraphs of the Heavy Truck Agreements, or anywhere else in the Agreements, required Ford to impose a termination on the dealers when Ford exercised its right to cease its own production of the HN-80.  If anything, the notion that Ford was required to impose termination is inconsistent with the plain terms of Paragraph 17(a), which gives a dealer the right to terminate with thirty-days written notice.

The limited class member discovery taken in the last year demonstrates that different dealers made different decisions about whether or not it was in their best interests to terminate their Heavy Truck Agreement with Ford.  The overwhelming majority of the class members made the decision that they would remain Ford heavy truck dealers after Ford exited the heavy truck business.  And there were at least three good business reasons to do so.

First, continuing dealers retained the right to sell Ford HN-80 heavy trucks after the sale; for instance, according to plaintiffs' own expert, the class member dealers sold 3,324 such trucks in 1998 and 1999, *after* Ford transitioned HN-80 production to Freightliner.  *See id.* ¶ 27.  Based on the analogous analysis of plaintiffs' own expert regarding 1998 Sterling sales, 7/ the sales of 3,324 Ford HN-80 trucks by the class member dealers in 1998 and 1999 likely resulted in more than $20.5 million total dealer profits.  *See id.*  A terminated dealer would have lost the legal right to sell those trucks as a Ford authorized dealer.  *See id.*

Second, continuing dealers retained the right to provide warranty service on Ford heavy trucks at Ford's expense under the Heavy Truck Agreements. Paragraph 19(c) of the Heavy Truck Agreements states that only Ford dealers with

---

7/      Plaintiffs' expert estimates 2,646 Sterling heavy trucks sold by dealers in 1998 (a number that Ford believes is a gross underestimate) for a profit on those sales of $16.3 million.  *See* SOF ¶ 27.

a Heavy Truck Agreement in place can be reimbursed for warranty work. *See id.* ¶ 28. Because Ford's warranty on heavy trucks lasted up to five years in several respects (and even the entire lifetime of the trucks with respect to noise emissions), Ford remained bound to reimburse continuing dealers for warranty work on legacy Ford heavy trucks for years after the last HN-80 rolled off the KTP assembly line in December of 1997. *See id.* ¶¶ 29-31. In fact, because some class member dealers continued to sell a number of Ford HN-80s into 1999, Ford's responsibilities to these dealers under the five-year portion of the heavy truck warranty extended at least until 2004—*after* the end of plaintiffs' purported damages period in this case. *See id.* ¶¶ 27, 29-31.

Again, there is no dispute about this. In the limited damages depositions Ford has been allowed to take, class members acknowledged earning revenues from warranty work on Ford heavy trucks after the Freightliner sale. *See id.* ¶ 31. For example, Westgate Ford Truck testified that it continues *to this day* to earn revenues from performing warranty work on Ford heavy trucks. *See id.* Dealers also continued to generate revenues by virtue of being a Ford Authorized Service Center. *See id.* ¶ 32. And as several of the class members conceded at their depositions, under the plain terms of Paragraph 19(c) of the Heavy Truck Agreements, no dealer would have been able to perform warranty work on any Ford heavy truck if the Agreements had been terminated. *See id.* ¶ 33.

Third, of course, there was Freightliner. Continuing dealers automatically qualified to continue selling the HN-80 as Sterling dealers. That was so because Ford made sure it would be so. The agreement between Freightliner and Ford specifically required that the dealers be Ford heavy truck dealers in good standing at the time of the sale. *See id.* ¶ 34. The vast majority of Ford's heavy truck dealers opted to become Sterling dealers, *see id.* ¶ 35, and according to plaintiffs' expert, the Ford dealers who chose to continue as Sterling dealers sold 68,802

17

Sterling trucks (and any remaining Ford HN80 or Cargo trucks) during plaintiffs' purported damages period of 1998 to 2003, earning literally hundreds of millions of dollars in overall profits during that time period by virtue of their ability to sell these Sterling products. *See id.*

