# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BAYSHORE FORD TRUCK SALES, INC., a Delaware corporation; MOTOR CITY TRUCKS, INC., a Delaware corporation; COLONY FORD TRUCK CENTER, INC., a Rhode Island corporation; individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | HON. JOSE L. LINARES Civil Action No. 99-741 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Return Date: August 17, 2009 |
| FORD MOTOR COMPANY, | ) ) | Oral Argument Requested |
| Defendant. | ) ) ) | (Document Filed Electronically) |

---

## MEMORANDUM IN SUPPORT OF DEFENDANT FORD MOTOR COMPANY'S MOTION TO DECERTIFY DAMAGES CLASS

---

DAY PITNEY LLP
P.O. Box 1945
Morristown, New Jersey 07962
(973) 966-6300

HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600

Attorneys for Defendant
Ford Motor Company

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................ iv

PRELIMINARY STATEMENT ................................................. 1

BACKGROUND ........................................................................ 5

    1.    Ford's Sale of Its Heavy Truck Business Affected Each of
Its Dealers in Widely Varying Ways............................................ 5

    2.    Relevant Procedural Background ................................................ 10

        A.    Class Certification. ............................................................ 10

        B.    Damages Discovery. ......................................................... 11

        C.    Plaintiffs' Expert Reports................................................... 13

DECERTIFICATION STANDARD .......................................... 14

ARGUMENT ............................................................................ 16

    I.    THE CLASS SHOULD BE DECERTIFIED BECAUSE
EVENTS HAVE CONFIRMED THAT COMMON
QUESTIONS DO NOT PREDOMINATE OVER THE
MANY INDIVIDUALIZED FACTORS THAT
DETERMINE THE AMOUNT OF EACH DEALER'S
LOST PROFITS, IF ANY ........................................................ 16

        A.    Calculating the Profits Each Dealer Allegedly Lost
Due to the Sale of Ford's Heavy Truck Business
Must Take Into Account Individualized Factors and
Thus Is Unsuitable for Class Disposition.......................... 17

        B.    The Freightliner Sale Affected Each Dealer In
Widely Varying Ways, And Many Were Net Better
Off. ................................................................................... 21

i

**<u>TABLE OF CONTENTS</u>—CONTINUED**

<u>Page</u>

1.   Plaintiffs Concede Some Dealers Benefited. ......... 22

2.   When All Benefits Are Counted, Many More Were Better Off. ...................................................... 22

3.   Dr. Manuel's Report Thus Confirms Deep Intra-Class Conflicts. ............................................. 26

C.   Plaintiffs Also Raise Individualized Issues In Seeking to Avoid the General Releases Signed by Over 30 Individual Dealers. ............................................................ 29

II.  THE CLASS SHOULD BE DECERTIFIED BECAUSE A CLASS TRIAL WOULD BE ENTIRELY UNMANAGEABLE AND AN ALTERNATIVE MECHANISM FOR ADJUDICATION OF DAMAGES IS SUPERIOR. ............................. 30

A.   Class Adjudication of Each Dealer's Lost Profit Damages Would Be Unmanageable. ............................................ 30

B.   Other Methods Exist for Trying Plaintiffs' Claims That Are Far Superior Because They Allow Trial Presentation on the Individualized Issues Critical To a Proper Determination of Lost Profits Damages. ................................................. 32

C.   Plaintiffs Are Sophisticated Businesses With Sizable Claims, Capable of Litigating Their Claims in an Individualized Fashion. ............................................... 34

III. DR. MANUEL'S NEW METHODOLOGY DOES NOT WARRANT CONTINUATION OF A CLASS WHERE INDIVIDUAL ISSUES PREDOMINATE AND TRIAL WILL BE UNMANAGEABLE. .................................................... 36

ii

## <u>TABLE OF CONTENTS</u>—CONTINUED

<u>**Page**</u>

A.    Dr. Manuel Did Not Base His Predictions of Lost Sales
Based on the Class-Wide Regression That He Promised
This Court Would Adequately Take Into Account
Individualized Differences Among Dealers. ............................... 37

B.    The Damage Methodology Dr. Manuel Does Employ is
Speculative and Unreliable. .......................................................... 39

CONCLUSION ......................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Amchem Products, Inc. v. Windsor,
    521 U.S. 591 (1997)................................................................31

Baby Neal for and by Kanter v. Casey,
    43 F.3d 48 (3d Cir. 1994) ........................................................32

Beck v. Maximus, Inc.,
    457 F.3d 291 (3d Cir. 2006) ....................................................26

Bieneman v. City of Chicago,
    864 F.2d 463 (7th Cir. 1988) ...................................................28

Bogosian v. Gulf Oil Corp.,
    561 F.2d 434 (3d Cir. 1977) .............................................14, 18

Broussard v. Meineke Discount Muffler Shops, Inc.,
    155 F.3d 331 (4th Cir. 1998) ...................................................18

Carnegie v. Household International, Inc.,
    376 F.3d 656 (7th Cir. 2004) ...................................................33

Cimino v. Raymark Indus., Inc,
    151 F.3d 297 (5th Cir. 1998) ...................................................31

Commander Prop. Corp. v. Beech Aircraft Corp.,
    164 F.R.D. 529 (D. Kan. 1995) ...............................................35

Danvers Motor Co. v. Ford Motor Co.,
    543 F.3d 141 (3d Cir. 2008) .............................................passim

Gen. Te. Co. of Sw. v. Falcon,
    457 U.S. 147 (1982)................................................................ 14

George Lussier Enterprises, Inc. v. Subaru of New England,
    No. 99-109-B, 2001 WL 920060 (D.N.H. Aug. 3, 2001) ...................................33

Georgine v. Amchem Prods.,
    83 F.3d 610 (3d Cir. 1996) ......................................................32

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page(s)</u>

<u>Gunnells v. Health Services Plan, Inc.</u>,
   348 F.3d 417 (4th Cir. 2003) .............................................................33

<u>In re Hydrogen Peroxide Antitrust Litig.</u>,
   552 F.3d 305 (3d Cir. 2008) ......................................................passim

<u>In re Methionine Antitrust Litig.</u>,
   No. 00-cv-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003)......................38

<u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>,
   148 F.3d 283 (3d Cir. 1998) .......................................................... 15

<u>Lazy Oil Co. v. Wotco Corp.</u>,
   95 F. Supp. 2d 290 (W.D. Pa. 1997).................................................18

<u>Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.</u>,
   149 F.R.D. 65 (D.N.J. 1993)......................................................... 34

<u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>,
   259 F.3d 154 (3d Cir. 2001) .......................................................... 14

<u>Pickett v. Iowa Beef Processors</u>,
   209 F.3d 1276 (11th Cir. 2000) ......................................................28

<u>Robin v. Doctors Officenters Corp.</u>,
   123 F.R.D. 579 (N.D. Ill. 1988).....................................................35

<u>Stoudt v. E.F. Hutton & Co.</u>,
   121 F.R.D. 36 (S.D.N.Y. 1988) ...................................................... 35

<u>Wachtel v. Guardian Life Ins. Co.</u>,
   453 F.3d 179 (3d Cir. 2006) .....................................................2, 16

<u>Windham v. American Brands, Inc.</u>,
   565 F.2d 59 (4th Cir. 1977) ..........................................................30

# TABLE OF AUTHORITIES—Continued

**Page(s)**

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ............................................................. 1, 2, 14, 15, 16, 30, 33, 37

Fed. R. Civ. P. 23(a) ....................................................................................................14

Fed. R. Civ. P. 23(b) ...............................................................................................14, 32

Fed. R. Civ. P. 23(b)(3) ...............................................................................................30

5 Moore's Fed. Prac. § 23.46[2][e] .............................................................................30

## PRELIMINARY STATEMENT

Ford Motor Company ("Ford") respectfully requests that the Court decertify the class with respect to trial of damages. In 2006, the Court certified a class including damages issues, based on plaintiffs' promise that they would attempt to prove the sales and profits each dealer would have made with Ford using a regression analysis that would purportedly control for all individual dealer issues. Cl. Cert. Op. (Dkt. No. 165) at 15-17. The question of whether Ford actually breached its Agreements remains appropriate for class disposition, but three critical developments since the Court's class certification ruling now require decertification as to damages.

First, the Third Circuit has substantially changed class certification law, decertifying two nationwide classes and highlighting many of the fundamental flaws that permeate the class in this case. In In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008), the court held that class certification cannot be based on a "threshold" showing nor on plaintiffs' desire or intention to present particular evidence like the promised regression in this case. Instead, class certification must be based on actual findings by the district court and supported by a preponderance of evidence, submitted by both sides (including both sides' expert testimony), that each of Rule 23's requirements are met, including 23(b)(3)'s critical predominance and superiority requirements. That is, plaintiffs must prove by a preponderance that with respect to the facts at issue – here, each dealer's damages – common issues will actually predominate at trial over the individualized analysis of each plaintiff's claim, and that the class approach is actually superior to other trial approaches for resolving the damages issues.

In Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141 (3d Cir. 2008), the Third Circuit gave guidance about how the predominance and superiority

1

requirements are to be applied.  The <u>Danvers</u> court reversed certification of a class of Ford dealers challenging Ford's "Blue Oval" program (a class that included some of the same dealers and represented by some of the same plaintiffs' counsel as here).  The Third Circuit held that the proposed class did not meet Rule 23's requirements because of conflicts between class members who allegedly lost as a result of the program and class members who actually benefited because of it, and because plaintiffs had not proven that common issues actually predominated over the numerous individualized issues that would have to be resolved to assess how the program affected each dealer.  These decisions, building on <u>Wachtel v. Guardian Life Ins. Co.</u>, 453 F.3d 179 (3d Cir. 2006) (decided after briefing on class certification in this case), have significantly changed the law of class certification in ways that make a damages class unsustainable.

