# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BAYSHORE FORD TRUCK SALES, INC., a Delaware corporation; MOTOR CITY TRUCKS, INC., a Delaware corporation; COLONY FORD TRUCK CENTER, INC., a Rhode Island corporation; individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) | HON. JOSE L. LINARES Civil Action No. 99-741 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| FORD MOTOR COMPANY, | ) ) | |
| Defendant. | ) ) | (Document Filed Electronically) |

---

## DEFENDANT FORD MOTOR COMPANY'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BEHALF OF CERTIFIED CLASS

---

DAY PITNEY LLP
P.O. Box 1945
Morristown, New Jersey 07962
(973) 966-6300

HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600

Attorneys for Defendant
Ford Motor Company

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT ......................................................... 1

COUNTER-STATEMENT OF FACTS .............................................. 3

SUMMARY OF ARGUMENT .......................................................... 3

ARGUMENT .................................................................................... 5

I.   FORD DID NOT BREACH THE HEAVY TRUCK
     AGREEMENTS WHEN IT STOPPED SUPPLYING HEAVY
     TRUCKS TO ITS HEAVY TRUCK DEALERS WITHOUT
     ALSO IMPOSING TERMINATION ON THEM. ....................... 5

     A.   The Plain Language of the Heavy Truck Agreements Permit
          Ford to Cease Production Of All Heavy Truck Lines
          Without Liability to the Dealers. ........................................ 5

     B.   In Contrast to *Fette & Causeway*, Plaintiffs' Cases of *Karl
          Wendt*  and *Buono Sales* Are Inapposite. .......................... 9

     C.   Ford Has Never Stopped Supplying Ford Company
          Products to Its Heavy Truck Dealers ................................. 11

II.  THE LAW OF THE CASE DOCTRINE DOES NOT
     PREVENT THE COURT FROM DENYING PLAINTIFFS'
     MOTION FOR SUMMARY JUDGMENT AS TO THE
     CLASS ................................................................................... 15

CONCLUSION ............................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arizona v. California*,
    460 U.S. 605 (1983)....................................................................16

*Buono Sales, Inc. v. Chrysler Corp.*,
    449 F.2d 715 (3d Cir. 1971) ......................................................10

*Culver v. Castro*,
    126 Mich. App. 824 (1983) ........................................................12

*Dasrath v. Continental Airlines, Inc.*,
    467 F.Supp.2d 431 (D.N.J. 2006)..........................................16, 18

*Fette Ford, Inc. & Causeway Ford, Inc. v. Ford Motor Co.*,
    Civil Action No. 97-4311 (D.N.J. Sept. 15, 2000), *aff'd in
    relevant part*, No. 00-2951 (3d Cir. Sept. 26, 2001) ............................passim

*Forge v. Smith*,
    458 Mich. 198 (1998) ................................................................12

*Hamilton v. Leavy*,
    322 F.3d 776 (3d Cir. 2003) ......................................................16

*Jim Barnett Motors, Inc. v. Ford Motor Co.*,
    355 F.2d 502 (5th Cir. 1966) ....................................................8, 9

*Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co.*,
    931 F. 2d 1112 (6th Cir. 1991) ................................................9, 10

*Mich. Elec. Employees Pension Fund v. Encompass
    Elec. & Data, Inc.*,
    556 F.Supp.2d 746 (W.D. Mich. 2008)......................................12

*Soc'y of St. Vincent de Paul v. Mt. Hawley Ins. Co.*,
    49 F.Supp.2d 1011 (E.D. Mich. 1999) ........................................5

*St. Joseph Equip. v. Massey-Ferguson, Inc.*,
    546 F.Supp. 1245 (W.D. Wis. 1982)........................................8, 9

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage*
     *Capital, Inc.*,
     274 F.3d 1085 (6th Cir. 2001) ........................................................................12

**OTHER AUTHORITIES**

Oxford American Dictionary (2006) ........................................................................6

Webster's Third New International Dictionary (2002) ...........................................6

## PRELIMINARY STATEMENT

Plaintiffs' summary judgment motion is based on a fundamental misreading of this Court's December 8, 2005 Summary Judgment Order. They say this Court held that Ford breached the Heavy Duty Truck Sales and Service Agreements (the "Heavy Truck Agreements") "by eliminating the manufacture and sale of Ford Heavy Trucks." Pls' Mot. at 5. But that was not this Court's holding at all. In its original ruling as to the named plaintiffs' contract-breach claim, the Court concluded that "Ford's failure to supply heavy trucks to Plaintiffs, *in the absence of termination by Ford in accordance with the terms of the contract*, was a breach of the [Heavy Truck] Agreements." *See* Summary Judgment Order at 18 (emphasis added). Thus, the Court read the Heavy Truck Agreements as contractually requiring Ford to terminate the dealers, and "Ford's failure to supply heavy trucks to Plaintiffs[] in the absence of [such a proper] termination" was, in the Court's view, how Ford breached the Agreements. *See id.*

