**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAYSHORE FORD TRUCK, et al., | Civil Action No.: 99-741 (JLL) |
| Plaintiffs, | |
| v. | **OPINION** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

**LINARES**, District Judge.

This matter comes before the Court on Plaintiffs' motion for partial summary judgment on behalf of the certified class, Ford's motion for summary judgment as to the class, and Ford's motion for summary judgment as to the claims of thirty-six class members.[1]  The Court has considered the submissions in support of and in opposition to the motions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Plaintiffs' motion is granted, Ford's motion for summary judgment as to the class is denied, and Ford's motion for summary judgment as to the claims of thirty-six class members is granted.

## I.    **BACKGROUND**

The facts in this case have been more fully set forth in this Court's prior summary

---

[1]Also pending before this Court, but not addressed in this Opinion, are a motion by Ford for decertification of the damages class, and several motions filed by both parties to strike the reports of experts.

judgment and class certification opinions.  Plaintiffs in this action were all dealers of Ford heavy

trucks pursuant to Ford Heavy Duty Truck Sales and Service Agreements ("Agreements").  "The

material terms of the Agreements as they relate to Ford's obligation to supply Company

Products, including Ford heavy trucks, are substantially identical."  (Stmt. Pursuant to L. Civ. R.

56.1 in Supp. of Pls.' Mot. for Partial Summ. J. on Behalf of Cert. Class [hereinafter "Pls.' Fact

Stmt."] ¶ 1.)  Company products was defined in the Agreements as "(1) new trucks and chassis of

series 850 or higher designations and (2) parts and accessories therefor, as from time to time are

offered for sale by the Company . . . ."  (Def.'s Counter-Stmt. to Pls.' Stmt. of Undisputed Facts

in Supp. of Their Mot. for Partial Summ. J. on Behalf of Cert. Class [hereinafter "Ford's Fact

Counter-Stmt."] ¶ 4.)  As this Court has previously held and as both parties agree, Michigan law

applies to the interpretation of the Agreements.  See Bayshore Ford Truck v. Ford Motor Co.,

No. 99-741, CM/ECF No. 146, at 11 (Dec. 7, 2005) (hereinafter "Dec. 7, 2005 Opinion").

     In 2007 Ford chose to sell its heavy truck business to Freightliner/Sterling.  Ford

announced the sale to its heavy truck dealers on February 19, 1997.  (Stmt. of Mat'l Undisputed

Facts [hereinafter "Ford Fact Stmt."] ¶ 10.)  Ford received $300 million dollars for the sale.  As a

result of this sale, Ford stopped supplying heavy trucks to its dealers.  Plaintiffs claim that, in

ceasing to supply heavy trucks, Ford breached the Agreements.  On December 7, 2005, this Court

agreed with Plaintiffs and granted the named Plaintiffs' motion for summary judgment with

regard to liability for its breach of contract claim.  The Court held that "Ford's failure to supply

heavy trucks to Plaintiffs, in the absence of termination by Ford in accordance with the terms of

the contract, was a breach of the Agreements."  (Dec. 7, 2005 Opinion, at 18.)  The court stated

that, "to accept Ford's interpretation of the [Agreement], . . . would effectively allow Ford to

completely change the nature and purpose of the contract unilaterally and without consequence despite express provisions to the contrary." (Id.)

A class of plaintiffs was subsequently certified on September 8, 2006. Plaintiffs' now seek to have the December 7, 2005 summary judgment breach of contract ruling applied to the class as a whole. Ford opposes this on two primary grounds, argued in separate motions: (1) that this Court's original breach of contract decision was incorrect, and (2) that there are individual issues related to thirty six class members which makes summary judgment against them appropriate. With respect to the first ground, Ford also has moved for summary judgment as to the class, seeking to overturn this Court's original holding. In its class summary judgment motion, Ford also seeks summary judgment with respect to the class as to damages.

## II.   LEGAL STANDARD

A court shall grant summary judgment under Rule 59(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324.

## III.   DISCUSSION

The Court addresses the summary judgment motions separately–one set which deals with application of this Court's breach of contract summary judgment holding to the class and the other motion which deals with the individual issues related to thirty six members of the class. In

doing so, the Court notes that reference to the "class" in the discussion of the first set of motions includes only those dealers who are held in this Opinion to be class members. The Court recognizes that Ford objects to thirty six dealers as class members, and, to the extent that this Court rules below that such individual dealers are not appropriate class members, then its decision, applying the December 7, 2005 summary judgment decision to the class, does not apply to them.