To be sure, not all dealers opted to continue as Ford heavy truck dealers. Some decided that, with Ford's sale of its heavy truck business to Freightliner, terminating their Heavy Truck Agreements was the best choice for their dealership. But that is the point. The dealers chose whether termination made sense for them. For example, Albuquerque Truck Center, Ltd., elected to terminate its Heavy Truck Agreement and receive termination benefits, rather than join Freightliner as a Sterling dealer, even though it qualified to become one. *See id.* ¶ 36. Likewise, Woody Anderson Ford engaged in the same calculus and reached the same conclusion, resigning its Heavy Truck Agreement while retaining its Car Agreement. *See id.* ¶ 37. And, over the course of the past decade, several dozen other class member dealers have voluntarily terminated their Heavy Truck Agreements after the Freightliner sale, when each decided it was in its best interests to do so. *See id.* ¶ 38. These dealers all made a business decision to terminate their Heavy Truck Agreements when, in their calculation, it was no longer to their benefit.

Nothing in the Heavy Truck Agreements required Ford to take that decision away from the dealers. And even apart from the lack of any legal duty to impose termination, Ford did the right thing here. It cannot be faulted for allowing its dealers to make their own individual decisions whether to continue or terminate their Heavy Truck Agreements. The Heavy Truck Agreements contemplate that a time may come when either Ford or its dealers might wish to end their business relationship. To that end, the Agreements provided the dealers the same contractual right as Ford to terminate the business relationship at will, in

18

recognition of the fact that each dealer possessed the ability to gauge for itself the relative value of its Heavy Truck Agreement, and to determine whether maintaining its relationship with Ford was worthwhile.  Because the dealers had precisely the same right and ability as Ford to terminate the Heavy Truck Agreements at any time, Ford cannot be said to have been required to impose termination of the Heavy Truck Agreements on all of its heavy truck dealers when it sold its heavy truck business to Freightliner.

### C.      Ford Met Its Contractual Duty to the Class Members by Continuing to Provide Them with Company Products.

As shown above, every Ford heavy truck dealer was able to earn very significant profits by continuing as a Ford heavy truck dealer, profits ranging from sales of Sterling HN-80's to the very significant revenues still rolling in today from servicing and selling parts for legacy Ford heavy trucks.  Despite all this, plaintiffs say Ford breached when it stopped producing new Ford HN-80's without imposing termination on all of its dealers.  We have shown above why this focus on new Ford vehicles makes no sense, either under the Agreements or as a matter of the business opportunities each dealer assessed in deciding to remain a Ford dealer.

But plaintiffs are also wrong even if we look only at new vehicles.  In 1997, every single class member sold other Ford products in addition to the HN-80.  And Ford met its obligations to provide those other "Company Products" to class members when it provided them the highly successful Super Duty line, as well as various light and medium-duty trucks, and in some cases SUVs and cars.  Taking each dealer's relationship with Ford as a whole, after the Freightliner sale, no dealer was left without Ford products to sell—instead, every one of the class members continued with the right to sell not only the HN-80 and other Sterling products, but myriad Ford products as well.

19

Under the applicable Michigan law, when one writing refers to another writing for additional contract terms, such writings must be read together.  *See Forge v. Smith*, 458 Mich. 198, 207 (1998); *see also Culver v. Castro*, 126 Mich. App. 824, 826 (1983), *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) ("When the written agreement refers to a separate document for additional contract terms, the court must read the writings together.") (citing *Forge*, 458 Mich. at 207); *Mich. Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc.*, 556 F. Supp. 2d 746, 758 (W.D. Mich 2008) (same).  This is consistent with the well-settled and universal principle of contract interpretation that unambiguous contracts are to be given effect according to their plain language.  *See, e.g.*, *Soc'y of St. Vincent de Paul*, 49 F. Supp. 2d at 1016.

Here, the relationship between Ford and each class member is defined by two or more vehicles sales agreements.  One was obviously the Heavy Truck Agreement.  But in addition, every class member also held at least one other Agreement with Ford—either a Truck Agreement or Car Agreement, and in some cases, both—that authorized the dealer to sell Ford trucks below the Ford 850 series designation, including some or all Super Duty trucks, or Ford cars and SUVs. *See* SOF ¶ 39.  These Truck and Car Agreements remained in place and were left undisturbed after the Freightliner sale.