Second, Magistrate Judge Cecchi overruled plaintiffs' efforts to use class certification to justify refusing Ford any discovery into the lost profits claims of over 130 individual dealers, and in the last year Ford has been afforded very limited damages discovery, including depositions of a small fraction of the class and limited interrogatories and document requests to the rest.  Even this minimal discovery has brought into sharp focus several realities that support decertification: (a) the dealers here (many of whom seek millions of dollars worth of damages) are each sophisticated unique businesses that operate in highly competitive local markets and whose ability to earn profits is highly dependent on competition, customer, and employee issues unique to each dealer; (2) as a result, any trial on plaintiffs' damages claims will be dominated by individual, dealer-specific issues (issues we now know are nowhere addressed in plaintiffs' expert damages methodology); and (3) it has become clear that trying the damages claims of more than 130 individual dealers in a single trial would be wholly unmanageable, and

would subject Ford to scores of multi-million dollar claims as to which it has been afforded virtually no discovery at all.

Finally, plaintiffs' expert has issued his long-promised damages analysis, and it is not what he promised the Court it would be when plaintiffs sought class certification.  The Court certified the class here based on the plaintiffs' promise that their expert could "attempt to prove on a class-wide basis . . . a regression analysis [to] obtain an estimate of expected market share and lost unit sales for each dealer."  Cl. Cert. Op. (Dkt. No. 165) at 17.  In a complete reversal, Dr. Manuel now admits that he has done no such thing:

- Dr. Manuel now admits that he has not used his regression results as promised to calculate a historical market share for each dealer;

- Dr. Manuel now admits he has not used his regression's estimates of lost unit sales in projecting the sales dealers would have made had Ford continued in the heavy truck business; and

- Dr. Manuel now admits that his regression does not control for the many individual dealer or local market issues that have occurred since the dealers shifted to Freightliner/Sterling in 1998.

To be clear, Dr. Manuel did perform a regression analysis, but it showed the dealers were better off with Freightliner Corporation ("Freightliner") than they would have been with Ford.

In short, plaintiffs sought class certification for damages on the basis of a single "common issue" – their expert's intention to use regression analysis to estimate lost unit sales while accounting "formulaically" for individual differences among dealers, but Dr. Manuel did no such thing.  Indeed, his new methodology not only fails to account for the myriad individual issues affecting each dealer's damages claim, even worse it actually highlights the significant conflicts among individual class members – some benefited and others allegedly were harmed – the

very sort of conflict that resulted in reversal of certification in <u>Danvers</u>.

*     *     *

It is now clear that the only tie that binds this nationwide class together is the question of whether Ford breached its Agreements at all.  Each of these dealers formerly sold HN-80 heavy trucks with Ford, and, as a result of arrangements Ford made in selling its heavy truck business to Freightliner, each elected to continue its Ford relationship and also to obtain authorization to sell the same HN-80 trucks (and others), as manufactured by Freightliner.  Plaintiffs claim Ford's conduct breached its dealer Agreement; Ford has moved for summary judgment as to the class on that issue, explaining the reasons why Ford was not obligated to impose termination on all its dealers instead of allowing them to remain and take on Sterling dealerships as well.  But there, the similarities end.

As to damages, both sides now agree that the impact of Ford's decision to sell its heavy truck business varied widely among the dealers – so widely, in fact, that plaintiffs' expert now concedes some benefited as a result of the sale to Freightliner.  Each of the 136 dealerships addressed by plaintiffs' expert is a separate and distinct business, with its own customers, management, product offerings, strategic focus, and market opportunities and challenges, and each was affected by the Freightliner transition in its own unique way.

For these reasons and those presented below, trial on the damages issues cannot lawfully proceed on a class basis.  Obviously, trial on damages would not be required at all, if this Court grants summary judgment to Ford on the question of breach.  But if damages are to be tried, Ford believes that the claims of individual dealers can be efficiently tried in groups.  The most logical starting point would be the group of dealers that have provided at least some semblance of damages discovery – the three named plaintiffs and the thirteen dealers who Ford has been

4

allowed to depose on damages issues.  The parties can be prepared to try to a bellwether case on those dealers' claims according to the existing schedule, with trial starting in early 2010.  That approach would allow the Court to take advantage of the efficiencies of trying the claims of multiple parties at one time, while at the same time bringing a dose of reality to the proceedings by requiring the parties to put on actual evidence of the lost profits (if any) of a manageable number of dealers, based on actual evidence related to their businesses, customers, and local markets.

## **BACKGROUND**

### 1.   **Ford's Sale of Its Heavy Truck Business Affected Each of Its Dealers in Widely Varying Ways.**

As the Court is aware, this case was brought by three plaintiffs purporting to represent over 130 1/ independently owned heavy truck dealerships across the country.  With plaintiffs' submission of their expert report, there is now no dispute that Ford's heavy truck dealers were affected in dramatically different ways by Ford's 1997 decision to sell its chronically unprofitable heavy truck business to Freightliner.  That is not surprising, since there were innumerable, significant differences among the various heavy truck dealers.  As Gerald Ducharme (he handled Ford's sale of heavy truck assets) testified, Ford's heavy truck dealers "were all individual businesses.  Some were big, some were small, some were in big cities, some were in the country, some had wonderful management, some had bad management, some had great consumer bodies, some had bad consumer bodies . . . ."  (Ex. 1.) 1/  James Donaldson, in charge of heavy trucks at the time of

---

1/     The deposition excerpts, documents, interrogatory responses, declarations, expert reports, and other authorities referenced are located in Erica M. Knievel's Certification in Support of Defendant Ford Motor Company's Motion to Decertify Damages Class, filed herewith and denoted as "Ex. __."

the sale, agreed. (Ex. 2 ("[W]e had . . . a great variety of Ford heavy truck dealers ranging . . . from some very big, very professional world class dedicated heavy truck dealers who . . . did what it took to be competitive, to so-called resale dealers . . . with nothing like the qualifications in terms of equipment and facilities and skilled personnel that . . . a . . . first class dealer would have.")

In other words, there are many issues that affect each individual dealership and its ability to turn a profit in its market and across the years. For example, some dealers were well-established, having been in business for decades. (See, e.g., Ex. 3 at 19.) Others, in contrast, had just recently entered the marketplace. (See, e.g., Ex. 4 at 22.)

Likewise, each dealer faced widely different local market competition – a key driver of dealership bottom line. Some of the dealers faced heated competition within their volatile, local markets, with new entrants emerging regularly to challenge their success and to win away customers. (See, e.g., Ex. 5 at 32-33, 55-56; Ex. 6 at 97-101.) In contrast, other dealers claim they were in much more established competitive markets. (See, e.g., Ex. 4 at 49.) Some dealers competed with other local Ford heavy truck dealers, see, e.g., Ex. 7, while other dealers primarily competed with other manufacturers' dealers. (See, e.g., Ex. 8 at 88.)

In addition, dealers' business strategies varied tremendously, from focusing sales and advertising efforts on local markets, see, e.g., Ex. 9 at 65-66, 98-99, to selling vehicles throughout the country. (See Ex. 10 at 232.) Besides selling new vehicles, dealers placed varying degrees of emphasis on used-truck sales, and their parts, service, and body shop business. (See, e.g, Ex. 5 at 103 (dealer principal testifying he was a "used truck guy"); Ex. 11 at 80 (dealer principal testifying that Badger Truck's Madison location does not have a separate parts sales force); Ex. 6 at 42 (Freeway Ford's dealer principal testifying that he did not have a body shop,

6

and that Freeway would use outside vendors to perform body shop work if necessary); see also Ex. 12 ¶ 21.)

While all of these class member dealers, by definition, sold Ford and then Sterling heavy trucks, their other product lines varied.  (See Ex. 12 ¶ 21 (noting that Ford's heavy truck dealers differed in terms of the products they sold and volumes of sales).)  Nearly 50 of the 136 alleged class member dealers were "combo" dealers, according to plaintiffs' expert, meaning that they sold Ford cars and light trucks in addition to heavy trucks.  (Ex. 13 ¶ 106, Manuel Tab 12, 1-4.)  The others were "truck centers," authorized to sell only medium and heavy trucks.  (Id.)  And even among truck center dealers, each one's product offerings varied significantly.  Over 30 dealers were "dual dealers," selling additional medium or heavy trucks from at least one other manufacturer at the time of the sale.  (Id. ¶ 80.)  For these reasons, each dealer was in its own unique position to benefit from Ford's sale to Freightliner.

Once the sale occurred, each dealer that opted to remain responded to the Freightliner/Sterling transition in different ways that in turn affected their bottom lines.  For example, while all class member dealers enjoyed the ability to sell the Sterling HN-80 after the transition, some also obtained the authority to sell other Sterling products, like the Acterra, and vehicles manufactured by Western Star, a company with a corporate relationship with Freightliner.  (See, e.g., Ex. 10 at 53, 57-58, 69-70; Ex. 14 at 35-36.)  Other dealers sought and took on additional manufacturers' heavy truck franchises in an attempt to fill the perceived void left by Ford's departure from the heavy truck business.  (See, e.g., Ex. 15 at 66 (acquired Autocar and Fuso lines).)  Still others, however, never obtained any additional product lines.  (See, e.g., Ex. 6 at 27-28; Ex. 4 at 27-28, 38; Ex. 5 at 30-32.)