In Ford's summary judgment motion and now in opposing plaintiffs', we urge this Court to give that ruling a second look before applying it to over a hundred other plaintiffs because, with respect, it makes no sense. If Ford had imposed termination on each of its heavy truck dealers, it would have denied each of them the right to make up its own mind about whether to terminate or continue. With the transition to Freightliner, each dealer had the opportunity to continue selling the same HN-80 under a different nameplate, and also retained the other valuable aspects of the Ford heavy truck franchise, including the right to provide warranty work to the thousands of Ford heavy trucks then on the highways. Indeed, new evidence from the recent court-ordered dealer depositions demonstrates like never before the concrete benefits dealers retained by choosing to maintain their Heavy Truck Agreements. And critically, if any dealer did not want to take these

opportunities and continue in the heavy truck business, that dealer had the clear and unmistakable right to terminate its Heavy Truck Agreement itself, and to receive exactly the same benefits as it would if Ford had done the terminating.

As a matter of law, there is absolutely nothing in the Agreements requiring Ford to impose termination on any dealer who chose to continue; in fact, a previous Court in this District has already held as much and the Third Circuit affirmed on appeal.  And as a matter of logic, it cannot have been a breach for Ford to leave that decision up to its dealers, since imposed termination would have forced the dealers to forfeit significant business opportunities, including their ability to continue selling the HN-80 as Freightliner/Sterling dealers and provide warranty work on Ford heavy trucks, and also their ability to sell the ramped up production of smaller Ford trucks made possible by the Freightliner transition.  *See* Ford's Mem. in Supp. of Mot. for Sum. J. as to the Class ("Ford Sum. J. Mot.") at 15-19.

In their motion, plaintiffs defy this logic by claiming that "Ford's sale of the Heavy Truck business to Freightliner did not permit termination of the Heavy Truck agreements." Pls' Mot. at 7.  But that is simply not true.  To be sure, if a class member dealer wanted a Freightliner/Sterling franchise, it had to be a Ford heavy truck dealer at the time of the sale.  *See* Ford's Rule 56.1 Statement of Undisputed Facts in Supp. of Sum. J. Mot. ("Ford Sum. J. SOF") ¶ 11.  But obviously, each dealer's rights under its Heavy Truck Agreement were independent of the sale to Freightliner.  Throughout, every dealer had the right to terminate its Heavy Truck Agreement at will if it so chose.  *See id.* ¶¶ 15, 24.  In fact, at least two heavy truck dealers did just that—rather than join Freightliner/Sterling as part of the sale, they concluded that it was in their best interests to simply terminate their Heavy Truck Agreements, and they received the same termination benefits as if Ford had terminated their Agreements.  *See id.* ¶¶

36-37.  It would have made no sense for Ford to impose that decision on all of its other heavy truck dealers, and there was certainly no legal requirement that it do so.

The parties agree that the question of breach is a common issue shared by each member of the class and that this Court can and should decide it on summary judgment.  But we urge the Court to deny plaintiffs' motion and join its predecessor Court in holding there was no breach here.

## COUNTER-STATEMENT OF FACTS

A complete response to plaintiffs' statement of undisputed facts to this motion is set forth in Ford's Counter-Statement to Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Partial Summary Judgment on Behalf of Certified Class ("Responsive SOF"), as well as Ford's Sum. J. SOF, which is incorporated herein by reference.

## SUMMARY OF ARGUMENT

There was no breach when Ford enabled its dealers to continue as Freightliner/Sterling dealers.  First, as noted above, each dealer had the right to terminate the Heavy Truck Agreements themselves at any time, and receive the very same termination benefits as they would if Ford had imposed termination.  There is absolutely no language in the Heavy Truck Agreements that even plausibly required Ford to impose termination on dealers who wanted to continue selling the very same HN-80 trucks as before, and to continue providing Ford warranty service and parts to the many thousands of Ford heavy trucks on the road.  *See* Ford Sum. J. Mot. at 15-19.  Two dealers opted to terminate, but the vast majority voluntarily chose to remain as Ford heavy truck dealers, most for many years, and the Agreements did not require Ford to deny them that opportunity.