> **A.    Summary Judgment on Behalf of the Class**

Plaintiffs' argue that this Court's December 7, 2005 summary judgment opinion, holding that Ford had breached its contract, should be applied to the class as a whole. It is "undisputed that each member of the proposed class had substantially similar [Agreements]." (Br. in Supp. of Pls.' Mot. for Partial Summ. J. on Behalf of Cert. Class [hereinafter "Pls.' Summ. J. Br."], at 2.) Additionally, both "parties agree that the question of breach is a common issue shared by each member of the class and that this Court can and should decide it on summary judgment." (Def. Ford Motor Co.'s Br. in Opp'n to Pls.' Mot. for Partial Summ. J. on Behalf of Cert. Class [hereinafter "Ford's Opp'n Br."], at 3; see also Reply in Supp. of Def. Ford Motor Co.'s Mot. for Summ. J. as to the Class [hereinafter "Ford's Reply"], at 14 ("Ford believed then and continues to believe that all former heavy truck dealers' claims of breach should be resolved consistently.").)

> 1.    Applying this Court's December 7, 2005 Breach of Contract Decision to the Class

In a June 10, 2007 letter to this Court, Ford stated:

**Ford's Recommendation on Summary Judgment Briefing**
Now that a class has been certified, Ford believes that the most efficient course of action would be for the Court to set a briefing schedule for both parties to move for

summary judgment with regard to the class.  In doing so, Ford would not oppose plaintiffs simply re-filing the summary judgment motion (and the related reply brief) that was previously denied without prejudice.  Moreover, *except for any unique issues related to individual class members that were not litigated when the three named plaintiffs moved for summary judgment, Ford would not oppose the Court's December 7, 2005 summary judgment rulings on liability be deemed applicable to all class members as long as all appellate rights are preserved.*

(Ltr. from Ford's counsel, Dennis LaFiura, dated June 11, 2007, at 2 (italics emphasis added, other emphasis in original).)  In its current briefing, Ford references another prior letter to the Court in which it stated that it "clearly retains the right to raise issues related to dealers that have now become plaintiffs as a result of class certification or that arise in discovery, *issues that were not and could not have been presented before that time*."  (Ford's Reply, at 14-15 (emphasis added).)

Despite such representations to the Court, with the exception of its argument that summary judgment should be granted against the class as to damages (discussed below), it is clear that Ford's opposition to Plaintiffs' partial summary judgment motion and its own class summary judgment motion papers, totaling sixty three pages, seeks nothing more than an opportunity to re-litigate issues that were or could have been presented to this Court as part of the original summary judgment cross motions in 2005.  For example, Ford states: (1) "[Ford] urge[s] this Court to give [its December 7, 2005 summary judgment] ruling a second look before applying it to over a hundred other plaintiffs because, with respect, it makes no sense," (Ford's Opp'n Br., at 1); (2) "[W]ith respect, Ford submits that the Court's prior ruling was erroneous under settled law, and the Court is by no means required to grant summary judgment for the class based on an earlier incorrect ruling," (Ford's Opp'n Br., at 5); and (3) "[T]his Court could still rule as the law requires to avoid trial and likely reversal on appeal," (Ford's Reply, at 13).

Apparently Ford believes that it has a right to reconsideration of a prior Court order at any time of its choosing.  In its present briefing it notes:

> [A]s Ford [previously] explained to the Court . . ., it has always maintained (with respect) that the Court's breach-of-contract ruling in its Summary Judgment Order "was wrong," and it has always made clear that, because of its belief that the Court's original contract ruling was wrong, Ford "may well seek reconsideration at some point."

(Id., at 15 (quoting from a letter from Ford's Counsel, Mr. LaFiura, to Magistrate Judge Cecchi dated February 1, 2008, at page 2).)  Ford further states that Magistrate Judge Cecchi "[s]id[ed] with Ford."  (Id.)  Magistrate Judge Cecchi agreed with Ford that limited discovery should take place and that, based on the findings of that discovery, Ford could submit a summary judgment motion addressing individual issues uncovered in discovery.  (See CM/ECF No. 229, Letter Opinion & Order, at 3 (July 14, 2008).)  She did not permit Ford to re-litigate the previously decided issues; as noted above, Ford had not made any such request, specifically representing that it would not seek to do so.

"Reconsideration is an extraordinary remedy" and should be "granted 'very sparingly.'" See L.Civ.R. 7.1(i) cmt.6(d); see also Fellenz v. Lombard Investment Corp., Nos. 04-3993, 04-5768, 04-3992, 04-6105, 2005 WL 3104145, at *1 (D.N.J. Oct. 18, 2005).  A party seeking reconsideration shall file its motion within ten business days after the entry of the order on the original motion.  L. Civ. R. 7.1(i).  A motion for reconsideration must "set[] forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked."  Id.  When the assertion is that the Court overlooked something, the Court must have overlooked "some dispositive factual or legal matter that was presented to it."  McGovern v. City of Jersey, No. 98-5186, 2008 WL 58820, at *2 (D.N.J. Jan. 2, 2008).