There is no dispute that the express terms of these various agreements required them to operate together to define the contractual relationship between the dealers and Ford.  Indeed, the Heavy Truck Agreement directly refers to the Ford Truck Agreement in several provisions, and vice versa.  For example, a heavy truck dealer's "Dealer Locality" under the Heavy Truck Agreement is defined by reference to the dealers' Truck (and, if applicable, Car) Agreement with Ford.  *Id.* ¶ 6; *see also id.*, Heavy Truck Agreement ¶¶ 2(a)(4) (promotion of Heavy Duty

Trucks by Ford Truck dealers), 10 (allowing distribution of Heavy Duty Truck pricing information to all Ford Truck dealers), 17(f)(2) (cross termination provisions of Heavy Truck and Truck Agreements).

The overlapping terms and obligations of the dealers' various agreements with Ford means that the overall contractual relationship between Ford and its truck dealers is defined by at least two interdependent sales and service agreements. Under Michigan law, these agreements must be read together to determine whether Ford met its contractual obligations to the class members. In *Culver*, for example, the court held that a land contract and a building contract—two completely separate documents executed at different times—were part of the same overall contractual relationship because the land contract referred to the building contract, and both contracts "clearly relate[d] to the same subject matter." 126 Mich. App. at 826. On that basis, the court held that the two contracts were to be construed together as part of the same agreement. *Id.* Here, as in *Culver*, the Heavy Truck Agreement and Truck Agreement must be read together to determine whether Ford met its contractual obligations to the class members.

Reading the Heavy Truck Agreements together with the Truck (and where applicable, Car) Agreements, it is clear that Ford continued to provide "COMPANY PRODUCTS" to class members after it left the heavy truck business. Again that is not disputed: after transitioning the HN-80 to Sterling, Ford continued to provide class member dealers with medium trucks, light trucks, including the Super Duty truck lines, and for some dealers SUVs and cars. *See* SOF ¶¶ 16, 40.

Indeed, the Freightliner transaction shows why Ford's various dealer agreements must be read together, since the transfer of the HN-80 to Freightliner brought a major benefit to Ford and its dealers with respect to sales of the Super Duty and Excursion lines. There is no dispute that in the late 1990's, when Ford's

21

heavy truck business was declining, the demand for its Super Duty truck line was exploding to such an extent that Ford was unable to meet class members' demand for Super Duty trucks. *See id.* ¶ 3. Even plaintiffs' expert agrees that Ford was able to increase its production of Super Duties as a result of the sale of its heavy truck division to Freightliner. *See id.* ¶ 18. That is so because after Ford freed KTP production and assembly capacity by transferring the HN-80 to Freightliner, it was able to increase production of Super Duty trucks, which were also made at KTP. *See id.* ¶ 17. 8/ This has been further confirmed by the recent damages depositions of the dealers themselves. For example, one class member dealer testified that his dealership was allocated an additional ten Super Duty trucks per month after the sale to Freightliner that it would not have otherwise received. *See id.* ¶ 41. Another dealer, Carmenita Truck Center, testified during its deposition that it received an additional sixty Super Duty trucks per year due to the Freightliner sale. *See id.*

Moreover, Ford was even able to provide selected dealers with additional product line authorizations under their Truck Agreements as a direct result of the Freightliner sale. Going back to the early 1990's, the Ford Heavy Truck Dealer Counsel had urged Ford to allow heavy truck dealers the right to sell so-called "commercial trucks," or trucks over 8,500 pounds gross vehicle weight (GVW), which a number of dealers were not authorized to sell under their Truck Agreements. *See id.* ¶ 19. These trucks included the very popular F-250HD and F-350 Super Duty truck lines. *See id.* Ford was forced to delay implementation of the long-awaited "commercial truck strategy," however, due to insufficient supply of the trucks. *See id.* ¶ 20. But after transferring the heavy truck product line to

---

8/    Likewise, Ford was also able to provide some dealers with Excursion SUVs that would not have been made had Ford not exited the heavy truck business. SOF ¶ 42.