7

Some dealers responded by redeploying resources to other parts of their business, shifting sales personnel and advertising previously devoted to heavy trucks toward selling light and medium trucks.  (See, e.g., Ex. 6 at 36-41; Ex. 9 at 34-36; Ex. 7 at 99-100, 158; Ex. 16 at 49-50 (dealer built a separate light truck facility next door and moved the light truck salesmen over there).)  Some dealers refocused their efforts on increasing used truck sales or parts, service, and body shop profits in the aftermath of the sale.  (See, e.g., Ex. 17 at 185-86 (increased emphasis on soliciting parts sales and service after sale).)  Other dealers made no significant changes to their approach, instead just focusing on selling Sterling trucks based on the same business model used when they sold Ford heavy trucks. (See, e.g., Ex. 18 at 42, 44-45; Ex. 4 at 32, 35.)

Various dealers benefited from the sale in other ways as well.  Some gained new Ford product lines, because at the time that it exited the heavy truck market, Ford was able to provide more than a dozen of its dealers additional authorizations, granting them permission to sell certain light trucks that they had been unable to sell previously.  (Ex. 19.)  This grant of additional authorizations allowed those dealers to gain profits on light truck sales that they otherwise would not have been able to make.  In contrast, some dealers who Ford identified as candidates for additional authorizations ultimately could not gain the additional authorizations because of protests from other dealers.  (Id.)

Furthermore, many of the dealers benefitted directly from additional production of other Ford products made possible by the transfer of heavy truck production to Freightliner.  As a direct result of its sale of the HN-80 manufacturing equipment to Freightliner, Ford was able to reconfigure the Kentucky Truck Plant ("KTP") to add capacity for producing and assembling highly profitable Super Duty trucks and to introduce the Excursion sport utility

8

vehicle.  (Ex. 20 ¶ 8.)  Many dealers were clamoring for these additional Super Duty trucks after the sale, which they were then able to sell at a handsome profit. (See, e.g., Ex. 9 at 150-52; Ex. 8 at 80-82.)  While the Super Duty and Excursion production was highly beneficial to most class member dealers, variation existed on this score as well; some dealers have asserted that the availability of additional Super Duties apparently had a less significant impact in their particular markets where Super Duties and Excursions were relatively less popular.  (See, e.g., Ex. 4 at 34-35.)

Ford also offered all of its heavy truck dealers various incentive programs in conjunction with the transition to Sterling, including a one-time heavy truck special parts return under which millions of dollars were paid to dealers.  (Ex.21 ¶ 9.)  It appears that several dozen dealers did not take advantage of that program, while approximately eight dozen did.  (Ex. 22.)  Likewise, in the wake of the sale to Freightliner, at least ten dealers took advantage of Ford's Small Market Improvement Strategy in which they received tens or hundreds of thousands of dollars, while approximately one-hundred dealers were not participants in this program.  (Ex. 23.)

And individual dealerships underwent significant changes over the years following the transition from Ford to Freightliner, as ongoing businesses do, all of which affected their bottom lines.  Some dealerships changed their facilities significantly.  (See, e.g., Ex. 15 at 161-62; Ex. 4 at 41-43; Ex. 17 at 39-42.) Dealership personnel changed and, in many specific instances, these changes impacted the corresponding dealer's profitability.  (See, e.g., Ex. 11 at 99-100;  Ex. 15 at 167-68; Ex. 6 at 81-86; Ex. 14 at 41-44.)  Other dealers sold their businesses in the years following the transition to Freightliner, either to retire or to pursue other business ventures.  (See, e.g., Ex. 24 at 12; Ex. 25 at 19; Ex. 26 at 14-15; Ex.

27 at 11-12.)  In conjunction with the resignations of their Ford Sales and Service Agreements, dozens of heavy truck dealers signed documents releasing Ford of any and all liability.  <u>See</u> Mot. for Summ. J. as to Thirty-Six Class Members, filed June 5, 2009.

The highly individualized nature of each dealer's business was not news to the dealers.  Those Ford was allowed to depose agreed that local market factors unrelated to Ford's sale of the heavy truck business continued to affect dealers' profitability in countless ways in the years following the Freightliner/Sterling transition.  Some dealers saw increased competition in their markets in the years following the sale.  (<u>See, e.g.</u>, Ex. 6 at 97-103; Ex. 9 at 46-53.)  Dealers' major customers experienced changes in their own business fortunes that affected their heavy truck purchases.  (<u>See, e.g.</u>, Ex. 17 at 100; Ex. 5 at 84.)  And fluctuations in the local economies within which the various dealers competed further affected individual dealer profitability.  (<u>See, e.g.</u>, Ex. 4 at 63-65; <u>see also, e.g.</u>, Ex. 18 102 (managers affect profitability); Ex. 6 at 80-81 (sales force affects profitability); Ex. 16 at 239 (must consider local economy in determining lost profits); Ex. 15 at 154-55 (business fortunes of largest customers impacts the bottom line); Ex. 8 at 86-87 (local competition is a factor in profitability).)

## 2.   Relevant Procedural Background

### A.   Class Certification.   In 2006, plaintiffs moved for class

certification, claiming that common issues predominate.  Plaintiffs understandably claimed that was so as to the question of breach, because the question whether Ford's sale to Freightliner breached its dealer Agreements turns on interpretation of substantially similar Agreements based on the same Freightliner/Sterling transition.  But plaintiffs also claimed it was so as to each individual dealer's actual lost profits claim, because of plaintiffs' assurance that their expert could and would

calculate damages using a regression analysis that "[gave] reasonable attention to relevant individual dealer issues and [took] these issues into account in measuring damages."  Pls.' Mot. for Cl. Cert. (Dkt. No. 150) at 23.  In his January 2006 declaration filed in support of class certification, Dr. Manuel testified that he would perform a "regression analysis" to "calculate the 'but-for' sales of Ford heavy trucks by each dealer absent the sale to Freightliner."  (Ex. 28 ¶¶ 65-73.) And in a supplemental declaration, Dr. Manuel further explained that his "proposed methodology consisted of two major steps" – (1) "regression analysis would be used to estimate on a class-wide basis the number of heavy truck sales lost by each class member"; and (2) "individual dealer financial statements [would be used] to determine the lost profits that would have otherwise flowed to each dealer from those lost truck sales."  (Ex. 29 ¶¶ 2-3, 9-14.)  Plaintiffs' corresponding motion promised that plaintiffs' expert would "formulaically account for individual dealer differences[,] and will produce a measure of damages suffered by each member of the proposed class."  Pls.' Mot. for Cl. Cert. (Dkt. No. 150) at 22.

This Court relied on plaintiffs' representations when it certified the class, stating that it was certifying such a class to permit plaintiffs to "attempt to prove on a class-wide basis . . . a regression analysis [to] obtain an estimate of expected market share and lost unit sales for each dealer."  Cl. Cert. Op. (Dkt. No. 165) at 17. Since then, Ford has taken limited discovery into certain dealers' actual lost profits claims, and plaintiffs have been forced to produce Dr. Manuel's promised analysis.

**B.    Damages Discovery.**  Ford requested the right to take discovery of the dealers asserting claims for millions in lost profit damages, and on July 14, 2008, Judge Cecchi agreed that Ford was entitled to discovery from class members to defend against plaintiffs' proposed lost profit damages theory.  The

Court allowed Ford to propound approved interrogatories and document requests and to depose an initial group of dealers comprising 10% of the class.  See Scheduling Order (Dkt. No. 229) at 5.  These depositions took place in November and December of 2008, and as summarized above, they confirmed the varied circumstances of the class members and the inappropriateness of class-wide treatment on damages.  In addition, as noted, all class members were ordered to submit answers to written interrogatories and to produce documents.  Despite this Court's order, 18 dealers failed to provide a single interrogatory response, another 8 submitted interrogatory responses with the answers left blank, and 31 dealers did not turn over a single document.  Even focusing on those dealers that went through the motions of submitting discovery responses, the vast majority provided inadequate answers and productions.  See Def.'s Ltr. Seeking Relief With Respect to Pls.' Inadequate Discovery Responses (Dkt. No. 235).  Yet even these minimal responses further demonstrated the individualized nature of the lost profit damages inquiry at hand.

Then there were the dealers contesting their own general releases of claims. On November 21, 2008, the Court instructed plaintiffs to make available for deposition any dealer who signed a release of claims and was now contesting it. See Order on Oral Mot. (Dkt. No. 248) at 3.  Plaintiffs responded by presenting nearly 30 dealers for questioning.  Once again, these depositions revealed widely different positions among the dealers, this time consisting of a variety of different arguments based on the facts underlying each dealer's effort to avoid the (unambiguous) release it signed.  While Ford contends that these unambiguous releases should be held valid on summary judgment, plaintiffs maintain the unsustainable position that the Court both should examine all of the factual circumstances behind each release and try the case as a class action with all 136

12

class members.

      **C.**    **Plaintiffs' Expert Reports.**  Beginning January 16, 2009, plaintiffs' expert, Dr. Ernest Manuel, presented a series of three reports, each of which varied significantly from its predecessor(s).  Setting aside the many other flaws that now underlie Ford's <u>Daubert</u> motion, the reports were significant because they showed plaintiffs' claims at class certification to be utterly false.  Despite his sworn statements to this Court on which basis the class was certified, Dr. Manuel failed to use his regression to calculate market share and lost unit sales.  (Ex. 30 at 121, 440-41, 444-45.)  It is not that he failed to do a regression.  He did one.  But it confirmed what Ford has insisted all along – that class members were better off selling Sterling than they would have been had Ford continued in the heavy truck business.  According to Dr. Manuel's own (flawed) regression, they were better off to the tune of $12.9 million.  (Ex. 31 ¶ 4.)