Second, plaintiffs cannot avoid that reality by reformulating their theory of breach away from a purported obligation to terminate.  Of late, plaintiffs have been

describing the breach as the mere failure to supply dealers with Ford-branded heavy trucks, but that notion of breach is directly contrary to the Heavy Truck Agreements' plain terms.  The Agreements explicitly grant Ford the contractual right to discontinue "any" heavy truck line, without liability to the dealers.  Indeed, this is true using the plaintiffs' own principles of contract interpretation in their motion.  And as plaintiffs know, another Court in this District, with the Third Circuit's support, has already held that Ford did not breach these same Heavy Truck Agreements based on these same facts—discontinued heavy truck production as part of the transition of the business to Freightliner.  *Fette Ford, Inc. & Causeway Ford, Inc. v. Ford Motor Co.*, Civil Action No. 97-4311 (D.N.J. Sept. 15, 2000) (unpublished), *aff'd in relevant part*, No. 00-2951 (3d Cir. Sept. 26, 2001 (unpublished) ("*Fette & Causeway*"). 1/

Third, even assuming that, as plaintiffs argue, Ford had a contractual obligation to supply dealers with Ford "Company Products" in perpetuity, Ford continued to do just that as to every dealer that opted not to terminate.  Under the applicable Michigan law, the dealers' Heavy Truck Agreements must be read together with the other sales and service agreements that the dealers held with Ford. And when reading those agreements together, it is clear that Ford satisfied whatever obligation it might have had to provide Ford "Company Products" to dealers after the Freightliner sale: from 1997 until today, Ford has irrefutably supplied all these dealers with Ford medium trucks and, in many cases, light trucks, SUV's, and cars.  In fact, as many class member dealers newly admitted at their recent court-ordered depositions, Ford's heavy truck dealers realized a major benefit from Ford's decision to sell its heavy truck business to Freightliner,

---

1/    Copies of the unpublished *Fette & Causeway* opinions issued by the District Court and the Third Circuit are attached as Exhibits A and B to Ford's Sum. J. Mot.

because the sale enabled Ford to manufacture and supply the dealers with significantly increased volumes of "Super Duty" trucks, an extremely popular and profitable vehicle to both Ford and its dealers during the plaintiffs' purported damages period.

Finally, plaintiffs argue that this Court is bound by its prior ruling as "the law of the case." But that is not true at all. Over the course of the limited absent class member discovery ordered by this Court, new facts have emerged that contradict the Court's original ruling. And in any event, with respect, Ford submits that the Court's prior ruling was erroneous under settled law, and the Court is by no means required to grant summary judgment for the class based on an earlier incorrect ruling.

## **ARGUMENT**

## I.    FORD DID NOT BREACH THE HEAVY TRUCK AGREEMENTS WHEN IT STOPPED SUPPLYING HEAVY TRUCKS TO ITS HEAVY TRUCK DEALERS WITHOUT ALSO IMPOSING TERMINATION ON THEM.

### A.    The Plain Language of the Heavy Truck Agreements Permit Ford to Cease Production Of All Heavy Truck Lines Without Liability to the Dealers.

Under Michigan law, as elsewhere, the plain language of the contract controls. *See, e.g., Soc'y of St. Vincent de Paul v. Mt. Hawley Ins. Co.*, 49 F.Supp.2d 1011, 1016 (E.D. Mich. 1999). Here, that language unambiguously permitted Ford to cease production of the HN-80 as it transitioned the business to Freightliner.

The relevant contract language is in two paragraphs of the Heavy Truck Agreements, Paragraph 1(a) and Paragraph 13. In Paragraph 1(a) of the Agreements, the term "COMPANY PRODUCTS" is defined as "(1) new trucks and chassis of series 850 or higher designations and (2) parts and accessories

therefor, as from time to time are offered for sale by [Ford] to Authorized Ford Heavy Duty Truck dealers as such for resale . . . ."  Ford Sum. J. SOF ¶ 23. Relatedly, Paragraph 13 of the Heavy Truck Agreements provides that:

> [Ford] may change the design of any COMPANY PRODUCT, or add any new or different COMPANY PRODUCT or line, series or body style of HEAVY DUTY TRUCKS, at any time and from time to time, without notice or obligation to the Dealer, including any obligation with respect to any COMPANY PRODUCT theretofore ordered or purchased by or delivered to the Dealer.  Such changes shall not be considered model year changes as contemplated by the provisions of any HEAVY DUTY TRUCK TERMS OF SALE BULLETIN.  *[Ford] may discontinue any HEAVY DUTY TRUCK or other COMPANY PRODUCT at any time without liability to the Dealer[s].*"

Responsive SOF ¶ 11 (emphasis added).