As noted above, Ford does not dispute that any summary judgment ruling should be applied across the class–the issue on which Plaintiffs' presently move.  Instead, except with regard to its damages argument, it seeks reconsideration of this Court's original summary judgment decision almost four years after the decision and after a class has been certified.  It goes without saying that such a request is untimely.

Even if not untimely, Ford's opposition and its own motion do not set forth any facts or controlling law that were presented to but overlooked by this Court.  Instead, it presents several arguments for why, in its view, the Court was wrong.  First, Ford states that "Plaintiffs cannot dispute that when presented with the very same theory of breach based on the very same contracts and the very same Freightliner sale at issue here, this Court found no breach."  (Ford's Reply, at 1 (citing Fette Ford, Inc. v. Ford Motor Co., Civil Action No. 97-4311 (D.N.J. Sept. 15, 2000) (Lifland, J.) as "this Court").)  It further states that "contrary to the holding in [Fette], the Court upheld the named plaintiffs' breach-of-contract claim."  (Mem. of Supp. of Def. Ford Motor Co.'s Mot. for Summ. J. as to the Class [hereinafter "Ford's Summ. J. Br."], at 7.)  Ford states: "[I]t is difficult to conceive of a precedent more clearly on point than [Fette]," and "[u]nless this Court adheres to this District's prior ruling in [Fette], the United States District Court for the District of New Jersey will effectively be addressing the exactly same dispute in exactly opposite ways."  (Ford's Reply, at 2, 4-5.)  Ford further argues: "With respect, that is exactly the sort of disparate outcome that the doctrine of stare decisis and ordinary respect for the rulings of other judges is aimed at preventing."  (Id. at 5.)  Ford continues: "Of course, if this Court adheres to its ruling as to the named plaintiffs, then [an] absurd disparity will exit between two rulings in this very Court, this one and [Fette]."  (Id.)

One would think such wild mis-characterizations of our judicial system mere hyperbole, but given that Ford makes similar statements repeatedly throughout its voluminous briefing on the class summary judgment issue, the Court assumes Ford is serious.  However, the Court doubts that Ford has ever made such an argument in a case where its opponent relied on a factually similar district court opinion with which it disagreed, conceding an issue to avoid disparities in district court rulings.

In fact, neither other district court opinions nor *non-precedential* Third Circuit opinions are binding on this Court.  Black's Law Dictionary defines "persuasive precedent" as "precedent that is not binding on a court, but that is entitled to respect and careful consideration; [f]or example, if the case was decided in a neighboring jurisdiction, the court might evaluate the earlier court's reasoning without being bound to decide the same way."  Black's Law Dictionary 1296 (9th ed. 2009).  Thus, depending on the similarity of the facts, the law applied, and the analysis engaged in by the court, be it thorough or merely cursory, this Court may be more or less persuaded by a non-binding opinion of another court.  Our system of justice does not find conflicting district court positions or even circuit splits an "absurd disparity" that is intolerable.  Instead, such disagreements or errors are addressed and corrected, if necessary, through the appellate process.  This Court clearly considered the <u>Fette</u> decision in its original summary judgment opinion.  It did not find it persuasive, and it will not revisit that decision here.

Ford also argues that this Court improperly held that Ford had "a legal duty to unilaterally terminate its heavy truck dealers," and that such a holding "makes no sense."  (Ford's Summ. J. Br., at 10; Ford's Opp'n Br., at 1.)  Ford mis-characterizes this Court's holding.  Ford had agreements with its dealers involving the sale of heavy trucks.  For business reasons, Ford

decided that it wanted to sell its heavy truck business. It made $300 million dollars from the sale. In seeking to exit the heavy truck business, Ford had options, one of which, under the Agreements, was termination. In other words, had it terminated the Agreements, it would have had no obligation to continue to supply heavy trucks to its dealers. Ford argues that, in some situations, termination of the Agreements did not make sense for either Ford or the dealer. In such a case, Ford was free to work out a mutually agreed new arrangement. This Court's holding was merely that the course of action Ford chose–to simply stop selling all heavy trucks to its dealers–was a breach of the Agreements. As Plaintiffs state, Ford was not free to stop supplying heavy trucks, while "retain[ing] the benefit of the contract and avoid[ing] paying termination costs." (Pls.' Fact Stmt. ¶ 48.)