Freightliner, and thereby freeing up its production and assembly capacity at KTP, Ford was finally able to implement the commercial truck strategy by offering—and ultimately providing—the 8,500 GVW franchise to between ten and twenty truck dealers, including some of the class member dealers in this case. 9/  *See id.* ¶ 21.

Accordingly, at no time after the Freightliner sale did Ford leave any of the class member dealers with empty showrooms, or fail to supply them with relevant COMPANY PRODUCTS, as plaintiffs have alleged.  To the contrary, Ford did exactly the opposite.  It assured that each class member would be entitled to continue selling the HN-80 with Freightliner/Sterling, it continued to provide each class member with medium trucks, highly sought-after light trucks, and for some SUVs and cars, and it even ramped up production and assembly of the Super Duty line in space formerly occupied making the HN-80. 10/  There was no breach here.

## II.   PLAINTIFFS HAVE PROVIDED NO ADMISSIBLE EVIDENCE THAT THEY SUFFERED ANY LOSSES AS A RESULT OF FORD'S DECISION TO SELL ITS HEAVY TRUCK BUSINESS TO FREIGHTLINER WITHOUT TERMINATING ALL ITS DEALERS.

Even if the Court holds that Ford's exit from the heavy truck business constituted a breach of the Heavy Truck Agreements, plaintiffs' inability to offer admissible evidence that class members sustained *any* damages as a result of the so-called breach renders summary judgment on damages appropriate.  Along with this motion, Ford has also filed a *Daubert* motion to exclude the opinions of plaintiffs' expert witness on damages.  Because plaintiffs' lack of admissible

---

9/    Ultimately, Ford was unable to provide a small group of dealers with the commercial truck franchise based on objections from longstanding Ford commercial truck dealers in their area.  *See* SOF ¶ 22.

10/    And this, of course, does not even take into account the substantial financial incentive programs and subsidies that Ford created and provided the dealers to assist them with their transition to Freightliner.  *See* SOF ¶ 14.

evidence on damages warrants summary judgment, we will briefly summarize the reasons plaintiffs' expert case should be excluded.

The class members' entire damages case rests on the estimates of "lost profits" calculated by plaintiffs' purported expert, Dr. Ernest H. Manuel.  But at the very foundation of Dr. Manuel's report is the baseless assumption that if Ford had continued its heavy truck business instead of selling it to Freightliner, Ford's historically failing heavy truck business would have miraculously turned around. *See* SOF ¶ 43.  Plaintiffs do not provide one shred of evidence indicating this reversal of fortune—a precondition of Dr. Manuel's "but for" damages estimates— would ever have occurred.

Under Michigan substantive law, a lost profits damages estimate based on mere conjecture or speculation cannot go to the jury, and courts regularly reject lost profit claims based on speculation that a new or failing business will become profitable.  *See, e.g.*, *Murray v. Wolverine Pipe Line Co.*, No. 267121, 2005 WL 3556148 at *2 (Mich. Ct. App. Dec. 29, 2005); *Wimsatt Bldg. Materials Corp. v. Breest*, No. 218434, 2001 WL 721365 at *2 (Mich. Ct. App. March 2, 2001); *Joerger v. Gordon Food Serv., Inc.*, 568 N.W. 2d 365, 370 (Mich. Ct. App. 1997). 11/  Despite literally thousands of hours of work by a dozen or more individuals and three attempts to produce a "complete and accurate and reliable" damages report, *see* SOF ¶ 44, it is inescapable that Dr. Manuel's damages estimates are based on sheer speculation.  As a result, his damages estimates are not sufficiently reliable to be admissible as proof of lost profit damages.

---

11/    Plaintiffs have focused all of their efforts on demonstrating the dealers' purported lost profit damages.  In doing so, they have failed to provide any evidence to demonstrate what, if any, benefits the dealers would have been entitled to if plaintiffs or Ford had opted to terminate the Heavy Truck Sales and Service Agreements at the time of the Freightliner sale.