      At his March 2009 deposition, Dr. Manuel admitted that the regression he had told this Court he would use as a means to estimate lost unit sales while taking into account individualized differences among the dealers was not used for that purpose at all.  Instead, he used his promised regression only to allocate among individual class members a portion of "lost" sales that he actually determined in a completely different way, based solely on two isolated documents.  (Ex. 30 at 440-41.)  In addition, Dr. Manuel's reports showed that his damages estimates fail to take into account numerous sources of profits that individual dealers actually earned because of the transition (among other profits, he completely ignores the dealers' sales of the additional Super Duty and Excursion units Ford was able to manufacture following the Freightliner sale), and his reports also patently ignore changes in dealers' individual circumstances.  (<u>See, e.g.</u>, <u>id.</u> at 44, 46-50, 53-58, 366-71, 396-400, 406-07; <u>see also</u> <u>id.</u> at 114-18, 121, 440-41, 444-45, 485, 487-88,

495.)

Finally, even though Dr. Manuel's methodology rejects the results of his promised regression, inflates every single dealer's projected lost sales, and completely ignores the tens of millions of dollars they earned selling the added Super Duty and Excursion vehicles, even still, Dr. Manuel admits that at least 14 dealers sustained _no net damages_ as a result of Ford's sale to Freightliner – that is, they were better off after the sale to Freightliner than they would have been had Ford continued in the heavy truck business.  (See Ex. 32 at Manuel Tab 37, 12-14.)2/

## DECERTIFICATION STANDARD

The law has long been that class certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are met. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982).  Such questions may be "enmeshed in the factual and legal issues comprising the plaintiff's cause of action," and "courts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001) (quotations omitted). Failure to satisfy any of the requirements of Rule 23(a) (numerosity, commonality, typicality, adequacy) or 23(b) (predominance of common questions and superiority of class trial) constitutes a basis for decertification.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 307, 320.  If the court foresees problems computing damages on a class-wide basis, it should consider limiting certification of a class to determination of liability.  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir.

---

2/      For a more detailed description of the numerous flaws in Dr. Manuel's opinion, see Defendant Ford Motor Company's Motion to Exclude the Opinions, Reports, and Testimony of Plaintiffs' Expert Ernest H. Manuel, Jr. and corresponding memorandum in support.

1977).  And, should a class prove to be unmanageable, a district court "may decertify or modify a class at any time during the litigation . . . ."  In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 321 (3d Cir. 1998).

As noted above, the Third Circuit has recently issued two significant opinions that change the process and tighten the standard for class certification, making it apparent that this class warrants decertification and would face such a fate on appeal if it is not decertified before this Court.  Just months ago, in Hydrogen Peroxide, the court emphasized that the criteria set forth in Rule 23 are "not mere pleading rules" that can be met through a "threshold showing," but rather constitute requirements that must be satisfied by a preponderance of the evidence in order for a class to merit certification.  552 F.3d at 307, 316, 321.  To determine whether the Rule 23 prerequisites for a class action are met, the court not only can but must consider all relevant evidence and resolve all relevant factual disputes.  Id. at 307, 321, 325.  The Third Circuit explicitly noted that resolving disagreements among the parties' experts "is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."  Id. at 323, 325.  Finding that the district court applied an inappropriately lenient standard when determining that Rule 23 had been satisfied, the Third Circuit vacated the lower court's class certification order.

Also in 2008, in Danvers, the Court decertified a class of Ford dealers, finding that "individualized and diverse issues . . . subsume[ed] any commonality" among the class members.  543 F.3d at 149.  Though the class alleged violations based on a "single course of conduct" by Ford – its Blue Oval Program – the court determined that decertification was appropriate in part because the class members had "diverse and conflicting interests"; not all dealers were harmed by the program, and in fact, some benefited from Ford's allegedly improper conduct.  Id. at 147-49.

15

Ultimately, the court found that the class action mechanism "would be neither more fair nor more efficient" because of the "multitude of individualized issues . . . that would entail complicated mini-litigations within the class action itself." Id. at 149.

These cases follow the Third Circuit's 2006 opinion in Wachtel, issued after the parties here briefed class certification to the Court, when the Third Circuit clarified the substantive, detail-oriented, and practical inquiry that a court must undertake at the class certification stage. The Wachtel court noted that the district court's class certification order must include "a clear and complete summary of those claims, issues or defenses subject to class treatment" and "full and clear articulation of the litigation's contours at the time of class certification." 453 F.3d at 184, 186. The court made clear that the 2003 amendment to Rule 23 "require[ed] more specific and more deliberate treatment of the class issues, claims, and defenses," and left open a "substantive inquiry" for the appellate tribunal as to whether the scope of the class has been adequately defined in preparation for trial. Id. at 185. The Third Circuit thus vacated the lower court's certification order, finding that "the Order's discussion of class claims, issues, or defenses is unclear, intermittent, and incomplete."   Id. at 189.

## ARGUMENT

## I.   THE CLASS SHOULD BE DECERTIFIED BECAUSE EVENTS HAVE CONFIRMED THAT COMMON QUESTIONS DO NOT PREDOMINATE OVER THE MANY INDIVIDUALIZED FACTORS THAT DETERMINE THE AMOUNT OF EACH DEALER'S LOST PROFITS, IF ANY.

The Third Circuit's trio of class action decisions establishes that to sustain class certification on damages, this Court must find by a preponderance of the evidence that common damages issues continue to predominate over the many

individualized factors relevant to each dealer's lost profits claim.  It is now clear, however, that the only common issue in this case is whether Ford breached its Heavy Truck Sales and Service Agreement when it sold its heavy truck business and transferred production of the HN-80 to Freightliner without formally terminating its dealers.

As to damages, with limited discovery and Dr. Manuel's report(s) now in hand, it is clear that the various dealers' lost profits claims share virtually nothing in common.  Dr. Manuel assured this Court that his regression analysis would account for the many individual market factors affecting each element of the analysis for each dealer.  With the promise of a single "formulaic" regression approach to estimating lost sales now abandoned, plaintiffs' counsel offer no credible basis to tie together any of the plaintiff dealers' various lost profits claims. And even if the Court were to accept Dr. Manuel's newly minted  "two document" approach to estimating lost sales, the actual dealers have testified just as Ford witnesses have, that a dealership's business profits depend on myriad individualized factors.  And that is borne out by plaintiffs' concession that some of the dealers they purport to represent actually benefited as a result of the Freightliner sale.

**A.  Calculating the Profits Each Dealer Allegedly Lost Due to the Sale of Ford's Heavy Truck Business Must Take Into Account Individualized Factors and Thus Is Unsuitable for Class Disposition.**

Dr. Manuel has agreed that plaintiffs' lost profits inquiry requires analysis of two elements – (1) the sales and profits each dealer would have made had Ford continued to produce heavy trucks, minus (2) each dealer's actual sales and profits, those that each dealer actually made as a Sterling (and continuing Ford) dealer. (Ex. 13 ¶ 14 (lost profits are "equal to the profits that Plaintiffs would have earned

17

had Ford continued to produce heavy trucks, minus the profits that Plaintiffs actually earned" in the real world).)

Assessing each of these elements requires investigation into the particular facts of a plaintiff's business.  Courts have long held that to calculate a business's lost profits, the particular facts of the plaintiff's business must be considered.  See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 455 (3d Cir. 1977) (when a plaintiff elects to prove damages on the basis of lost profits, his proof "necessarily would focus on the operation of his business.").  Indeed, courts have found that the class action vehicle is ill-suited to lost-profits damages claims for this very reason.  See id.; Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342-343 (4th Cir. 1998); Lazy Oil Co. v. Wotco Corp., 95 F. Supp. 2d 290, 303 (W.D. Pa. 1997).  When "the calculation of lost profits is too dependent upon consideration of the unique circumstances pertinent to each member," decertification is proper. Broussard, 155 F.3d at 343 (citations omitted).

Individualized differences that can affect a plaintiff's lost profit damages include "both tangible factors like market saturation, shop location, and the local economy, and intangibles like the level of service at each shop and the management skills of the franchisee."  Id.  Failure to consider relevant differences between individual class members' lost profits results in overly generalized lost profit damages estimates that are speculative and unreliable, necessitating class decertification.  See Lazy Oil, 95 F. Supp. 2d at 301-03 (discussing the variation in the length of time it takes to stimulate production among producers, differences in the properties that would affect the cost of new drilling, and the possibility that some producers could operate in an unreasonable fashion).

In this case, there is no dispute that individual business and market factors affect each dealer's profits.  Individual dealers have acknowledged that time and

again, both in deposition testimony (where depositions have been allowed) and in interrogatory responses (where dealers actually responded).  And Ford's damages and market experts have agreed. 3/

The several class members who sat for damages depositions uniformly acknowledged that local competition affects the dealership's profitability and bottom line.  (See Ex. 11 at 77-78; Ex. 15 at 108; Ex. 18 at 56; Ex. 6 at 72; Ex. 7 at 120-21; Ex. 17 at 96-97; Ex. 8 at 86-87; Ex. 14 at 67-68; Ex. 5 at 33; Ex. 16 at 81-82.)  For example, the 30(b)(6) deponent for class member Trans-West testified that every other heavy truck manufacturer has a dealership within a radius of a few miles – or even a few blocks – of his location, and he described the "cutthroat" parts business competition in his area.  (Ex. 5 at 32-33, 62-67.)  Class member Carmenita Truck Center faced a new competitor in 2000, when a publicly-traded company bought a locally owned Peterbilt dealership, which previously had not been competitive with Carmenita.  (Ex. 15 at 125-28.)  Between 1997 and 1999, class member Peach State Ford faced much more aggressive competition from

---

3/      "[A]ny reliable damage estimate here must properly consider the economic factors encountered by individual dealers . . . including . . .  the number and strength of other competitors and relevant local economic conditions . . . the loss or gain of individual customers in such areas; and idiosyncratic factors unique to the individual dealers themselves such as the quality and strength of management and sales personnel, and strategic imperatives; and how all such factors, among others, may have changed over time."  (Ex. 31 ¶ 8; see also Ex. 33 ¶¶ 15-16 ("[A] number of different individual factors can and do affect an individual truck dealership's profitability . . . rang[ing], for example, from a truck dealership's level of local competition; a dealership's location and service capabilities; the quality of a dealership's business systems and business processes; the financial health of a dealership's largest customers; the state of the local and national economies; the quality and performances of a dealership's dealer principal or general manager; and the quality and performances of a dealer's sales and service managers, and respective sales and service forces.  And any changes in these various factors over time . . . can and will affect a truck dealer's profitability.")