Plaintiffs admit that Paragraph 13 grants Ford the right to "discontinue any HEAVY DUTY TRUCK or other COMPANY PRODUCT at any time," but they find in those words a critical limitation.  According to plaintiffs, Ford can discontinue any heavy truck line unless it is the only line, as the HN-80 line was in 1997, in which case Ford is supposedly required to continue manufacturing it.  *See* Pls.' Mot. at 12-13.  That "reading" of the Paragraph is incorrect, however, for at least four reasons.

First, such a reading of Paragraph 13 would require the Court to disregard the plain and ordinary meaning of the sentence.  "Any HEAVY DUTY TRUCK" means just what it says.  *See* Webster's Third New International Dictionary (2002) (defining "any" as "the maximum or whole of a number or quantity"). 2/  Second, there are absolutely no words of restriction or qualification preceding or following

---

2/      Indeed, a more recent edition of the very dictionary cited by plaintiffs in their motion also defines "any" as "some, *no matter how much or many or of what sort*."  Oxford American Dictionary (2006) (emphasis added).

"any HEAVY TRUCK" in Paragraph 13.  Third, plaintiffs effectively concede in their motion that "any," as used in Paragraph 13 at least, does in fact mean "all." The very first sentence of Paragraph 13 contains the term "any" followed by a singular noun as well, providing that "[Ford] may change the design of *any* COMPANY PRODUCT . . . without notice or obligation to the dealer . . . ." Responsive SOF ¶ 11 (emphasis added).  Plaintiffs acknowledge in their motion that "any" in this first sentence grants Ford the right to "change any company product," without limitation.  Pls.' Mot. at 13.  Having conceded that "any COMPANY PRODUCT" in Paragraph 13 means "all COMPANY PRODUC*TS*," plaintiffs cannot rationally claim that in Paragraph 13's other parallel sentence, the meaning of "any" has inexplicably changed.  Paragraph 13 means precisely what it says:  Ford is free under the Heavy Truck Agreements to discontinue *any* or *all* of its heavy duty trucks lines, without liability to the dealers.

Fourth, there is nothing elsewhere in the Heavy Truck Agreements or in their structure that remotely suggests a perpetual obligation of the kind plaintiffs claim.  To the contrary, the Agreements make clear that the dealers have the right to sell those heavy truck products Ford designs and builds for so long as Ford does so; after that, they (or Ford) are free to terminate the relationship, with specified termination benefits, if continued warranty service or other benefits do not warrant continuing their heavy truck franchise.  *See* Responsive SOF ¶ 11; Ford Sum. J. SOF ¶¶ 15, 24-25.

Indeed, other courts confronted with very similar contracts concerning a manufacturer's right to cease production of a product line have granted summary judgment in the manufacturer's favor.  Most obviously, this Court agreed when it read these same Agreements against these same facts in *Fette & Causeway*, Civil Action No. 97-4311.  Two Ford heavy truck dealers made exactly the same claim plaintiffs do here—that Ford breached its Heavy Truck Agreements by not

contractually terminating its heavy truck dealers when it ceased production of the HN-80 and sold the assets of its heavy truck division to Freightliner.  In that case, the Court agreed with Ford that the plain language in Paragraphs 1(a) and 13 of the Heavy Truck Agreements allowed Ford to "discontinue" the HN-80 "HEAVY DUTY TRUCK . . . at any time without liability to the Dealer[s]."  *See id.* at 38 (finding it "axiomatic that Ford's contractual right to cease making *any* of its trucks encompasses its right to cease making *all* of its trucks," and concluding termination provisions were "not implicated" by the Freightliner sale because Ford's Heavy Truck Agreements remained very much alive thereafter) (emphasis added); *see also* Ford Sum. J. Mot. at 12-14.

The holding in *Fette & Causeway* is in keeping with other decisions upholding the right of manufacturers to cease production of product lines.  For example, in *St. Joseph Equip. v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245 (W.D. Wis. 1982), the district court granted summary judgment to a manufacturer of construction equipment, squarely rejecting the plaintiff dealer's claim of breach arising from the manufacturer's decision to cease production of construction machinery after substantial financial losses.  *See* 546 F.Supp. at 1250.  The Court concluded that the manufacturer's decision to completely end its production of construction machinery was not a breach of the relevant dealership agreement because the "clear wording of the agreement" authorized the manufacturer "to discontinue or replace [the construction machinery] without incurring any obligation or liability whatsoever to Dealer[s] . . . ."  *Id.*

Similarly, in *Jim Barnett Motors, Inc. v. Ford Motor Co.*, 355 F.2d 502 (5th Cir. 1966), the Fifth Circuit upheld the district court's grant of summary judgment for Ford against an Edsel dealer's claim for breach of contract, when Ford ceased producing the Edsel due to poor public acceptance.  *See* 355 F.2d at 502.  The Fifth