Next, Ford argues that the plain language of the contract does not support a finding of breach. This is the exact issue previously litigated and will not be revisited here.

Finally, Ford also argues that "new facts have emerged that contradict the Court's original ruling." (Ford's Opp'n Br., at 5.) These alleged new facts are facts related to the thirty six individual dealers obtained through damages discovery and the fact that Ford continued to supply smaller trucks to its dealers and that the dealers continued to receive benefits from their Agreements through warranty work. (Id. at 16-17.) With respect to the individual arguments, those are addressed separately and are not relevant to Ford's argument that the original decision was incorrect. With respect to its argument regarding the supply of small trucks, a relationship *not covered by the Agreements at issue* and an argument not originally presented, or any continued benefits the dealers received under the Agreements, these facts can hardly be considered newly discovered. Surely Ford knew what it was supplying to its dealers at the time

of the original motions and the details of any ongoing relationships.  For the first time now it wishes to argue that the Court should have looked at the entire Ford relationship with its dealers not simply the relationship governed by the Agreements at issue.  This issue could have been presented before, it was not, and this Court will not entertain it here at this stage of the litigation. Additionally, its allegations regarding benefits the dealers continued to receive are more appropriately made in connection with its damages arguments.

For these reasons and because Ford agrees that "the question of breach is a common issue shared by each member of the class," the Court grants Plaintiffs' motion for partial summary judgment and denies Ford's motion for summary judgment as to the class with regard to liability. This Court's December 7, 2005 Opinion finding in favor of the named Plaintiffs as to liability on its breach of contract claim shall be applied to all class members.

2.      Summary Judgment on Damages

Ford argues that "[e]ven if the Court holds that Ford's exit from the heavy truck business constituted a breach of the Heavy Truck Agreements, plaintiffs' inability to offer admissible evidence that class members sustained *any* damages as a result of the so-called breach renders summary judgment on damages appropriate."  (Ford's Summ. J. Br., at 23 (emphasis added).) The evidence of damages in this case consists of expert reports as well as damages discovery, as noted above and discussed in Ford's motion to decertify the damages class.  In its motion for decertification, Ford states that the report of Dr. Manuel, Plaintiffs' expert, notes that "some [Plaintiffs] benefited [sic] and others allegedly were harmed."  (Mem. in Supp. of Def. Ford Motor Co.'s Mot. to Decertify Damages Class [hereinafter "Ford's Decert. Mot."], at 3.)  Thus, Ford recognizes that Dr. Manuel found that at least some dealers suffered damages.  In fact, Ford

puts significant emphasis in arguing for decertification of the damages class on its aragument that

there are class conflicts due to evidence showing that some Plaintiffs benefitted from Ford's sale

to Freightliner while others were allegedly harmed.  Ford's conflict argument in its

decertification motion is not based solely on Dr. Manuel's report, but also on information

obtained through the damages discovery.  (See id. at 26.)  As pointed out by Ford, Thomas

Reynolds testified that Peach State's truck dealership lost profits due to the transition to

Freightliner.  (Id. (citing Cert. of Erica M. Knievel, Esq. in Supp. of Def. Ford Motor Co.'s Mot.

to Decert. Damages Class, Ex. 17, Tr. 221:4-8).)  Therefore, this Court finds that there are

genuine issues of material fact as to the amount of damages suffered by plaintiffs as a result of

Ford's breach.  Ford's motion for summary judgment as to the class on the issue of damages is

denied.  The real issue with respect to damages, as addressed by Ford's decertification motion, is

whether the damage issue should be resolved on a class-wide or individual basis, an issue that

goes beyond Ford's argument in its summary judgment motion.

> **B.     Thirty Six Dealers Individually Challenged by Ford**

Plaintiffs agree that six of the thirty six dealers challenged by Ford should be dismissed.

(Pls.' Counter-Stmt. to Ford's L. Civil R. 56.1 Stmt. in Supp. of its Mot. for Summ. J. as to

Claims of Thirty-Six Class Members [hereinafter "Pls.' Fact Counter-Stmt."], at ¶ 7.)  These

dealers are: Diesel Truck Sales, Inc., Grappone Ford Truck Center, GSTC, Riverside Truck

Center, TCFS, and Max Larsen, Inc. (Id.)  Therefore, summary judgment in favor of Ford is

granted for these dealers' claims.