From his first appearance in this case, Dr. Manuel claimed that he could accurately estimate plaintiffs' lost profit damages using a regression analysis, and yet when it came time to actually produce damages estimates, he rejected the results of his promised regression. In his January 2006 declaration, filed in support of plaintiffs' motion for class certification, Dr. Manuel testified that he would perform a "regression analysis" to "calculate the 'but-for' sales of Ford heavy trucks by each dealer absent the sale to Freightliner." *See* SOF ¶ 45. Plaintiffs' corresponding motion promised that "Plaintiff's expert will be able to use comprehensive market data and regression analysis to demonstrate the number of new unit sales lost by the class of Heavy Truck dealers as a result of Ford's breach of contract." Pls.' Mot. for Cl. Cert. (Dkt. No. 150) at 22; *see also* SOF ¶ 46 (Supp. Manuel Decl. describing his methodology as consisting of a "regression analysis" to estimate the number of heavy truck sales each class member would have made with Ford, and then analysis of "individual dealer financial statements" to determine the profits that each would have earned from those lost truck sales.) This Court granted plaintiffs' motion for class certification based on Dr. Manuel's representations, permitting plaintiffs to "attempt to prove on a class-wide basis . . . a regression analysis [to] obtain an estimate of expected market share and lost unit sales for each dealer." Pls.' Mot. for Cl. Cert. at 22.

Dr. Manuel actually conducted the regression he promised the Court he would use, but he rejected the results when they showed what Ford has been saying all along—the dealers were better off with Freightliner than they would have been with Ford. Dr. Manuel's regression estimates projected that if Ford had continued in the heavy truck business, class member dealers would have sold a total of 63,513 Ford trucks from 1998-2003. *See* SOF ¶ 47. During this period, Dr. Manuel found that dealers actually sold 68,802 Sterling trucks (and remaining Ford heavy trucks). *See id.* In other words, according to Dr. Manuel's regression, the

class member dealers would have sold *thousands of fewer heavy trucks* with Ford than they actually did with Freightliner/Sterling.

Not surprisingly, selling more trucks with Freightliner/Sterling means earning more profits with Freightliner/Sterling.  That is true even based on Dr. Manuel's own methods for calculating sales profits and "downstream profits," or profits associated with parts, service, body shop, as well as profits associated with used truck sales.  Taking all elements of Dr. Manuel's own (flawed) methodology, his regression results indicate that class members made *$12.9 million more* as Sterling heavy truck dealers than they would have made had Ford continued its heavy truck business.  *See id.* ¶ 48.

Dr. Manuel therefore rejected the regression approach that he told this Court was the right approach for projecting lost unit sales, and instead came up with a completely different approach using a made-for-litigation methodology based upon the unsupported and unsupportable assumption that Ford's heavy truck business would have reversed its years of decline and dramatically grown had Ford not sold the business to Freightliner.  For reasons detailed in Ford's *Daubert* motion, Dr. Manuel's assumption of a sudden upsurge in sales of Ford heavy trucks constitutes sheer speculation and guesswork and thus should not be deemed admissible.  And his opinion is even more flawed for its complete failure even to consider, much less account for, the tens of thousands of additional Super Duty trucks that were produced at Ford's Kentucky Truck Plant once transfer of the HN-80 freed production capacity.  Even before accounting for the tens of millions of dollars in additional profits dealers earned selling this increased inventory of Super Duty trucks, Dr. Manuel's report demonstrates that plaintiffs did not sustain damages but rather were *better off* selling Sterling trucks than they would have been if Ford had continued heavy truck production, since the very regression that Dr. Manuel promised this Court reflects that dealers sold *more* heavy trucks than

the regression projects they would have sold if Ford had remained in the business. Without more, plaintiffs have failed to offer a reliable damages estimate, and Ford is entitled to summary judgment on damages.

## CONCLUSION

For all of the foregoing reasons, Ford's Motion for Summary Judgment as to the Class should be granted.

Dated:  June 5, 2009

 s/ Dennis R. LaFiura
Dennis R. LaFiura
DAY PITNEY LLP
P.O. Box 1945
Morristown, New Jersey 07962
(973) 966-6300

Jonathan L. Abram
E. Desmond Hogan
J. Raymond Reduque
Erica M. Knievel
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600

Attorneys for Defendant
Ford Motor Company