Atlanta Mack, which stepped up efforts to draw customers toward Mack and away from Peach State.  (Ex. 17 at 192-93.)  Class member Grande Truck Center transferred its Freightliner franchise to the owner's son at another dealership five miles away in 1997, with the predictable effect – lost sales to the new franchise.  (Ex. 9 at 46-53.)  These facts regarding local market competition – which Ford must be allowed to develop at trial for each plaintiff – define the profitability of individual dealers and overwhelm any conceivable common issue.

And there is more.  According to the dealers' own testimony, the financial condition of a dealership's largest customers affects order volume – and ultimately the dealership's profitability.  (Ex. 11 at 78-79; Ex. 10 at 13; Ex. 15 at 155; Ex. 18 at 81-82; Ex. 6 at 72-73; Ex. 9 at 201-02; Ex. 4 at 61-64; Ex. 7 at 123-24; Ex. 17 at 99-100; Ex. 8 at 89-90; Ex. 14 at 86-87; Ex. 5 at 68-69; Ex. 16 at 82-83.)  Even among the small number of class members Ford was allowed to depose, particular dealers testified that they lost customers during the damage period.  Trans-West, for example, testified that its customer, Inner Pipe, went out of business in the first half of the damages period.  (Ex. 5 at 84.)  Thus, individual issues predominate not only with respect to local competition, but also with respect to individual dealers' customer bases.

Class members also agreed that the quality of their sales staff affects their bottom line.  (Ex. 10 at 226-228, 234-39; Ex. 11 at 80-84; Ex. 15 at 23, 82-84, 151; Ex. 18 at 102; Ex. 6 at 79-81, 89-90; Ex. 9 at 202-203; Ex. 4 at 67-68; Ex. 7 at 130-33; Ex. 17 at 101-04; Ex. 8 at 91-92; Ex. 16 at 88, 90-91, 93-95.)  Dealers conceded that they did not retain the same personnel throughout the damages period, and many explicitly testified to changes that negatively affected their sales.  (See, e.g., Ex. 15 at 69-73 (management restructuring in 2000); Ex. 18 at 108-115 (service managers and parts manager left within damage period); Ex. 6 at 85-90

(high turnover and difficulty retaining qualified sales managers during late 1990's and early 2000's); Ex. 9 at 14-15, 86-88, 94-95 (testifying to the loss of four or five salespeople, six service mechanics, and the general manager during the damages period).)  As a single example, class member Tom Boland Ford's one and only heavy truck salesman died around the time of the transition from Ford to Sterling heavy trucks and was not replaced for three to six months.  (Ex. 14 at 42-44.)  Parts managers were stealing from the dealership, see id. at 119-121, and the replacement heavy truck salesperson was fired for lying to customers.  (Id. at 46-48.)

These three examples – local competition, changes in customer base, and internal personnel and other business issues – are only a few of the myriad unique issues which affect each dealership differently and must be considered for every single class member in order to accurately calculate lost profits.  As in Danvers Motor Co., 543 F.3d at 148, the issues that must be considered on an individual dealer basis dwarf any common issue to be presented at trial.  Individual issues not only predominate at the damages stage, they are in fact the *only* consideration in calculating the lost profits for each dealer.   Thus, decertification is appropriate.

### B.   The Freightliner Sale Affected Each Dealer In Widely Varying Ways, And Many Were Net Better Off.

With all this variability among the dealers, it is not surprising that plaintiffs' own expert has now acknowledged that a significant number of dealers were not injured but benefited by Ford's sale of the heavy truck business to Freightliner. Thus, this class must be decertified for the same reason the class was in Danvers Motor Co., 543 F.3d at 148 – even by plaintiffs' lights, Ford's alleged conduct had a tremendously variable impact on its dealers.

### 1.      Plaintiffs Concede Some Dealers Benefited.

Calculation of lost profits must take into account profits each dealer actually earned that are attributable to the sale.   Plaintiffs admit they must account for these profits each dealer actually earned, and they do (in part) by acknowledging that as a result of the Ford-Freightliner deal, each class member obtained the ability to sell the Sterling HN-80 that they would not have been in a position to sell had Ford remained in the heavy truck business.  (Ex. 30 at 44, 399, 402.)  Some dealers not only obtained the ability to sell the Sterling HN-80s, but also units they list on their financials as "Other Sterling," such as the Acterra.  (See, e.g., Ex. 11 at 57; Ex. 10 at 57-58, 70; Ex. 17 at 83; Ex. 14 at 33; Ex. 7 at 101.)  Additionally, some dealers were able to parlay their Sterling franchise into authorizations to sell Western Star and/or Freightliner trucks.  (See, e.g., Ex. 10 at 52-53, 70; Ex. 11 at 49; Ex. 17 at 87-88; Ex. 14 at 36-37.)  The only way to adequately account for such profits actually earned is to examine each particular dealer to see if the dealer made such sales, and what profits the dealer made as a result.  Dr. Manuel has purported to do that, and based just on his partial counting of actual Sterling sales, he now acknowledges that here, as in Danvers, "[s]ome dealers benefited from the [Freightliner sale], while others were harmed."  543 F.3d at 148.

### 2.      When All Benefits Are Counted, Many More Were Better Off.

In fact, Dr. Manuel severely underestimated the benefits dealers realized from the Freightliner/Sterling transition.  Not only did he undercount the Sterling sales each dealer made, but he completely ignored benefits the dealers realized on the Ford side.

**Added Super Duty/Excursion Production.**  First, most of the class member dealers benefited because Ford substantially increased its production of

Super Duty and Excursion models after moving heavy truck production out of the Kentucky Truck Plant.  (Ex. 20 ¶¶ 4-5, 7-8; Ex. 31 ¶¶ 75-76.)  Prior to the transition, many of Ford's heavy truck dealers were clamoring for additional Super Duty trucks, and demand for these products greatly outstripped supply.  (Ex. 8 at 80-82; Ex. 14 at 165-66; Ex. 9 at 148-50; Ex. 10 at 140, 143-44; Ex. 5 at 130-31.)  After selling its heavy truck line to Freightliner, Ford was able to increase Super Duty production very significantly using the production capacity previously occupied by the HN-80 line.  (Ex. 20 ¶ 8.)  Many dealers acknowledged that they enjoyed additional profits due to increased supply of Super Duty trucks after the transition.  (Ex. 14 at 166-68; Ex. 9 at 150; Ex. 8 at 81-81; Ex. 5 at 130-31.)

**New Ford Product Line Authorizations.**  In addition, certain selected dealers received additional product line authorizations under their Truck Agreements as a direct result of the Freightliner sale.  Going back to the early 1990's, the Ford Heavy Truck Dealer Counsel had urged Ford to allow heavy truck dealers the right to sell so-called "commercial trucks," or trucks over 8,500 pounds gross vehicle weight (GVW), which a number of dealers were not authorized to sell under their Truck Agreements.  (Ex. 34.)  These trucks included the very popular F-250HD and F-350 Super Duty truck lines.  (Ex. 35; Ex. 17 at 80-81.)  Ford was unable to implement its long-awaited "commercial truck strategy," because production constraints meant insufficient supply of the trucks.  (Ex. 36; Ex. 37; Ex. 38.)  But after transferring the heavy truck product line to Freightliner, and thereby freeing up its production and assembly capacity at KTP, Ford was finally able to implement the commercial truck strategy by offering – and ultimately providing – the 8,500 GVW franchise to more than a dozen dealers.  (See, e.g., Ex. 39 at No. 2(e); Ex. 40 at No. 2(e).)  Profits attributable to such additional vehicle sales by class members that would not have occurred without Ford's

23

reconsideration of its commercial truck strategy in the aftermath of the transition must be considered on a dealer-by-dealer basis.

**Ford Incentive Programs.**  Ford also offered its heavy truck dealers various incentive programs in conjunction with the Freightliner sale; each dealer's use of these programs must be taken into account when determining the profits each actually earned as a result of the Freightliner sale.  (Ex. 21 ¶ 9.)  For example, Bi-state's interrogatory responses indicate that it received $70,000 from Ford's special heavy truck parts return, offered only in conjunction with the sale.  (Ex. 41 at No. 2(a).)  Evidence in the record indicates that eight dozen dealers took advantage of this parts return.  (Ex. 22.)  Other dealers received $30,000-$150,000 under the Small Market Improvement Strategy that Ford offered after they left the heavy truck business.  (Ex. 23.)  These are just two examples of a variety of incentive programs made available at the time of the transition, the effect of which must be analyzed on a dealer-by-dealer basis.  (Ex. 21 ¶ 9.)