Circuit found that Ford's decision to terminate production of the entire Edsel line did not breach the dealer's sales and service agreement for the vehicle.  *See id.*

In this case, Ford's Heavy Truck Agreements contain equally "clear" language, authorizing Ford to "discontinue any HEAVY DUTY TRUCK or other COMPANY PRODUCT at any time without liability to the Dealer."  *See* Responsive SOF ¶ 11.  Thus, as the *St. Joseph* court concluded, here too "it is clear as a matter of express contractual language that under the terms of the Dealership Agreement [the manufacturer] had the authority to do as it did . . . and therefore the contract was not breached."  *See St. Joseph Equip.*, 546 F.Supp. at 1251. 3/

### B.    In Contrast to *Fette & Causeway*, Plaintiffs' Cases of *Karl Wendt* and *Buono Sales* Are Inapposite.

Plaintiffs ignore all of this—indeed, they fail even to cite *Fette & Causeway* in their motion, a decision by a Court in this very District that involved the exact same Agreements and facts as this case, and the same theory of breach.  Instead, plaintiffs once again rely on the two cases of *Karl Wendt Farm Equip. Co., Inc. v.*

---

3/      Incredibly, Plaintiffs claim that Stephen Bolerjack, a Ford witness, admitted at his deposition that Ford "would be in breach of the [Heavy Truck Agreement] with dealers if it simply stopped selling company products to them."  Pls' Mot. at 4. That is flatly wrong.  Of course, it is for this Court to decide the meaning of the Agreements' plain language.  But setting that aside, Mr. Bolerjack read the Agreements just as Ford does (and as the *Fette & Causeway* Court did).  First, in the deposition excerpt cited by plaintiffs, Mr. Bolerjack's testimony was as follows: "Q:  If Ford just stopped selling products to the dealer they would be in breach of the contract with the dealer?  A:  Well, there's certainly that.  I think the agreement allows for sales.  There's an obligation for the dealer to sell the products provided."  Responsive SOF ¶ 16.  Despite plaintiffs' spin, Mr. Bolerjack's response does not "admit" liability.  And lest there be any doubt, Mr. Bolerjack later testified that he had not read the Heavy Truck Agreement before his deposition, and that, after actually reviewing it, he believed "discontinuing all lines of heavy trucks does *not* constitute a breach of the agreement."  *Id.* (emphasis added).

*Int'l Harvester Co.*, 931 F. 2d 1112 (6th Cir. 1991), and *Buono Sales, Inc. v. Chrysler Corp.*, 449 F.2d 715 (3d Cir. 1971), and describe them as "remarkably similar" cases.  Pls' Mot. at 15-16.  Both cases, however, are inapposite.

First, in *Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co.*, 931 F. 2d 1112 (6th Cir. 1991), the contract language at issue was materially different than the language at issue here and therefore the case cannot form the basis for summary judgment against Ford.  The relevant language in *Karl Wendt* authorized the defendant International Harvester to make shifts in its farm equipment product lines, but did not allow the manufacturer to discontinue those lines entirely.  *See* 931 F.2d at 1120.  In contrast, the relevant language in the Heavy Truck Agreements gives Ford the unambiguous right to discontinue "*any* HEAVY TRUCK or other COMPANY PRODUCT at any time without liability to the Dealer[s]."  Responsive SOF ¶ 11 (emphasis added); *see also* Ford Sum. J. SOF ¶ 23.  The plaintiff franchisee in *Karl Wendt* was also left without a single company product to sell by International Harvester, and did not qualify for a replacement franchise.  *See Karl Wendt*, 931 F.2d at 1114.  As shown in more detail below, however, Ford continued to supply each of the class member dealers with a number of Ford-branded products after the Freightliner sale, and, at the same time, arranged for the dealers to continue selling the exact same HN-80 trucks as before, only this time with Freightliner/Sterling.

In *Buono Sales*, the court's breach-of-contract liability finding rested on defendant Chrysler's discontinuation of DeSoto production, not its failure to impose termination on its dealers, as found by the Court here.  *See* 449 F.2d at 717; Summary Judgment Order at 18.  The court in *Buono Sales* also never addressed whether the franchise agreements at issue obligated Chrysler to continue reimbursing warranty work performed by the plaintiff dealer.  Here, Ford indisputably remained obligated under the Heavy Truck Agreements for any

warranty work performed by its dealers (and recent deposition testimony of dealers confirmed they have continued to perform warranty work).  Indeed, that is precisely the reason the *Fette & Causeway* Court held that Ford did not implicate the termination provisions in the Heavy Truck Agreements when it sold its heavy truck business to Freightliner.  *See Fette & Causeway* at 38.