Of the remaining thirty dealers, Ford argues that twenty nine should be dismissed because

they previously released Ford from any claims.  Twenty eight of these dealers resigned their Ford

heavy truck franchises and "elected to demand its termination benefits or, in some cases, to assign them to a successor dealer, in written resignation letters to Ford, which Ford accepted." (Stmt. of Mat'l Undisputed Facts [hereinafter "Ford Fact Stmt. as to Thirty-Six Class Members"], at ¶ 15.)  As part of this process, these dealers executed general releases.  These dealers are referred to herein as the "Resigning Dealers."[2]  The other dealer who executed a release, which Ford argues bars any claim here, is W.W. Wallwork, Inc. ("Wallwork").  Wallwork entered into a settlement agreement with Ford in connection with a dispute separate from the instant action.  (Id. at ¶ 26.)  All of the releases at issue for these twenty-nine dealers were executed after Ford's announcement of the sale of its heavy truck business in February 1997 but before September 8, 2006, when the class in this case was certified.  Finally, Ford argues that Sooner State, the last dealer at issue in this motion, is barred from bringing a claim because it did not have a heavy truck Agreement until after the breach at issue occurred.

      1.    <u>Resigning Dealers</u>

The Agreements for all of the Resigning Dealers contained the following provision:

TERMINATION BENEFITS FULL COMPENSATION; GENERAL RELEASE

---

[2]The Resigning Dealers referred to here are: (1) Bayou City Ford Truck Sales, Inc.; (2) Bob Rice Ford, Inc.; (3) Crosstown Ford Sales, Inc.; (4) Dave Gill Trucks, Inc.; (5) Duthler Ford Truck, Inc.; (6) Eagle Truck Sales of Wisconsin; (7) East Bay Truck Center; (8) Holman Commercial Truck; (9) Lacy Motors, Inc.; (10) Lake Erie Ford Truck Center; (11) Lakeland Truck Center, Inc.; (12) Long Lewis of Cullman, Inc.; (13) Martin Automotive Group, Inc.; (14) Mike Pruitt Ford; (15) National Car Sales, Inc.; (16) Northwest Truck and Trailer Sales, Inc.; (17) O'Connor Truck Sales, Inc.; (18) Roberts Ford Trucks; (19) Rock River Ford, Inc.; (20) Ron Blackwell Ford, Inc.; (21) Ruxer Ford Lincoln Mercury, Inc.; (22) Sacramento Valley Ford Truck Sales, Inc.; (23) Sea-Tac Ford Truck Sales, Inc.; (24) Southwest Truck Sales, Inc.; (25) Tar Heel Ford Truck Sales, Inc.; (26) Whiteford Ford Trucks, Inc.; (27) Whiteford Truck Center FW, Inc.; and (28) Wolf Motor Company.  (See Ford Fact Stmt. ¶ 16; Cert. of Erica M. Knievel, Esq. in Supp. of Def. Ford Motor Co.'s Mot. for Summ. J. as to the Claims of Thirty-Six Class Members [hereinafter "Knievel Cert. as to Thirty-Six Class Members"], Exs. 47-77.)

23. In the event of termination or nonrenewal of this agreement by the Company, the Company**,** within thirty (30) days after the effective date thereof, shall submit to the Dealer (1) a written tender of the benefits provided for in paragraph 21 (and in paragraph 22 where applicable) and (2) a form for the Dealer to use to elect either to reject all of such benefits or to accept one or more of them as full and complete compensation for such nonrenewal or termination.  The Dealer shall have thirty (30) days after receipt of such form to return the same to the Company evidencing his election.  If the Dealer fails to return the form stating such election within such thirty (30) days, the Dealer shall be deemed to have elected to accept such benefits.  *Upon the Dealer's election to accept any of such benefits, or upon the Dealer's demand of any such benefits upon any termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company, however claimed to arise except any liability that the Company may have under subparagraph 19(f) and said paragraphs 21 and 22, and except for such amounts as the Company may have agreed in writing to pay to the Dealer.*  Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the company.

(Knievel Cert. as to Thirty-Six Class Members, Ex. 7., ¶ 23 (emphasis added).)  The letters for all of the Resigning Dealers terminating their Agreements with Ford stated that the resignation was being conducted pursuant to the provisions of the Agreements.  (See id., Exs. 47-77.)  All but two, the letters from Ruxer Ford and Wolf Motor, specifically reference Paragraph 23 of the Agreements.  (Id.)  For example, the resignation letter for Bayou City states:

[I]n accordance with Paragraph 23 of the Ford Sales and Service Agreement, we hereby release Ford from all other liability to us, except for such amounts as Ford may have agreed in writing to pay us, and will furnish Ford a satisfactory general release.