**Added Sales Due to Shifted Resources.**  In addition to selling the new Sterling products and additional Ford units, many dealers have also acknowledged that after the Freightliner sale, they gained new sales by shifting resources to other lines.  Some shifted to selling other lines of heavy trucks.  (See, e.g., Ex. 42 at No. 1(a).)  Other dealers opted to focus on other types of vehicles.  For example, Bayou City Ford Truck Sales shifted personnel from heavy trucks to selling light, medium, and used trucks.  (See, e.g., Ex. 43 at No. 1(a); see also, e.g., Ex. 44 at No. 1(a) (hired an exclusive used truck salesman and increased inventory and advertising of used trucks).)  Lake Erie Ford Truck moved some of its sales personnel to its Peterbilt store, presumably resulting in additional Peterbilt sales.  (Ex. 45 at No. 1(a).)  Barry Motor Co. reassigned personnel to selling light duty trucks and cars.  (Ex. 46 at No. 1(a).)  Eckenrod Ford increased its heavy truck used inventory, Ex.

47 at No. 1(b), and Don's Truck Sales increased its used car inventory, Ex. 48 at No. 1(a).  Mike Kehoe switched its focus to service and maintenance, Ex. 49 at No. 1(a), and National Car Sales, Inc. focused on selling parts, Ex. 50 at 1(b).  Bob Rice Ford developed a motor home service business at the dealership, Ex. 51 at No. 1(a), and Crossroads Ford went into the leasing business, Ex. 52 at No. 1(a).  Gateway Motors acquired a Hyundai dealership.  (Ex. 53 at No. 1(c).)  Gabrielli acquired a Kenworth franchise and increased Mack sales.  (Ex. 54 at No. 1(d).)  LJL obtained a Mack and Mitsubishi franchise.  (Ex. 55 at No. 1(d).)  Lakeland and Westgate both acquired UD Nissan franchises.  (Ex. 56 at No. 1(a) and Ex. 57 at No. 1(a).)  None of this relates to any failure to mitigate.  Instead, each of these dealers redeployed resources to increase actual sales in ways they would not have done had Ford remained in the heavy truck business.  Those additional actual sales must be accounted for in Dr. Manuel's lost profits rule – profits that plaintiffs would have earned had Ford continued to produce heavy trucks, minus the profits that plaintiffs actually earned.

All of these benefits must be taken into account in assessing the actual financial impact Ford's sale to Freightliner had on each individual dealer, and when they are counted, the number of dealers who benefited from the Freightliner sale will obviously climb much higher than Dr. Manuel's estimate, based as it was only on partial Sterling sales.  In any event, Dr. Manuel's concession alone makes clear that the Freightliner sale affected each dealer in widely different ways, just the sort of variability that required decertification of the damages class in Danvers: "Some dealers benefited from the [Freightliner sale], while others were harmed." 543 F.3d at 148 (emphasis added).

25

### 3.   Dr. Manuel's Report Thus Confirms Deep Intra-Class Conflicts.

The plaintiffs' concession that some dealers benefited not only destroys any hope that common issues could predominate in computing each dealer's damages. It also reveals just the kind of intra-class conflict that requires decertification.  In considering whether a named plaintiff can adequately represent a class, a court asks whether "conflicts of interest" exist between the "named parties and the class they seek to represent."  Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006) (internal quotation marks omitted).  Here, such conflicts permeate the class.

Plaintiffs now admit that Ford's decision to stop production of heavy trucks and sell its business to Freightliner was an *advantage* to some class members.  "Plaintiffs'" expert takes that position even as to some dealers who have themselves testified that they believe they suffered damages due to Ford's sale to Freightliner.  (Compare Ex. 32 at Manuel Tab 37, 12 (calculating that Peach State Truck Center performed better, and made more sales, with a Sterling franchise than it would have under Ford) with Ex. 17 at 221-22 (contending that Peach State lost profits due to the transition to Freightliner and stating that he would "hire an expert" to calculate the amount of damages) and Ex. 58 at Nos. 11, 12 (relying on experts for damage calculation); see also Ex. 30 at 347-351 (plaintiffs' expert testifying that he did not communicate with those dealers for whom he calculated zero damages or gains from the sale, and that he was unaware whether plaintiffs' counsel had).) 4/

So plaintiffs' counsel and their class representative clients have now submitted an expert report purportedly on behalf of the class, even though that

---

4/      And this problem will only grow when Dr. Manuel takes account of the tens of thousands of additional Super Duty and Excursion units and other benefits made available for dealers to sell as a result of the Freightliner transition, because the number of dealers with "zero damages" claims will rise dramatically.

expert admits that certain "absent" dealers who think they have suffered damages actually have no damages claim at all.  These dealers, herded together into the present makeshift class on damages, are likely unaware that "their" expert has found they suffered none.  Such a perverse result undermines any claim that the named plaintiffs are typical of or adequately representing a class of dealers.

It is bad enough that the present class includes some dealers who plaintiffs' "class expert" agrees were better off for Ford's conduct and so have no claim, but here the conflict goes even deeper because class members competed against each other.  In a lost-profits damages case premised on a finite market share, it is in each dealer's interest to show that he would have "beat" his fellow Ford/Sterling dealer and earned more had Ford stayed in the business.  Class members' interests are thus indisputably divergent.  Here, Dr. Manuel confessed that, rather than use a regression to predict lost sales for each dealer, he actually predicted a market share percentage for all dealers as a group (either from Build Plan 603 or an average of Build Plan 603 and the 90-Day Study), and then used the regression only to allocate the resulting "forecasted" lost sales to particular dealers.  (Ex. 30  at 121; see id. at 440-41, 444-45.)  Dr. Manuel admits that the effect of calculating lost sales this way means that gained sales for one dealer translate to lost sales for another dealer.  (Id. at 440.)  Yet neither Dr. Manuel nor plaintiffs' counsel have explained how this method can possibly estimate the lost sales for any particular dealership.  (See id. 120-121, 488-89.)  An individualized trial would afford each dealership the opportunity to put forth his best case for damages.

Moreover, the presence of dealers in the class that benefited from the transition has the effect of decreasing all class members' damages.  Because any remotely accurate calculation of the damages of the entire class must sum the positive damages of class members harmed and the negative damages of class

27

members that benefited, the ultimate effect is that the total damages to be apportioned to "loser" Dealer X is smaller because of the benefits enjoyed by "winner" Dealer Y. 5/  Indeed, Dr. Manuel acknowledges in his report that even using his own methodology, the damages he calculates under his Build Plan model decrease from $130,612,634 to $95,465,884 because of the inclusion of dealers who benefited from Ford's sale of the heavy truck business to Freightliner, see Ex. 32 at Manuel Tab 36, 1-2, and the damage amount he calculates under his Midpoint Damage model decreases from $236,180,779 to $217,263,613 for the same reason.  (See Ex. 32 at Manuel Tab 37, 1-2.)  Ultimately, if any dealer was actually harmed (and Ford disputes any were), success in a trial of "classwide" damages would result in lower damages for those dealers than they might be able to prove if left to try their claims alone. 6/

Again, Danvers decertified for this reason as well.  Not only did  "[s]ome dealers benefit[] from [Ford's conduct], while others were harmed," 543 F.3d at 148, but "some dealers lost sales to other certified dealers."  Id.; see also Bieneman v. City of Chicago, 864 F.2d 463, 465 (7th Cir. 1988) (rejecting class certification while some were harmed by the noise of operations at O'Hare Airport, some residents benefited, and effect depended on many variables including topography/flight patterns, homeowners who want to sell businesses versus those who did not, etc.); see also Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280

---

5/     Of course, Dr. Manuel's complicated calculations for estimation would not be used in individualized cases but rather would be substituted with documents and discovery to prove an individual dealer's case.

6/     Dr. Manuel's indication at his deposition that damages will not necessarily be apportioned according to the damage calculations he computes does not solve the problem but rather increases the likelihood of conflicts, entrusts their resolution to "backroom" negotiations, and further calls into question the sustainability of the class.  (Ex. 30 at 348-349.)

(11th Cir. 2000) (decertifying class which "include[d] those who claim harm from the very same acts from which other members of the class have benefited").  Thus, Dr. Manuel's testimony not only fails to sustain plaintiffs' burden to prove that common issues predominate, but it affirmatively demonstrates the intra-class conflicts that require decertification.

> **C.   Plaintiffs Also Raise Individualized Issues In Seeking to Avoid the General Releases Signed by Over 30 Individual Dealers.**

Over 20 percent of the dealers now part of the class have released their claims against Ford.  Five have openly admitted that their releases are valid and binding and preclude the claims counsel is purporting to advance on their behalf. (Ex. 59.)  But about 30 dealers have claimed that their releases do not apply.  Ford has now deposed almost all of them, and each has advanced its own separate reason why it believes its general release does not bar the claims asserted here.

Ford has moved for summary judgment based on these releases because each unambiguously discharges Ford from all claims, including those advanced by plaintiffs' counsel here.  See Mot. for Summ. J. as to Thirty-Six Class Members, filed June 5, 2009.  Should the Court deny Ford's summary judgment motion on the release issue, however, each releasing dealer apparently will advance its own unique factual reasons for escaping the effect of its release, and this issue will become yet another individualized factor not common to the class. 7/  As a result, if it must be tried, the validity of each release cannot be effectively addressed in a class action damages trial, and decertification is appropriate on this ground as well.

---

7/    The variety of their arguments is limited only by the number of releasing dealers.  As explained in detail in Ford's Motion for Summary Judgment as to the Claims of Thirty-Six Class Members, each releasing dealer raises one or more of several reasons as to why its general release is purportedly invalid.

29

## II.   THE CLASS SHOULD BE DECERTIFIED BECAUSE A CLASS TRIAL WOULD BE ENTIRELY UNMANAGEABLE AND AN ALTERNATIVE MECHANISM FOR ADJUDICATION OF DAMAGES IS SUPERIOR.