C.   **Ford Has Never Stopped Supplying Ford Company Products to Its Heavy Truck Dealers.**

Even if contrary to their plain language, the Heavy Truck Agreements obligated Ford to perpetually supply the dealers with "Company Products," the record demonstrates that Ford has done just that.  In 1997, when Ford sold its heavy truck business to Freightliner, every single class member dealer sold other Ford products in addition to the HN-80 line that was sold to Freightliner.  And since 1997, Ford has supplied each of the dealers with a constant flow of numerous Ford vehicles to sell, including the highly popular Super Duty truck lines (model lines F-250 through F-550), other light and medium duty truck lines, and, for many dealers, SUV's and cars, too.  Ford Sum. J. SOF ¶¶ 16, 40.  In fact, the transfer of Ford's heavy duty truck line to Freightliner resulted in extra capacity at Ford's Kentucky Truck Plant ("KTP"), which, in turn, allowed Ford to supply even *more* Company Products to the dealers, in the form of increased Super Duty volumes and a brand new SUV model.  *See id.* ¶¶ 17-18.

Ignoring this reality, the plaintiffs' motion gives the impression that Ford abandoned its dealers with nearly empty showrooms, with little to no Ford-branded products to sell.  *See* Pls' Mot. at 17-18.  But that is blatantly false.  Setting aside the continued flow of HN-80's from Freightliner/Sterling, the record shows that every single dealer continued to sell a variety of Ford products even after the Freightliner transition.  Ford Sum. J. SOF ¶¶ 16, 40.  Viewing each dealer's relationship with Ford as a whole, as the Court must under Michigan law, each

dealer continued to sell vehicles bearing the Ford brand, one that plaintiffs describe as "one of the most valuable and recognized trademarks in the United States, if not the world."  Pls' Mot. at 18.

Under the applicable Michigan law, when one contract refers to another for additional terms, the contracts must be read together.  *See Forge v. Smith*, 458 Mich. 198, 207 (1998); *see also Culver v. Castro*, 126 Mich. App. 824, 826 (1983); *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001)("When the written agreement refers to a separate document for additional contract terms, the court must read the writings together.") (citing *Forge*, 458 Mich. at 207); *Mich. Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc.*, 556 F.Supp.2d 746, 758 (W.D. Mich. 2008) (same).

Here, all of the class member dealers had at least two—and sometimes three—different sales and service agreements with Ford.  Besides their Heavy Truck Agreements, every dealer also held, at a minimum, a Ford Truck Sales and Service Agreement (the "Truck Agreement"), which, in general, authorized them to sell new trucks below the Ford 850 series designation, including some or all of the Super Duty truck lines.  Ford Sum. J. SOF ¶ 39.  In addition, some class members also held a Ford Sales and Service Agreement (the "Car Agreement"), which authorized them to sell Ford's full-line of passenger cars, SUVs, and certain light trucks.  *See id.*  These Truck and Car Agreements were entirely unaffected by the Freightliner sale.  *See id.* ¶ 16.

These multiple sales and service agreements must be read together because they explicitly refer to one another for additional contract terms and because they define the parties' overall relationship.  For example, the definition of a dealer's "Dealer Locality" under the Heavy Truck Agreement is defined by reference to the dealer's Truck and, where applicable, Car Agreements.  *See id.* ¶ 6.  And there are

- 12 -

a number of other provisions in the Heavy Truck Agreements that explicitly refer to the dealer's Truck Agreements and vice versa. *See id.* (Heavy Truck Agreement ¶¶ 2(a)(4) (promotion of Heavy Duty Trucks by Ford Truck dealers), 10 (allowing distribution of Heavy Duty Truck pricing information to all Ford Truck dealers), 17(f)(2) (cross termination provisions of Heavy Truck and Truck Agreements). And there is no dispute that the dealers viewed their relationship with Ford as a unified whole, as new facts from the recent dealer depositions demonstrate. The customer bases for heavy and other trucks regularly overlap. *See* Responsive SOF ¶ 49. And not surprisingly, dealers' salesmen frequently sell both heavy and medium duty trucks, and sometimes light duty trucks as well. *See id.* ¶ 50. The same sales manager often oversees heavy, medium, and even light truck operations. *See id.* ¶ 51. And dealers' service departments repair not only heavy trucks, but medium trucks and sometimes light trucks, too. *See id.* ¶ 52. Thus, as these business realities of the dealers suggest, and as reflected in the various cross-references among the Heavy Truck, Truck, and Car Agreements, each dealers' various Agreements with Ford should, and under Michigan law must, be read together.