(Id., Ex. 47.)  The other letters specifically referencing Paragraph 23 are substantially similar if not identical.  (See Exs. 48-77, except the letters for Ruxer & Wolf.)  All of the Resigning Dealers thereafter executed general releases.

Ford argues that "when the Resigning Dealers 'demand[ed]' in their written resignation letters that Ford give them the termination benefits outlined in their Heavy Truck Agreements, or

allow them to assign those same termination benefits to a successor dealer, this unambiguous

release language in paragraph 23 was automatically triggered, and 'any and all' of the Dealers'

claims of liability against Ford were released."  (Mem. in Supp. of Def. Ford Motor Co.'s Mot.

for Summ. J. as to the Claims of Thirty-Six Class Members [hereinafter "Ford Summ. J. Br. for

Thirty-Six Class Members"], at 11.)  Plaintiffs', in their 42 page opposition to Ford's motion, do

not address this argument that Paragraph 23 bars the Resigning Dealers claims.  In fact, they do

not even mention Paragraph 23 in their brief.  Needless to say, they also provided no law

supporting a position that Paragraph 23 is unenforceable or supporting an alternative

interpretation of this provision than the one argued for by Ford.  In their counter-statement of

facts, Plaintiffs simply state that "Paragraph 23 of the Heavy Truck Agreements . . . speaks for

itself."  (Pls.' Fact Counter-Stmt. ¶ 12.)  With reference to the resignation letters, Plaintiffs again

simply state "that the written resignation letters . . . speak for themselves."  (Id. at ¶ 16.)

     Instead of opposing Ford's primary argument, Plaintiffs argue that the general releases

executed after resignation of the Agreements by the dealers are ambiguous and were not intended

to release Ford from the claims presented in this class action.  They also argue that the general

releases violate Rule 23 of the Federal Rules of Civil Procedure.

     As noted above, Michigan law applies to the interpretation of the Agreements.  Under

Michigan law, "[i]f the language of a release is clear and unambiguous, the intent of the parties is

ascertained from the plain and ordinary meaning of the language."  Batshon v. Mar-Que Gen.

Contractors, Inc., 624 N.W.2d 903, 905 n.4 (Mich. 2001).  "[A] contractual provision is

ambiguous if the language of a written contract is subject to two or more reasonable

interpretations or is inconsistent on its face."  DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,

811 F.2d 326, 330 (7th Cir. 1987) (applying Michigan law) (internal quotations omitted).  Ford

argues that Paragraph 23 is unambiguous and bars the Resigning Dealers' claims.

In DeValk, the Seventh Circuit was faced with the same question that this Court faces:

whether Paragraph 23 is ambiguous and whether it bars future claims relating to the Agreement.

See id.  The plaintiffs in DeValk "contend[ed] that the requirement of a written general release

by the dealer at the time benefits are received modifies the earlier nebulous release granted by the

dealer at the time benefits are demanded[;] [i]f the initial release is automatic and absolutely

effective at the time the dealer makes the demand, plaintiffs ask, why does paragraph 23 discuss

the requirement of a written release in the very next sentence?"  Id.  On the other hand, like Ford

does here, the defendants in that case argued that Paragraph 23 is unambiguous and that this

"initial release is controlling as to any and all liability on Ford's part," being "absolute in its

effect."  Id. at 331.  They further argued that "[a]ny subsequent written release executed by the

dealer merely memorializes the initial release and reminds the parties of their respective

obligations."  Id.  The Seventh Circuit agreed with the defendants, finding that "when the dealer .

. . demands the benefits of returning inventory, 'the Company shall be released from any and all

other liability to the Dealer.'"  Id. (quoting Paragraph 23).  The DeValk court stated: "We can

scarcely conceive of a more clearly written release of liability[;] [t]he subsequent requirement for

a written document simply allows the parties to memorialize an automatic release already in

effect."  Id.

This Court agrees with the DeValk court.  Contrary to Plaintiffs' framing of the issue, the

issue here does not involve the conditions surrounding the actual execution of the general

releases; those releases were merely memorializing an earlier agreement.  All of the Resigning

Dealers entered into Agreements with Ford, agreeing to a contract that included Paragraph 23. As Ford states in its brief: "From the very moment these Dealers first signed their Heavy Truck Agreements, they knew that a general release in Ford's favor would result if they resigned and sought termination benefits." (Reply in Supp. of Def. Ford Motor Co.'s Mot. for Summ. J. as to the Claims of Thirty-Six Class Members [hereinafter "Ford's Reply as to Thirty-Six Class Members"], at 1.) The Resigning Dealers decided to resign their heavy truck dealerships and accept or assign the contractual termination benefits. In exchange for these benefits, as they agreed at the time they entered the Agreements with Ford and as noted in almost every resignation letter, they provided Ford with a general release in accordance with Paragraph 23. Therefore, as Plaintiffs state, Paragraph 23 and the resignation letters speak for themselves–they clearly provide that upon acceptance of the termination benefits under the Agreements, they released Ford from any and all claims related to the heavy truck Agreements.