### A.   Class Adjudication of Each Dealer's Lost Profit Damages Would Be Unmanageable.

To sustain class certification, the Court must also find by a preponderance that the class mechanism remains the superior method of resolving the action, considering "likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  "[W]here the issue of damages . . . does not lend itself to . . . mechanical calculation, but requires separate mini-trial, of an overwhelming large number of individual claims, courts have found that . . . the damage aspect of the case predominate[s] and render[s] the case unmanageable as a class action."  Windham v. American Brands, Inc., 565 F.2d 59, 67 (4th Cir. 1977); see also 5 Moore's Fed. Prac. § 23.46[2][e] at 23-280 (2008) ("If each class member's individual damages claim must be resolved, and if each damages calculation is relatively complex, the class is probably unmanageable.").  Just so here.  The inherently individualized nature of lost profit damages class adjudication would raise insurmountable trial management challenges and is not superior to other methods for resolving the damages phase of this case.

Complicating matters further, plaintiffs have used class certification to avoid having to provide the actual evidence that is required for a lost profits plaintiff to prove damages, and also to avoid having to provide Ford the opportunity to discover and fully and fairly challenge each dealer's damages claims.  That is especially egregious here, where lost profits claims are not only highly individualized and complex, but also run into the many millions of dollars.  The Supreme Court has held that Rule 23's procedural rules cannot abridge any

30

substantive right of a party.  See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997); Cimino v. Raymark Indus., Inc, 151 F.3d 297, 312 (5th Cir. 1998) ("[T]he applicability of the Seventh Amendment is not altered simply because the case is a Rule 23(b)(3) class action.") (citations omitted).

Here, the dealers making up the class have provided either no evidence supporting their substantial damage claims or virtually none.  Thirty-one class members, including several of those that are actively contesting the validity of their releases, 8/ have not produced a *single document* in response to Ford's document requests.  Of those class members who have ostensibly complied with Ford's document requests, 42 produced fewer than 100 pages.  For example, five class members 9/ assert claims that plaintiffs' expert collectively values at between $14,264,137 and $21,581,686 (the expert does not say which).  (Ex. 32 at Manuel Tab 36, 12-14; Manuel Tab 37, 12-14.)  Yet taken together, these five plaintiffs have provided only 70 pages of documents in total.  Twenty-six class members 10/ have either completely failed to respond to the court-approved interrogatories or have submitted "responses" that include objections but leave blank spaces for the answers.  Meanwhile, Ford has only been permitted to depose a small fraction of the class members to discover key real-world facts that affect each dealer's damage

8/      E.g., Martin Automotive, Southwest Truck Sales, Bob Rice Ford, Lake Erie Ford Truck, Ron Blackwell Ford.

9/      Chesapeake Ford Truck Sales (18), Sacramento Valley Ford Truck (17), Southland Truck Center (0), Southside Ford (0), Tri-Point Ford Truck Sales (35).

10/     Country Ford Trucks, Diesel Truck Sales, Don's Ford, Inc., Fred Jones Auto Collection, Gator Ford Truck Sales, Genesee Ford Truck, Grappone Truck Center, Great Southern Truck Company, Lee-Smith Ford, Martin Truck Center, Max Larsen, Mike Raisor Ford, O'Connor Truck Sales, O'Connor South, Paul Miller Ford, River City Ford Truck Sales, Riverside Truck Center, Roberts Ford Truck, Ron Blackwell, Southland Truck Center, Southside Ford, Trans-Power Ford, Truck City Ford, Truck Parts & Equipment, Utah Auto Collection, Whited Ford Truck Center.

claims.  See supra, section I (discussing the individualized nature of each dealer's claims for damages).

To try this case as a class action would be to allow plaintiffs to continue to shirk their discovery obligations and to use their mass class grouping to falsely prop up each individual dealer's unproven damages claim, all the while denying Ford the ability to meaningfully challenge each dealer's damages based on real-world factors affecting the individual class members. Going forward in this manner would, in violation of the Rules Enabling Act, impermissibly abridge Ford's due process and Seventh Amendment right to prepare and present its case.

### B.     Other Methods Exist for Trying Plaintiffs' Claims That Are Far Superior Because They Allow Trial Presentation on the Individualized Issues Critical To a Proper Determination of Lost Profit Damages.

In order to find that Rule 23(b)'s superiority requirement continues to be met, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." Georgine v. Amchem Prods., 83 F.3d 610, 632 (3d Cir. 1996) (internal quotations omitted). Decertification is proper where "[t]he multitude of individualized issues presented in plaintiff's claims would entail complicated mini-litigations within the class action itself [rendering it] neither more fair nor more efficient to proceed with th[e] matter as a class action." Danvers Motor Co., 543 F.3d at 149.

If this Court grants Ford's motion for summary judgment on liability, the need for trial will be moot.  But if not, there is ample precedent for bifurcation of the matter, with class adjudication limited to the common question of whether Ford breached its Agreements, and then individual determinations of each plaintiff's damages.  See Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994) (stating that "under well-established principles of modern case management,

32

actions are frequently bifurcated" and that "classes can be certified for certain particularized issues").  The advisory committee to the Federal Rules has noted that Rule 23 contemplates class adjudication of liability issues with "the members of the class . . . thereafter . . . required to come in individually and prove the amounts of their respective claims."  Gunnells v. Health Services Plan, Inc., 348 F.3d 417, 428 (4th Cir. 2003) (quoting Fed. R. Civ. P. 23(c)(4) advisory committee's note, 1966 Amendment).

Once the common and individual issues are bifurcated, a number of options are available for efficient trial at the damages phase.  "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues."  Carnegie v. Household International, Inc., 376 F.3d 656, 661 (7th Cir. 2004).  Such solutions could entail, among other things, "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages [or] . . . altering or amending the class."  Id. (internal citation omitted).  See also George Lussier Enterprises, Inc. v. Subaru of New England, No. 99-109-B, 2001 WL 920060, at *1, *20 (D.N.H. Aug. 3, 2001) (finding individual dealer's damages would require consideration of individual factors and concluding that, if the manufacturer were found liable, each dealer's damages could be resolved through individual trials or trials in groups to adequately take into account these differences in alleged injury).

Here, a class trial on damages would be utterly unmanageable because it would require proper discovery into scores of additional dealers' lost profits claims, and then a trial of more than 100 different dealers' individualized circumstances in a single proceeding.  But there is no reason why the damages phase could not be tried in groups, as so many courts have done, with the first being the dealers who

have already provided discovery – the three named plaintiffs and the thirteen additional "absent" dealers who Ford was permitted to depose.  The additional discovery needed would be very limited, and the trial would actually be quite feasible.

### C.   Plaintiffs Are Sophisticated Businesses With Sizable Claims, Capable of Litigating Their Claims in an Individualized Fashion.

Such an approach is entirely appropriate here, because these dealers are not asserting the sort of small, homogeneous damages claims for which the class action mechanism was designed.  Here, the class is made up of sophisticated businesses fully capable of litigating their own claims.  Heavy truck dealerships are not small "mom-and-pop" operations with homogeneous claims; rather, they are multi-million dollar businesses of very longstanding success.  (See, e.g., Ex. 10 at 192-95 (listing Boyer's multi-million dollar total gross profits from 1996 through 2000); Ex. 3 at 19 (dealer in business for decades).  At bottom, this Court had it just right in Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.:  "[T]he purported class members are all motor vehicle dealerships; each is a substantial business capable of litigating for itself."  149 F.R.D. 65, 74 (D.N.J. 1993).

And the individual dealer's damages claims run into the many millions of dollars, clearly sums worth litigating if a dealer actually believes it has a claim. (Ex. 32 at Manuel Tab 37, 14 (showing individual dealer damages as high as $17,815,097).)  The reason plaintiffs so desperately want to maintain their class is simple:  While each dealer's claim is obviously of litigable size, the plaintiffs' strategy is gain advantage in their sum – by addressing the matter as a class, plaintiffs can argue not about an individual dealer's losses (or gains), but can instead proclaim that all the various claims add up to a huge number (according to Dr. Manuel, either $95,465,884 or $217,263,613, he is not sure which).  (Id. at

Manuel Tab 36, 1; Manuel Tab 37, 1.)  The district court in <u>Stoudt v. E.F. Hutton & Co.</u> could have had a case just like this in mind when it warned that "Rule [23] was not designed to permit large claimants, who are fully capable of proceeding on their own, to strengthen their bargaining position by threatening their adversaries with the prospect of class-wide relief and large attorney fee awards."  121 F.R.D. 36, 38 (S.D.N.Y. 1988).

Courts have found class certification inappropriate because of the large size of each individual damage claim.  <u>Stoudt</u>, 121 F.R.D. at 38 (denying certification in case in which each plaintiff had claims of $60,000 or more); <u>Robin v. Doctors Officenters Corp.</u>, 123 F.R.D. 579, 582 (N.D. Ill. 1988) (stating that plaintiffs claiming losses of over $360,000 were clearly capable of seeking recovery in individual litigation); <u>Commander Prop. Corp. v. Beech Aircraft Corp.</u>, 164 F.R.D. 529, 542 (D. Kan. 1995) (noting that purchasers of airplanes had sufficient economic incentive to pursue own claims against manufacturers).