When one reads the Heavy Truck Agreements together with the Truck (and, where applicable, Car) Agreements, it is indisputable that Ford continued to supply the dealers with "COMPANY PRODUCTS" after the sale to Freightliner. There is no dispute that after Ford sold the HN-80 platform to Freightliner, class member dealers continued to sell not only the HN-80, but Ford medium and light trucks, including the Super Duty truck lines, and in some cases Ford cars and SUV's. *See* Ford Sum. J. SOF ¶ 40.

In fact, because of the Freightliner transaction, the class members received a major benefit because Ford was able to significantly increase its production of Ford Super Duties and Excursions. It is undisputed that in the late 1990's, while

Ford's heavy truck business was declining, customer demand for Super Duties was skyrocketing and dealers were consequently clamoring for more supply.  *See id.* ¶ 3.  Ford was unable to meet the market demand for Super Duties because of its then existing limited production capacity at KTP.  *See id.*  But after the sale of HN-80 and transfer of the heavy truck production line to Freightliner, Ford was able to convert production space in KTP to build more of the Super Duty trucks.  *See id.* ¶ 17.  As a result, Ford was able to supply class members with increased allocations of the Super Duty products.  *See id.*  Indeed, class member dealers have acknowledged this increased supply of Super Duties in their damages depositions. *See id.* ¶ 41. 4/  But even setting this increased production aside, there is no dispute that throughout, every class member dealer continued selling other Ford products after Ford transitioned its heavy truck line to Freightliner.

Thus, even if the Agreements required Ford to provide "COMPANY PRODUCTS" into eternity, it never stopped doing so.  In every meaningful sense, Ford has continued to provide each and every plaintiff dealer with Ford-branded "COMPANY PRODUCTS" in the years after Freightliner took over manufacturing the HN-80.  Reading the Heavy Truck, Truck, and, if applicable, Car Agreements together, as they must be, there was no breach. 5/

_____

4/      The increased production capacity at KTP arising from the Freightliner sale even allowed Ford to introduce and provide to class members an entirely new Ford product, the Ford Excursion SUV.  There is no dispute that the Excursion would not have been manufactured had Ford stayed in the heavy truck business.  *See id.* ¶ 42.

5/      A final note on this point.  In asserting that Ford breached the Heavy Truck Agreements because it stopped supplying the dealers with Ford heavy trucks after the Freightliner sale, plaintiffs offer a strangely recharacterized statement of their damages theory, stating that "the dealers will show that they suffered consequential damages from [February 19, 1997] going forward," including, apparently, the lost "opportunity to sell trucks made by a manufacturer with one of the most valuable

## II.   THE LAW OF THE CASE DOCTRINE DOES NOT PREVENT THE COURT FROM DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO THE CLASS.

Plaintiffs argue in their motion that under the "doctrine of the law of the case," this Court is legally required to extend its summary judgment ruling on breach to the entire certified class. *See* Pls' Mot. at 19-20. 6/  But that is not so. This Court can and should grant Ford summary judgment as to the class on the breach-of-contract claim because absent class member discovery since the Court's Summary Judgment Order has uncovered new facts that directly contradict the Court's original ruling, and because as shown above and in Ford's own Motion for Summary Judgment as to the Class, this Court's earlier decision to grant summary judgment to the named plaintiffs was erroneous. 7/

---

and recognized trademarks in the United States, if not the world."  Pls' Mot. at 17-18.  To Ford's knowledge, the only damage claim remaining is the claim for lost profits purportedly quantified by plaintiffs' damages expert, Dr. Ernest Manuel.  In his report, Dr. Manuel "project[s] lost profit damages for 1998 through 2003"— without any damages calculation for 1997.

6/      Plaintiffs also make much of a supposed agreement between the parties to stipulate to an entry of partial summary judgment on behalf of the class, without a single citation memorializing such an understanding.  Pls.' Mot. at 19-20.  Ford has never denied that the Court's interpretation of the named plaintiffs' Heavy Truck Agreements would apply equally to the interpretation of the same Agreements of the class members if governed by the same state law.  Instead, Ford's position, with respect, is that the Court's interpretation of the Agreements as it pertains to the named plaintiffs was incorrect.  Additionally, Ford has never objected to plaintiffs saving time and effort by simply re-filing their original brief for partial summary judgment on behalf of the then-proposed class.  However, Ford has never agreed to stipulate to an entry of partial summary judgment on liability as to the class.