Plaintiffs' arguments regarding Rule 23 do not change this conclusion. Plaintiffs argue that Ford improperly obtained the releases via unsupervised, unilateral communication with the putative class members, in order to diminish the size of the class and undermine the purposes behind the class action rule. Plaintiffs also argue that while Ford and the Resigning Dealers were in an ongoing business relationship, Ford's unilateral communication scheme was both abusive of Rule 23 and coercive.

Plaintiffs argument again focuses only on the timing of the execution of the general releases, ignoring that the subject of a release in exchange for termination benefits was agreed to well before the current dispute arose. Additionally, it is undisputed that the resigning dealers resigned before the class action was certified. (Cert. of Erica M. Knievel, Esq. in Supp. of Def.

Ford Motor Co.'s Reply in Supp. of its Mot. for Summ. J. as to the Claims of Thirty-Six Class

Members, Ex. 1, at 7.; see also Ford's Fact Stmt. ¶ 8.)

"Because the advantage of class action litigation comes at the cost of binding absent class

members through the res judicata effect of litigation over which they lack control, the district

courts must closely monitor the notice process and take steps to safeguard class members from

unauthorized [and] misleading communications from the parties or their counsel." In re Cmty.

Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig., 418 F.3d 277, 310

(3d Cir. 2005) (internal quotation omitted, alteration in original). Thus, "Rule 23(d) provides: 'In

the conduct of actions to which this rule applied, the court may make appropriate orders: . . . (3)

imposing conditions on the representative parties or on intervenors . . . [and] (5) dealing with

similar procedural matters.'" Id. (quoting Fed. R. Civ. P. 23(d)). While Rule 23 deals with class

members, courts have held that it also applies to contacts with putative class members, allowing

courts to "issue Rule 23 orders to prevent abuses of the class action *process*." See Jenifer v. Del.

Solid Waste Auth., Nos. 98-270/98-565, 1999 U.S. Dist. LEXIS 2542, at *8-9 (D. Del. Feb. 25,

1999) (emphasis added) (citing In re School Asbestos Litig., 842 F.2d 671, 680 (3d Cir. 1988)).

But, "before a class action is certified, it will ordinarily not be deemed inappropriate for a

defendant to seek to settle individual claims." Id. at *10. Thus, the situation presented here

where the releases were negotiated as part of the original Agreements and executed prior to class

certification are distinguishable from the cases relied on by Plaintiffs. See, e.g., Kleiner v. First

Nat'l Bank of Atlanta, 751 F.2d 1193, 1197-98 (7th Cir. 1985) (involving communications with

*class members* trying to persuade them from withdrawing from the class).

For the foregoing reasons, this Court finds that Paragraph 23 of the Agreements in which

the Resigning Dealers agreed to release Ford from all claims related to the Agreements in the

event they accepted or demanded termination benefits, is enforceable and bars the claims of the

twenty-eight Resigning Dealers.  Summary judgment in favor of Ford for these dealers is granted.

     2.    <u>W.W. Wallwork, Inc.</u>

Wallwork, Inc. entered into a settlement agreement with Ford in connection with a

dispute separate from the instant action.  (Ford's Fact Stmt. as to Thirty-Six Class Members ¶

26.)  Plaintiffs' assert that "[i]t is undisputed that the releases were executed in connection with

litigation against Ford over Wallwork's car franchise, and had no reference to its heavy truck

franchise."  (Br. in Opp'n to Def. Ford Motor Co.'s Mot. for Summ. J. as to the Claims of Thirty-

Six Class Members, at 43.)  In fact the Wallwork settlement agreement contained numerous

references to the Interim Ford Heavy-Duty Truck Sale and Service Agreement executed between

Ford and Wallwork.  (<u>See, e.g.</u>, Knievel Cert. as to Thirty-Six Class Members, Ex. 45, at 1.)