To be sure, if these plaintiffs' lawyers lose their class, some individual dealers are unlikely to pursue their claims against Ford – but that is because they were *not* injured by the sale, but in fact *benefited* financially, once all profits actually earned are considered.  (Ex. 12 at ¶ 22.)  Even using *plaintiffs'* expert's damage calculations, at least 14 and as many as 21 dealers were better off with Sterling.  (Ex. 32 at Manuel Tab 36, 12-14; Manuel Tab 37, 12-14 (noting several dealers who suffered zero damages and in fact enjoyed higher profits as a result of sale).)  And that is before accounting for the huge additional benefits dealers realized selling the additional Super Duty and Excursion units.  Several dealers have already opted out, and a number of others apparently feel that the case is worth so little of their time that they did not bother to respond to court-ordered discovery.  (<u>See</u> Ex. 30 at 139.)  If the case is decertified, those who actually

35

believe they have legitimate damage claims will still be free to pursue them, and trial of their claims can proceed individually or in small groups, affording both sides adequate opportunity to discover and present evidence of each dealer's damages and the jury a fair chance at arriving at a damages award based on a real lost profits trial.

III.   **DR. MANUEL'S NEW METHODOLOGY DOES NOT WARRANT CONTINUATION OF A CLASS WHERE INDIVIDUAL ISSUES PREDOMINATE AND TRIAL WILL BE UNMANAGEABLE.**

Ultimately, this class was certified on a threshold basis when plaintiffs' expert promised more than he could deliver.  In his January 2006 declaration filed in support of class certification, Dr. Manuel testified that he would perform a "regression analysis" to "calculate the 'but-for' sales of Ford heavy trucks by each dealer absent the sale to Freightliner."  (Ex. 28 ¶¶ 65-73.)  Plaintiffs also claimed that Dr. Manuel's analysis would "formulaically account for individual dealer differences[,] and will produce a measure of damages suffered by each member of the proposed class."  Pls.' Mot. for Cl. Cert. (Dkt. No. 150) at 22.  In a supplemental declaration, Dr. Manuel explained that his "proposed methodology consisted of two major steps" – (1) a "regression analysis would be used to estimate on a class-wide basis the number of heavy truck sales lost by each class member"; and (2) "individual dealer financial statements [would be used] to determine the lost profits that would have otherwise flowed to each dealer from those lost truck sales."  (Ex. 29 ¶¶ 2-3, 9-14.)

This Court relied on these representations by plaintiffs and their expert when it certified a class for determination of damages, stating that it was certifying such a class to permit plaintiffs to "attempt to prove on a class-wide basis . . . a regression analysis [to] obtain an estimate of expected market share and lost unit sales for each dealer."  Cl. Cert. Op. (Dkt. No. 165) at 17.

36

But based on recent decisions in this Circuit, "[a] party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 318.  The truth is that no regression could have estimated the lost sales of over 130 business while accounting for the myriad individual facts relevant to each dealer's lost profits claim.  What has changed is that plaintiffs' expert has now abandoned his claim that it could.  In Hydrogen Peroxide, the Third Circuit made clear that "the court's obligation to consider all relevant evidence and arguments [when considering class certification] extends to expert testimony." Id. at 307.  In fact, the Third Circuit explained, "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." Id. at 323.  Now that plaintiffs have abandoned their promise to prove lost unit sales through a single common regression analysis that takes into account individualized differences between dealers, Rule 23's requirements are clearly not met with respect to the issue of damages.

### A.   Dr. Manuel Did Not Base His Predictions of Lost Sales on the Class-Wide Regression That He Promised This Court Would Adequately Take Into Account Individualized Differences Among Dealers.

Dr. Manuel actually performed the "regression analysis [to] obtain an estimate of expected market share and lost unit sales for each dealer," as this Court noted he promised to do when granting class certification.  Cl. Cert. Op. (Dkt. No. 165) at 17.  But having done the analysis, Dr. Manuel then rejected the resulting "estimate of expected market share and lost unit sales for each dealer." The reason is clear:  His regression results confirmed that the dealers were better off with Freightliner/Sterling.

Recognizing that the regression he promised eviscerated plaintiffs' case, Dr.

Manuel set it aside and adopted a completely different approach to estimating the sales dealers would have made had Ford continued in the heavy truck business.  Dr. Manuel elected to estimate "but for" sales based not on the dealers' actual downward sale trends that are the focus of the regression, but instead on two Ford documents he never mentioned in his earlier declarations – collectively eleven pieces of paper, cherry-picked from a production of over 100,000 pages.  Wielding these two documents, Dr. Manuel ignores his own regression based on the dealers' actual sales trends and manages to provide plaintiffs a dramatically different result – actually, two.  Based on one of the documents, Dr. Manuel says the dealers lost a total of $95 million; based on a combination of the two documents, he ups that estimate to $217 million in damages (without interest).  (Ex. 32 at Manuel Tab 36, 1; Manuel Tab 37, 1.)   He has no opinion which is "right."11/

In rejecting his regression, Dr. Manuel gave up the very analysis of lost sales that he claimed would subsume individual differences among the dealers.  As Ford has shown in its Daubert submission, Dr. Manuel's new methodology should be excluded because he has departed from a promised regression methodology to compute class-wide damages.  See In re Methionine Antitrust Litig., No. 00-cv-1311, 2003 WL 22048232, at *4 (N.D. Cal. Aug. 26, 2003) (decertifying class where the expert "did not perform a multiple regression analysis as he promised he would do").  In Methionine, the court explained that it would not have certified in the first place if the class certification moving papers had been based on the expert opinion actually put forward for trial purposes.  See id. at *5.

---

11/    Dr. Manuel conceded at his deposition that "all the regression is doing is saying, okay, out of that – that aggregate total of damages [generated], how did the different dealers sort that out in terms of what each one might expect if there were a – a judgment for the class."  (Ex. 30 at 121; see id. at 440-41, 444-45 (describing the "principal function" of the regression to "allocate damages among the dealers").)

38

Whether Dr. Manuel's new "two document" approach is excluded under Daubert or not, his promise of a common, formulaic regression that eliminates the need for individualized analysis of each dealer's specific business can no longer provide the basis for even a threshold determination that common issues predominate, much less the finding required by the Third Circuit.

## B. The Damage Methodology Dr. Manuel Does Employ is Speculative and Unreliable.

Decertification is all the more appropriate here, because Dr. Manuel's new "two document" approach cannot be allowed to go to a jury.  See generally Def. Ford Motor Company's Mot. to Exclude the Opinions, Reports, and Testimony of Plaintiffs' Expert Ernest H. Manuel, Jr.  After abandoning his regression as a basis for predicting the sales individual dealers would have made had Ford remained in the heavy truck business, Dr. Manuel now bases his projections not on actual historical sales or trends, but on two isolated Ford documents, "Build Plan 603" and the "90-Day Study."  Plaintiffs have absolutely no evidence that the resulting assumed business changes (including enormous continued losses by Ford) would actually have taken place; all the evidence is that they would not.  And plaintiffs have no evidence that the resulting assumed market shares, which form the foundation of Dr. Manuel's lost profits analysis, would actually have been achieved; all the evidence (including Dr. Manuel's regression results) is that they would not.  Thus, Dr. Manuel's new "two document" predictions are without factual basis and entirely speculative, and make Dr. Manuel's opinions inadmissible.

But that is not even the worst of it.  While Dr. Manuel's analysis takes account of the dealers' actual sales of Sterling HN-80's (or at least some of them), it completely fails to account for numerous other sources of known profits that

39

plaintiffs actually earned as a result of Ford's sale of the heavy truck business to Freightliner.  For example, he fails to account for the sales of over 3,000 Freightliner/Sterling trucks – sales he knows happened but failed to include in his analysis.  And even more glaringly, based on conversations with plaintiffs' counsel, Dr. Manuel elected to omit sales of tens of thousands of additional Super Duty trucks that would not have been available for dealers to sell had Ford not succeeded in freeing needed production capacity by transferring its heavy truck operation to Freightliner.  Furthermore, Dr. Manuel's "analysis" is rife with arbitrary and unsupported assumptions that inflate his damage calculations.  To take just two, he calculates purported lost profits extending out two years beyond the 2003 cut-off plaintiffs have long assured would be the end of their damage period, and he has included damages for dealers who are not class members or who have acknowledged they released their claims.  And Dr. Manuel's methodology is fundamentally flawed in myriad other ways as well – he states required analytical procedures but then fails to follow them, he chooses to reject actual data in favor of his own estimates of what the data should have been, and, on top of it all, his work was so laden with errors that it took him three tries just to produce the error-ridden version we now have.

Because Dr. Manuel's report fails to accurately estimate class members' damages, it must be rejected as unreliable.  Even with Dr. Manuel's new "two document" theory, individual issues clearly predominate and intra-class conflicts abound.  Without it, there is no common element to plaintiffs' damages proof at all.

## CONCLUSION

For all of the foregoing reasons, this Court should decertify the damages class.  If this Court grants Ford's motion for summary judgment on the common question of breach, there will obviously be no need to try damages at all.  But if the

Court denies that motion, Ford submits that the proper approach to trying each dealer's damages claim is to begin with trial of those 16 dealers that have actually provided discovery, and then if necessary to allow other dealers who believe they suffered losses to come to court and prove their claims.

Dated:       June 5, 2009

                                                    s/ Dennis R. LaFiura
                                                   Dennis R. LaFiura
                                                   DAY PITNEY LLP
                                                   P.O. Box 1945
                                                   Morristown, New Jersey 07962
                                                   (973) 966-6300

                                                   Jonathan L. Abram
                                                   E. Desmond Hogan
                                                   J. Raymond Reduque
                                                   Erica M. Knievel
                                                   HOGAN & HARTSON LLP
                                                   555 Thirteenth Street, N.W.
                                                   Washington, DC 20004-1109
                                                   (202) 637-5600

                                                   Attorneys for Defendant
                                                   Ford Motor Company