7/      Summary judgment also cannot be entered as to the entire class because more than two dozen plaintiffs have signed effective releases in this matter.  *See* Ford's Mem. in Supp. of Mot. for Sum. J. as to the Claims of Thirty-Six Class

At bottom, the law-of-the-case doctrine does not restrict a court's ability to overturn its earlier rulings in appropriate circumstances. The doctrine "directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 619 (1983). This Court remains perfectly free to reassess the question of breach in light of the pending motions and record and make the decision it believes to be correct.

Moreover, even on its own terms, the law of the case doctrine does not apply: (1) when new evidence is available; (2) when a new law has been announced; or (3) when the Court concludes that an earlier decision was erroneous. *Dasrath v. Continental Airlines, Inc.*, 467 F.Supp.2d 431, 442-443 (D.N.J. 2006) (quoting *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir.1998)). The Third Circuit has recognized that revisiting the reasoning of a previous decision may be especially appropriate when the record contains new evidence that differs materially from the record evidence at the time of the previous decision. *See Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003) (finding law of the case doctrine may be inapplicable to situation where parties engaged in discovery and supplemented the record).

Here, two of the exceptions to the law of the case doctrine exist in spades. First, the record contains new evidence never considered by this Court which undermines the Court's prior ruling. In the last year, Ford has been permitted limited discovery of the absent class member dealers, discovery consisting of document production and interrogatory responses, an initial round of thirteen damages depositions, and twenty-seven depositions of dealers who signed general releases of their claims. In the course of providing this recent discovery, plaintiff dealers have admitted key facts directly at odds with the plaintiffs' original motion

---

Members. Of the releasing dealers, five do not even contest that their releases completely bar their claims in this case. *See id.* at 1, 8 n. 9.

for summary judgment. For example, the new discovery makes clear that far from being left with empty showrooms and nothing to sell, plaintiffs continued to earn profits from selling Ford-branded vehicles after the sale to Freightliner. *See* Responsive SOF ¶ 53.

The new discovery also demonstrates that plaintiffs obtained other significant benefits from continuing under their Heavy Truck Agreements, including very significant reimbursement from Ford for warranty work that they performed as continuing heavy truck dealers, and revenues that they earned as authorized Ford service centers—benefits that would not have been possible had Ford imposed termination on the dealers. *See* Ford Sum. J. SOF ¶¶ 29-33. Even plaintiffs' damages expert agrees that warranty and service work represents a very significant percentage of a heavy truck dealer's profits. *See* Ford Sum. J. SOF ¶ 26 (asserting that lost downstream parts, service, and body shop profits account for sixty-five percent of the dealers' overall alleged lost profit damages). In addition, dealers have now admitted that they specifically chose *not* to terminate their Heavy Truck Agreements precisely because they wanted to retain the significant benefits made available to them under the Agreements. *See* Responsive SOF ¶ 54. For example, class member dealer Rowe Ford Sales unequivocally conceded at its deposition that it chose to continue its Heavy Truck Agreement due to the "benefits that [it] continued to receive even after Ford stopped making new heavy trucks." *See id.* These plaintiff admissions and expert quantifications of warranty and service revenues further demonstrate that Ford was under no obligation to impose termination on dealers who wished to continue their franchise, as this Court originally held. *See also* Ford Sum. J. SOF ¶¶ 31-33.

Second, the Court's prior decision granting summary judgment to the named plaintiffs was erroneous and thus should not be followed as the law of the case. Courts including this one recognize that "the law of the case" does not prevent

them from reaching a correct result when they conclude that a prior ruling was incorrect. *See, e.g.*, *Dasrath*, 467 F. Supp. 2d at 443-448 (D.N.J. 2006) (granting defendant's motion for summary judgment, after previously denying the motion, because upon further review, the evidence showed that the defendant had not engaged in unlawful discrimination after all).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Ford Motor Company respectfully requests that the Court deny Plaintiffs' motion for partial summary judgment and grant Ford's motion, an action that would bring the Court in line with the now-affirmed ruling in *Fette & Causeway* and that would bring this long litigation to a close.


Dated:  July 10, 2009                                  Respectfully submitted,


                                                        s/ Dennis R. LaFiura
                                                       Dennis R. LaFiura
                                                       DAY PITNEY LLP
                                                       P.O. Box 1945
                                                       Morristown, New Jersey 07962
                                                       (973) 966-6300

                                                       Jonathan L. Abram
                                                       E. Desmond Hogan
                                                       J. Raymond Reduque
                                                       Erica M. Knievel
                                                       HOGAN & HARTSON LLP
                                                       555 Thirteenth Street, N.W.
                                                       Washington, DC 20004-1109
                                                       (202) 637-5600

                                                       Attorneys for Defendant
                                                       Ford Motor Company

- 18 -