Additionally, Paragraph 5 provides: "Within 30 days of the execution of this Agreement, Ford

shall withdraw its Notice of Non-Renewal of Wallwork's Heavy-Duty Truck Sales and Service

Agreement."  (<u>Id.</u> ¶ 5.)  The settlement agreement also contained the following release provision:

> The Wallwork Parties release and forever discharge Ford . . . from all claims, actions, causes of actions, rights, or obligations, whether known or unknown, whether contingent or liquidated, of every kind, nature and description which arise directly or indirectly from any act or omission, or alleged act or omission, by each or any of the Ford Released Parties that occurred on or prior to the date of this Agreement which the Wallwork Parties . . . has, had or may have against [Ford], including, without limitation, all allegations made or which could have been made in the Action and any and all liability, actions, claims, demands, causes of action, or suits arising out of, or resulting from, or in any manner pertaining to, damages, loss of enjoyment, loss of services, loss of business, loss of business opportunities, loss of profits, contractual rights, torts and any and all claims which might hereinafter result to the Wallwork Parties, arising out of or in any way connected with the Wallwork Parties'

Page 18 of  21

operation of the Ford dealership and other operations in Fargo, North Dakota, provided that (i) third-party claims brought for personal injury, product liability, breach of warranty; (ii) the obligations set forth under paragraphs 19, 21 and 23 of Wallwork's Ford Sales and Service Agreement for car and light truck; and (iii) Ford's obligation to make customary payments or grant customary credits for transactions between Ford and Wallwork in the ordinary course of business, are not released.

(Id. at ¶ 1.)  The settlement agreement provides that it "shall be governed by and construed under the laws of the State of North Dakota."  (Id. at ¶20.)

Under North Dakota law, "[i]f [a] contract is unambiguous, the intentions of the parties are to be ascertained from the contract alone."  First Nat'l Bank & Trust Co. v. Scherr, 435 N.W.2d 704, 706 (N.D. 1989).  Ambiguity exists "when a rational argument can be made for different positions about its meaning."  Id. (Internal quotations omitted).  Here, the settlement agreement refers both to Wallwork's Agreement with Ford authorizing it to sell and service cars and light trucks as well as the Agreement to sell and service Ford heavy trucks.  (Knievel Cert. as to Thirty-Six Class Members, Ex. 45, at 1.)  And, the settlement agreement clearly indicates that Wallwork is releasing Ford from any and all past, present, or future claims "in any way connected with the Wallwork Parties' operation of the Ford dealership and their other operations in Fargo, North Dakota," except for the three specifically enumerated exceptions.  The Court finds that this release is unambiguous and bars Wallwork's present claims regarding its heavy truck dealership.  Therefore, the Court grants Ford's summary judgment motion with respect to Wallwork.

3.     Sooner State Ford

It is undisputed that Sooner State Ford purchased its heavy truck franchise from a

dealership wholly owned by Ford and entered into its own Heavy Truck Agreement with Ford on March 20, 1998. (Ford's Fact Stmt. ¶ 67.) It is also undisputed that, while Sooner State later sold its dealership and resigned its Heavy Truck Agreement in 2002, it did not execute a general release in favor of Ford. (Id. at ¶ 68.) Indeed, Ford does not argue that Sooner State's claims are barred due to execution of a release. (Ford's Reply as to Thirty-Six Class Members, at 20.) In moving for summary judgment, Ford argues that Sooner State Ford does not have a breach-of-contract claim because it did not hold a heavy truck Agreement at the time of the breach in this case. Again, Plaintiffs' opposition completely ignores Ford's argument. Instead, Plaintiffs' opposition centers on its argument that a release does not bar Sooner's claim–an argument that Ford did not make.

In the statement of facts submitted with their summary judgment motions, Plaintiffs state: "Members of the certified class of Ford Heavy Truck dealers all held Ford Heavy Duty Truck Sales and Service Agreements ("Agreements") in December 1997 and they all subsequently signed a franchise agreement with Freightliner/Sterling." (Pls.' Fact Stmt. ¶ 1.) A dealer who undisputedly did not hold an Agreement in 1997 is not covered by Plaintiffs' own statement. The Court is not clear why Ford and Sooner would enter a Heavy Truck Agreement in 1998, after Ford ceased producing heavy trucks, but such a question is beyond the scope of the present litigation. Therefore, summary judgment in favor of Ford with respect to Sooner is granted. The Court expresses no opinion on whether Sooner has other claims against Ford, outside those covered by this class action.

IV.  <u>**CONCLUSION**</u>

For the foregoing reasons, this Court grants Plaintiffs' motion for partial summary judgment on behalf of the class, denies Ford's motion for summary judgment as to the class, and grants Ford's motion for summary judgment with respect to the thirty six individual dealers. These motions resolve all issues of liability in this case.  An appropriate Order accompanies this Opinion.

DATED: November 16, 2009          /s/ Jose L. Linares
                                                   JOSE L. LINARES
                                                   UNITED STATES DISTRICT JUDGE