**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BAYSHORE FORD TRUCK, et al.,

                Plaintiffs,

v.

FORD MOTOR COMPANY,

                Defendant.

Civil Action No.: 99-741 (JLL)

**OPINION**

**LINARES**, District Judge.

This matter comes before the Court on Ford Motor Company's ("Ford") motion for decertification of the damages class, Ford's motion to strike the opinions, reports, and testimony of Plaintiffs' expert, Dr. Ernest H. Manuel, and Plaintiffs' motions to strike the expert opinion testimony of Ford's experts, David P. Kaplan, Marc Gustafson, and Ned Barnes. The Court has considered the submissions in support of and in opposition to the motions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Ford's motion for decertification is granted, and all motions to strike the various expert opinions, reports, and testimony are denied without prejudice.

## I.    INTRODUCTION

The facts in this case have been more fully set forth in this Court's prior summary judgment and class certification opinions. Plaintiffs in this action were all dealers of Ford heavy trucks pursuant to Ford Heavy Duty Truck Sales and Service Agreements. Plaintiffs seek

millions of dollars of damage for most class members.  (See generally Cert. Of Erica M. Knievel, Esq. in Supp. of Def. Ford Motor Co.'s Mot. to Decertify Damages Class [hereinafter "Knievel Cert."], Ex. 32, Expert Report of Ernest H. Manuel, Jr., Version III (Feb. 11, 2009).)  On December 7, 2005, this Court granted the named plaintiffs' motion for summary judgment with regard to liability for their breach of contract claim.  On September 7, 2006, this Court certified this case as a class action.[1]

Based on the record and arguments presented to the Court at the time of the motion for class certification, including a proffer of what Plaintiffs' expert, Dr. Manuel, would prove on a class-wide basis with regard to damages, this Court found that Plaintiffs met the requirements of Federal Rules of Civil Procedure 23(a)(1)-(4) as well as the predominance and superiority requirements of 23(b)(3).  Specifically with regard to predominance, the Court found that "[a]lthough this Court concludes that common issues establishing liability predominate, the Court is mindful that the need to calculate individual damages could predominate."  (Am. Opinion, at 14.)  But, after examining Dr. Manuel's declarations regarding his proposed methodology, the Court found that "Dr. Manuel concludes that it is possible to calculate damages, both before and after mitigation, for all plaintiffs on a class-wide scale to a reasonable degree of certainty."  (Id., at 15.)  The Court also noted that "Defendant's expert, Dr. David P. Kaplan concludes that there is no reliable way to determine Plaintiffs' damages on a class-wide basis," but nevertheless found that "[a]t the class certification stage, the Court is not required to

---

[1] On November 17, 2006, this Court issued an Amended Class Certification Opinion; the amendment addressed a minor factual error in the original opinion and did not alter the "analysis or substantive aspects of the original Opinion filed on September 7, 2006."  (Am. Opinion, CM/ECF No. 176, at 1 n.1 (Nov. 17, 2006).)

conclude that the Plaintiff could prove common impact, but must decide whether Plaintiffs'

attempt to prove [class-wide] injury would predominantly involve common legal and factual

questions."  (Id., at 16-17 (internal quotations omitted; alteration in original).)  Ultimately the

Court held: "Plaintiffs can attempt to prove on a class-wide basis: (1) that the [Ford heavy Truck

Agreements] were breached; (2) evidence related to Ford's historical market share; and (3) using

a regression analysis obtain an estimate of expected market share and lost unit sales for each

dealer."  (Id., at 17.)  This Court further found that "given that liability can and has been

established on a class-wide basis, and the fact that part of the damages can also be decided on a

class-wide basis, any of the individualized damages calculations that Dr. Kaplan identifies do not

predominate over the common issues."  (Id.)

Since the date of the class certification decision, Dr. Manuel has produced his expert

report, Ford has taken Dr. Manuel's deposition, Ford has conducted limited discovery, and this

Court has granted summary judgment to the class as to liability.[2]  In light of the new evidentiary

productions and an asserted change in Third Circuit class certification law, Ford argues that

decertification of the damages class is now required.

## II.   FORD's MOTION FOR DECERTIFICATION OF THE DAMAGES CLASS

### A.   Legal Standard

"An order that grants or denies class certification may be altered or amended before final

judgment."  Fed. R. Civ. P. 23(c)(1)(C).  Pursuant to this rule, district courts may decertify a

---

[2] Summary judgment was granted in favor of Ford related to individual issues of thirty six proposed class members.  (See Class Summ. J. Opinion, CM/ECF No. 320, at 21 (Nov. 16, 2009).)  Summary judgment was granted in favor of the remaining class members with regard to liability.  (Id.)

class where appropriate after the case develops.  See Barnes v. Am. Tobacco Co., 161 F.3d 127,

140 (3d Cir. 1998).  Citing to Sley v. Jamaica Water & Utilities, Inc., Plaintiffs argue that a class

"should be decertified only where it is clear there exist[s] changed circumstances making

continued class action treatment improper."  77 F.R.D. 391, 394 (E.D. Pa. 1977).  Sley applied

the "law of the case" doctrine in setting forth this requirement for decertification.  Id.  However,

the Third Circuit has made clear that the rule of the case doctrine is not applicable to class

certification rulings.  See Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir.

1976).  But, this Court does not read Zenith to mean that pursuant to Rule 23 a court's class

certification ruling should simply be reconsidered for any reason.  Rather, as the Third Circuit

noted in Zenith, "modification of a class certification [may be appropriate] if, upon fuller

development of the facts, the original determination appears unsound."  Id. (internal quotations

omitted).[3]  Courts regularly re-evaluate and/or decertify classes where subsequent facts call into

question whether continued class action treatment is proper.  See, e.g., Smilow v. Southwestern

Bell Mobile Sys., 323 F.3d 32, 41 (1st Cir. 2003) ("If later evidence disproves [the plaintiff's

expert's] proposition, the district court can at that stage modify or decertify the class, or use a

variety of management devices.") (citations omitted); Zenith, 530 F.2d at 512 (holding that new

factual developments "warranted the reevaluation of the original class certification"); In re

Methionine Antitrust Litig., MDL No. 00-1311, 2003 U.S. Dist. LEXIS 14828, at **10-11 (N.D.

---

[3] The Court notes that this case was decided prior to the amendments of Rule 23 in 2003.
Prior to the amendments, conditional certifications were permissible, and the Third Circuit had
made clear that courts were required to reassess such certifications as the case progressed.  See
Barnes, 161 F.3d at 140.  Although this is a distinction, the Court finds that it is one without a
relevant difference as applied here.  The question presented here is whether it is permissible to
reassess a class certification holding in light of subsequent evidentiary changes; the Court finds
that it is under Rule 23(c)(1)(C).

Cal. Aug. 26, 2003) (decertifying a class where the court found that the plaintiff's expert did not do what he had proposed prior to class certification, and that what he did do was not "sufficient to support a finding on a class wide basis of the amount . . . of [the injury]").

**B.      Development of the Case Since Class Certification**

Ford argues there have been three changes since this Court's class certification decision. First, Ford asserts that Plaintiff's expert, Dr. Manuel, has produced his report and it is not what was promised.  Ford further argues that Dr. Manuel's report and deposition testimony demonstrate that individual issues will predominate any damages trial and that conflicts exist between the named plaintiffs and some absent class members.  Second, Ford argues that the limited discovery that has taken place highlights the individual nature of any lost profits calculation for each dealer.  And, finally, Ford argues that the Third Circuit's recent class certification decisions represent a change in the law, and that, under the law as set forth in those decisions, decertification of the damages class is required.

1.      Dr. Manuel's Expert Report

In the declarations Dr. Manuel submitted to this Court prior to certification, he asserted that "[d]amages can be calculated on a class-wide basis while giving appropriate attention to individual dealer issues."  (Knievel Cert., Ex. 28, Decl. of Dr. Ernest H. Manuel, Jr. (Jan. 30, 2006) [hereinafter "Manuel Decl."], at 30 (heading).)  He stated:

> Although Ford truck dealerships may vary in size, location, makes carried and the like, they all suffered injury or potential injury from a single, common cause at the same point in time . . . .  This commonality means that a class-wide analysis provides a more robust and reliable basis for proving causation than would be the case in a dealer by dealer analysis.

(Id. at ¶ 66.)  His proposed methodology had two steps.  In step one, a "regression analysis would

be used to estimate on a class-wide basis the number of heavy truck sales lost by each class

member." (Id., Ex. 29, Supplemental Decl. of Dr. Ernest H. Manuel, Jr. (May 12, 2006)

[hereinafter "Manuel Supplemental Decl."], at ¶ 2.)  In step two, he planned to "use individual

dealer financial statements to determine the lost profits that would have otherwise flowed to each

dealer from those lost truck sales, including the loss of profits on the new trucks, used trucks and

the loss of service, parts, body and [finance & insurance] income." (Id.)  In response to the

report of one of Ford's experts, Mr. Kaplan, Dr. Manuel stated that his model, which would "use

dealer level data, not national level data," (Manuel Decl. ¶ 73), would "address nearly all [Mr.

Kaplan's] dealer-specific criticisms," (Manuel Supplemental Decl. ¶ 10).  He stated that his

proposed model would "incorporate differences in local markets, differences in dealers'

management strategies and other circumstances as reflected in their actual performance, and

differences in their operations such as whether they are truck centers or combo dealers." (Id.)

Dr. Manuel also compared his method to another method previously suggested which

used "national data aggregated across all Ford heavy truck dealers." (Id. at ¶ 12.)  He stated that

his method used "individual data for each dealer pooled in a regression model using panel data

estimation procedures to allow estimation of individual effects for each dealer." (Id.)  He

explained that such "'pooling' [of] the data for a regression analysis is not the same as

aggregating it." (Id.)  Thus, while Dr. Manuel's method proposed using historical market share

information as an input, he emphasized that the methodology would focus on individual dealer

level data.

In January and February of 2009, Dr. Manuel produced three different versions of his

expert report, dated January 16, 2009, January 22, 2009, and February 11, 2009.  Although the

third version changed the damage estimates, the description of his methodology is contained in

the January 22, 2009, version of the report.  Thus, the Court's references to Dr. Manuel's report

methodology descriptions refer to the January 22, 2009, version of the report.

      Dr. Manuel's expert report states that the method he actually used was comprised of

three, not two, steps: (1) "determining aggregate sales," (2) "predicting individual dealer sales,"

and (3) "adjusting individual dealer predictions for consistency with the aggregate sales."

(Knievel Cert., Ex. 13, Expert Report of Ernest H. Manuel, Jr. (Jan. 22, 2009) [hereinafter

"Manuel Report"], ¶ 84.)  Aggregate sales in step one were estimated on a national level for all

161 franchised Ford heavy truck dealers, of which approximately 100 are current class members.

(See id., at ¶ 14.)  Dr. Manuel calculated two estimates of the aggregate national level damage

amount; he refers to them as "the Build Plan Damage model and the Midpoint damage model."

(Id., at ¶ 15.)  The Build Plan Damage model was based on a 1997 Ford document titled "Build

Plan" that sought to "predict overall future HN80 sales."  (Id.)  The Midpoint damage model

represents a midpoint between the Build Plan model and an estimate using another Ford

document forecasting 1997 sales, called the "90-Day Study."  (Id.)  This first step of estimating a

national level damage number based on these two Ford documents was not part of the proposed

methodology prior to class certification.

      At step two, Dr. Manuel used a regression model which took into account, among other

factors, an estimate of local marketplace opportunity to predict individual dealer "but for" sales.

(Id., Ex. 30, Excerpts of Dep. Tr. of Ernest Manuel (Mar. 12-13, 2009) [hereinafter "Manuel

Dep."], Tr. 116:15-17, 487:16-488:2.)  But, his regression did not account for such things as

"differences in dealers' management strategies" as originally proposed.  Dr. Manuel explains in

detail in his deposition that his methodology did not consider many dealer level operational factors.  His position is that variances in operational factors at the individual dealer level are "picke[d] up through [his] calculation of opportunity in the marketplace."  (Id., at 116:15-17.) He asserts that operational factors that may have affected individual dealers are "random events [that] wash themselves out in [his] model."  (Id. at 121:7-8.)  He takes this position of long-term irrelevance of operational factors despite the fact that he calculates damages on a year by year basis.  (See id., at 491:13-22.)  Thus, while step two, involving the regression analysis, appears similar to the proposed regression, it also appears to include fewer individual factors than originally proposed.

At step three, another step not included in the proposed methodology put forward prior to certification, Dr. Manuel "adjust[s] individual dealer prediction for consistency with the aggregate sales."  (Manuel Report ¶ 84.)  In other words, the ultimate individual damage number that Dr. Manuel puts forward for each dealer is not the number produced by the regression. (Manuel Dep., Tr. 441:11-442:4.)  Instead, it is a number that has been adjusted to "match[] the market share total . . . in the United States."  (Id., at 442:3-4.)  This adjustment is also why Dr. Manuel takes the position at step two that many individual dealer factors wash themselves out in his model; the national level aggregate number is driving the model so any factors not otherwise captured will in theory be compensated for by adjusting the dealer numbers to meet the national damage estimate.

Thus, as Dr. Manuel's deposition testimony makes clear, what *drives* the methodology he actually used is national data related to Ford's expected market share, not individual dealer inputs.  (Id. at 121:15-18 ("[W]hat's driving the overall model is the assumption about the

market share that Ford's going to capture in the marketplace, and that's what drives the

damages."); <u>see also</u> <u>id.</u>, at 440:21-441:1, 492:19-21.)   The regression and any individual dealer

data is used only an allocation tool for the national aggregate damage estimate.  (<u>Id.</u>, at 121:19-23

("And all the regression is doing is saying, okay, out of that–that aggregate total of damages"

how much should each dealer expect."); 445:4-7 ("The regression analysis is critical for . . .

distributing the national lost sales to dealer level.").)

      Plaintiffs argue that Dr. Manuel proposed a model prior to class certification that would

use historical market share data and a regression analysis to compute dealer damage estimates,

and that is what he did.  (Br. in Opp'n to Ford Motor Co.'s Mot. to Decertify Damages Class

[hereinafter "Pls.' Opp'n"], at 39 ("[A]t no time in describing the dealer-level regression did Dr.

Manuel 'promise' that he would not use the dealer-level regression in combination with evidence

of Ford's historical market share.").)  They state that "[c]learly, regression is being used . . . and

clearly evidence of Ford's historical market share is being used."  (<u>Id.</u>, at 43.)  This Court

acknowledges that Dr. Manuel's actual methodology uses historical market share data and a

regression analysis.  But, saying that a methodology is the same or substantially the same because

two inputs are the same, regardless of how those inputs are used and the importance given to

each input, is flawed.  This Court agrees with Ford that the methodology actually used by Dr.

Manuel is not the method proposed by him to this Court prior to class certification and on which

this Court's class certification decision relied.  Dr. Manuel's proposed method, as interpreted by

this Court, was one that was driven by individual dealer level data; the model proposed to use

individual dealer level data in a way that could be applied class-wide.  As Dr. Manuel expressly

stated many times in his deposition, the actual methodology he used is driven by a national

aggregate damage estimate.  It is a top down approach that starts with a number that is based

solely on national data, not individual dealer level data.  Dealer level data is used only to allocate

this number.  This is a fundamentally different approach for purposes of evaluating whether class

certification is appropriate.

Additionally, Dr. Manuel's report takes the position that certain members of the class

cumulatively had no actual damages.  He states: "In some instances, particularly in later years,

certain dealers had actual sales that exceeded the adjusted predicted sales, hence, there were

gains rather than losses for those dealers[;] [u]nder these circumstances, some dealers had

economic gains while others had economic losses."  (Manuel Report ¶ 19.)  The Court finds that

this is another difference between Dr. Manuel's proposal, which appeared to be put forth to

support a claim for actual damages for all dealers, and his actual report, which does not.

In summary, this Court finds that the actual methodology used by Dr. Manuel is not the

methodology relied on by the Court for its class certification decision.  The Court finds that this

change warrants re-evaluation of whether continued class certification is appropriate.  Although

this basis alone is sufficient to warrant re-evaluation of the class, for completeness, the Court

also addresses Ford's additional arguments regarding its position that re-evaluation of the

damages class is presently required.

   2.   Discovery

Since certification, Ford has been permitted limited discovery.  It was permitted to take

depositions of "the three named plaintiffs and . . . thirteen [other] dealers," approximately 10% of

the class at the time.  (Mem. in Supp. of Def. Ford Motor Co.'s Mot. to Decertify Damages Class

[hereinafter "Ford Decert. Br."], at 4-5.)  Additionally, "all class members were ordered to

submit answers to written interrogatories and to produce documents." (Id., at 12.)  However, many dealers did not respond to the interrogatories or document request.  Notwithstanding the incomplete submissions, Ford argues that the depositions taken and the documents produced supports the arguments it previously made prior to certification regarding the individual nature of the damage inquiry in this case.

Gerald Ducharme testified that the Ford heavy truck dealers "were all individual businesses[;] [s]ome were big, some were small, some were in big cities, some were in the country, some had wonderful management, some had bad management, some had great consumer bodies, some had bad consumer bodies." (Knievel Cert., Ex. 4, Dep. of Gerald Ducharme, Tr. 12:19-23.)  The depositions of many of the dealers taken since class certification support this statement that many factors affect a dealer's profitability.  For example, there are general factors that affect profitability such as the national and local economies.  (See, e.g., id., Ex. 8, Dep. of Rowe Ford (Wallace E. Camp, Jr.), Tr. 90:13-25; id., Ex. 9, Dep. of David Keck, Tr. 202:5-13.)  But, many dealers also testified that there are many dealer-specific factors that affect profitability such as the quality of sales staff, changes in personnel, and the economic performance of a dealer's largest customers.  (See, e.g., id., Ex. 4, Dep. of Richard Textor as the 30(b)(6) Representative of Trans-West Ford truck Sales, Tr. 67:19-69:13; id., Ex. 6, Dep. of Thomas Dolan of Freeway Ford Truck Sales, Tr. 85:18-88:17; id., Ex. 11, Dep. of Paul Schlagenhauf, Tr. 100:5-18; id., Ex. 14, Dep. of Tom Boland, Tr. 41:24-44:11, 120:12-19, 123:3-7.)  As discussed above, Dr. Manuel has admitted that many of these dealer specific factors are not accounted for in his methodology and resulting damage estimate.  Thus, these depositions emphasize the many individual areas affecting profitability that Ford will have a right to explore regardless of how or

if Dr. Manuel's report is used.

Plaintiffs argue that Ford's arguments regarding the size and complexity of many of the dealers' businesses and the need for some individual analysis of mitigation are the same arguments that Ford presented prior to class certification, which were rejected by this Court. While Ford may have made the same or similar arguments previously, an argument may be more or less persuasive depending on its factual support.  The Court previously rejected Ford's arguments that such considerations outweighed other factors based on the factual record before it at the time, which included a proffer from Dr. Manuel that his methodology would "address nearly all [Mr. Kaplan's] dealer-specific criticisms."  (Manuel Supplemental Decl. ¶ 10.)  In light of the information obtained from the limited discovery conducted by Ford, especially when coupled with the difference in expert methodology, this Court agrees with Ford that this new evidence also supports the need for a re-examination of whether continued class treatment is proper.

3.    Change in Law

The Third Circuit has recently issued a couple of decisions clarifying the appropriate standard for certification of a class action pursuant to Federal Rule of Civil Procedure 23.  See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008); In re Schering Plough Corp. ERISA Litig., No. 08-4814, 2009 U.S. App. LEXIS 27930 (3d Cir. Dec. 21, 2009) (precedential decision).  In both of these cases, the Third Circuit has emphasized that a district court must engage in a "rigorous analysis" in determining whether a class should be certified. See Hydrogen Peroxide, 552 F.3d at 309; Schering Plough, 2009 U.S. App. LEXIS 27930, at *17.  It has also made clear that Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), is not to

be read to stand for the proposition that in a "doubtful" case, a court should allow class certification.  See Hydrogen Peroxide, 552 F.3d at 321-22; Schering Plough, 2009 U.S. App. LEXIS 27930, at *31 n.14.  Thus, a district court should certify a class "only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Schering Plough, 2009 U.S. App. LEXIS 27930, at *17 (internal quotation omitted).

Because this Court found above that the factual developments in this case since its class certification decision warrants a re-examination of whether continued class treatment is appropriate, this Court need not decide whether these recent Third Circuit clarifications alone would warrant re-evaluation of this Court's prior class certification decision.  But, once this Court undertakes a re-evaluation, it must apply the standard as it is currently understood. Therefore, pursuant to the recent Third Circuit guidance, in analyzing whether Rule 23's requirements have been met, this Court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." Hydrogen Peroxide, 552 F.3d at 307.  This is true even if the class certification inquiry overlaps with the merits of the causes of action.  Id.  And, this rigorous analysis also applies to expert opinions.  Id., at 323 ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under Daubert or for any other reason.").  Thus, even if this Court were to accept Dr. Manuel's report as admissible, it still must rigorously analyze his methodology and conclusions in light of other evidence and expert opinions.  Finally, as the Third Circuit has made clear, if there is any doubt as to whether the Rule 23 requirements have been met, class certification is not appropriate.  Id. at 321.

**C.     Appropriateness of Continued Class Certification for the Damages Class**

1.     <u>Typicality & Adequacy</u>

Recently, the Third Circuit clarified the standard for assessing typicality and adequacy under Rule 23. In <u>Schering Plough</u>, the Third Circuit held:

> [T]he proper consideration in assessing typicality . . . include[s] three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

2009 U.S. App. LEXIS 27930 at *27, 29 (finding that the named plaintiff's "interests and incentives may not be sufficiently aligned with those of the class"). The <u>Schering Plough</u> Court stated that "[a] common thread running through the various components of typicality–the requirements of similarity of legal claims, factual similarity, and absence of defenses unique to the representative–is the interest in ensuring that the class representative's interests and incentives will be generally aligned with those of the class as a whole." <u>Id.</u> at *26 (citing <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 626 n.20 (1997)).

Ford argues that Dr. Manuel's report shows that the named plaintiffs' interests are not sufficiently aligned with those of some absent class members. Specifically, it points to Dr. Manuel's report and deposition testimony that some class members had no actual damages. Ford argues that this opinion by Plaintiffs' expert demonstrates that an intra-class conflict exists. Plaintiffs argue that Ford's conflict argument "relies entirely on the false premise that one class member's mitigation of the expectation damages it suffered as a result of Ford's breach of its supply obligation, will diminish the amount of contract damages suffered by another class

member"–the offset argument.  (Pls.' Opp'n, at 4; see also id., at 29 ( "Ford is just making it up

when it asserts that one or more class members benefitted from Ford's breach of contract in a

way that would reduce the damages claim of any other class member.").)  Plaintiffs mis-

characterize Ford's conflict argument.

While Ford does make an offset argument, that argument is derived directly from Dr.

Manuel's report.  Dr. Manuel's report explicitly states that "[i]n one version [of damages], profits

and lost profits were allowed to offset one another."  (Manuel Report ¶ 19.)  However, Ford's

primary conflict argument is not based on an offset theory.  Rather, Ford argues that a conflict

exists because Dr. Manuel uses a methodology that produces an actual damage estimate of zero

for at least thirteen absent class members (over 10% of the current class) even though at least

some of the dealers themselves assert that they have suffered actual damages as a result of Ford's

breach.  In other words, Ford argues that the named plaintiffs' use of Dr. Manuel's methodology,

which benefits them, comes at the expense of other absent class members who will have no claim

for actual damages under Dr. Manuel's damages theory and approach.

As discussed above, Dr. Manuel opines: "In some instances, particularly in the later years,

certain dealers had actual sales that exceeded the adjusted predicted sales, hence, there were

gains rather than losses for those dealers[;] [u]nder these circumstances, some dealers had

economic gains while others had economic losses."  (Id., at ¶ 94.)  In his deposition, Dr. Manuel

was asked if it was his "expert opinion [that] for each of those dealers . . . on a cumulative basis

they have zero damages?" (Manuel Dep., Tr. 344:17-20.)  He responded: "That's correct."  (Id.)

In contrast, Thomas Reynolds of Peach State Truck Center, an absent class member for whom

Dr. Manuel's report shows zero actual damages, testified that he believed Peach State lost profits

because of Ford's sale of its heavy truck business.  (Knievel Cert., Ex. 17, Dep. Tr. of Thomas

Burke Reynolds, 30(b)(6) Deponent for Peach State Truck Center (Dec. 4, 2008), Tr. 221:4-8.)

Mr. Reynolds further testified that in quantifying the amount of lost profits, he would rely on an

expert.  (Id. at 221:16-223:20.)  Therefore, the evidence before the Court at this time includes not

merely an allegation that class members' interests are at odds, it includes an expert report that

uses a methodology that shows that at least 10% of class members have no claim for actual

damages.

      Plaintiffs argue that no conflict exists because "no dealer benefitted from Ford's breach

and all dealers suffered large and positive expectation damages because of its breach."  (Pls.'

Opp'n, at 31; see also id., at 33.)  Plaintiffs do acknowledge "that expectation damages are

limited to the extent that the loss is avoided or avoidable."  (Id., at 31 (citing the Restatement

(Second) of Contracts § 347).)  But, Plaintiffs argue that it is "not accurate to say that the dealer

'benefitted' by Ford's breach of contract" because "some few dealers (by their own extraordinary

efforts) were able to avoid a loss on Ford's breach of contract."  (Id., at 33.)  But, the point is that

Plaintiffs' chosen expert and damages approach shows that the named plaintiffs suffered an

actual loss after mitigation and that some absent class members did not.  This is not simply a

"richer or poorer" element to the damage estimates as Plaintiffs suggest.  (Id., at 35.)  Plaintiffs

have chosen a damage theory and approach that produces a possible claim of actual damages for

the named plaintiffs and not for some absent class members, despite the fact that some of these

absent class members believe they have suffered actual damages.

      It may be that any expert would conclude that a class member like Peach State has no

actual damages.  But, that fact is not before the Court; it is unclear on the record before the Court

if these absent class members are even aware that Dr. Manuel opines that they have suffered no

actual damages.  Thus, this Court finds that the incentives of the named class members with

respect to damages are not aligned with the entire class, and are, in fact, in direct conflict with a

significant number of absent class members.  Therefore, the Court finds that typicality is no

longer satisfied with respect to the damages class.[4]

The Third Circuit in <u>Schering Plough</u> also clarified the standard for adequacy under Rule

23.  With regard to whether named plaintiffs are adequate representatives of a class, the Third

Circuit stated that "[t]he second component of the adequacy inquiry seeks to uncover conflicts of

interest between named parties and the class they seek to represent."  2009 U.S. App. LEXIS, at

*37 (internal quotations omitted).  The Third Circuit further stated that "[t]here are clear

similarities between the components of the typicality inquiry relating to the . . . alignment of

interests, and this second part of the adequacy inquiry that focuses on possible conflicts of

interest." <u>Id.</u> (noting that the named plaintiff in that case "may lack the same financial stake as

the other members of the class").

As found above, the named plaintiffs here have chosen a damages methodology and

approach that, if permitted to proceed as a class, essentially excludes a significant number of

absent class members from the chance of recovering an actual damages amount.  Those dealers

should be free to pursue a damage strategy and theory that may better represent their interests.

Therefore, the Court also finds that the intra-class conflicts of interest identified by Dr. Manuel's

---

[4] There is no argument that there is any similar conflict for the liability class.  All parties previously agreed that the dealer Agreements at issue were substantially similar for all class members, and that, if, as a matter of law, the Court found that a breach had occurred, the liability decision should be applied across the class.  (<u>See</u> Class Summ. J. Opinion, at 4.)

report preclude a finding that the named plaintiffs are adequate representatives of all of the class members.  Because this Court finds that the new factual evidence demonstrates that typicality and adequacy are no longer met for a damages class, decertification of the damages class is required and no further analysis is necessary.  However, the Court also will address Ford's predominance argument, which provides an alternative basis for this Court's decision to decertify the damages class.

       2.    <u>Predominance</u>

Rule 23(b)(3) requires a finding "that the questions of law or fact common to the class members predominate over any questions affecting only individual members [(predominance)], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [(superiority)]."  Fed. R. Civ. P. 23(b)(3); <u>see also</u> <u>Hydrogen Peroxide</u>, 552 F.3d at 310.  "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out [at trial] in order to determine whether common or individual issues predominate in a given case."  <u>Hydrogen Peroxide</u>, 552 F.3d at 311 (citations and quotations omitted).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  <u>Id.</u> (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 172 (3d Cir. 2001)).

As this Court previously held and as both parties have agreed, Michigan law applies to the interpretation of the Agreements in this case.  <u>See</u> <u>Bayshore Ford Truck v. Ford Motor Co.</u>, No. 99-741, CM/ECF No. 146, at 11 (Dec. 7, 2005).  Additionally, as this Court previously held, although under Michigan law "actual harm is not required to establish liability for a breach of

contract claim," in order to recover more than nominal damages, actual harm and causation must be proven.  (Am. Opinion, at 13 (emphasis removed).)  See also Fera v. Village Plaza, Inc., 242 N.W.2d 372, 374 (Mich. 1976) ("In order to be entitled to . . . damages for breach of contract, the plaintiff must lay a basis for a reasonable estimate of the extent of his harm, measured in money.").  Such proof for a lost profits claim must be established "with a reasonable degree of certainty;" fact-finders may not "speculate or guess [with regard to] the amount of loss of profits."  Joerger v. Gordon Food Serv., 568 N.W.2d 365, 369 (Mich. Ct. App. 1997) (quoting Fera, 242 N.W.2d at 373) (alteration in original).  Because of the "inherently individualized" nature of lost profits claims, some courts have found that such claims are "not easily amenable to class treatment."  See, e.g., Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 342-43 (4th Cir.1998) (applying North Carolina law which, like Michigan law, does not allow lost profit damages to "be awarded based upon hypothetical or speculative forecasts of losses").

        The fact that a case is brought as a class action does not change these proof requirements.  "[T]he procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members."  Id., at 345 (citing 28 U.S.C. § 2072(b)); see also Amchem, 521 U.S. at 613; Cimino v. Raymark Indus., Inc., 151 F.3d 297, 312 (5th Cir. 1998)).  This does not mean that a plaintiff may never use a common method of proof.  Where such a method reasonably estimates individual damages, it may be appropriate.  For example, in a case involving investment injury, where a stock value changed in a consistent way for everyone, common proof related to the expected price of a stock may be used even though a later individual step will be required to determine individual damages based on the differences in number of shares owned.  But, a common proof methodology may not be used "to mask the prevalence of individual issues," or

as a short cut to the damage proof process.  McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 232 (2d Cir. 2008); see also Gutierrez v. Wells Fargo & Co., No. 07-5923, 2009 U.S. Dist. LEXIS 38143, *10 (N.D. Cal. May 5, 2009).   Actual individual injury must be proven, whether by a common or individual method.  See In re Hydrogen, 552 F.3d at 326; Newton, 259 F.3d at 191-92.  Thus, allowing a plaintiff to "[r]oughly estimat[e] the gross damages to the class as a whole . . . would inevitably alter [the] defendants' substantive right to pay damages reflective of their actual liability."  McLaughlin, 522 F.3d at 231.

Ford argued prior to class certification "that calculating lost profits damages is too individualized an effort and therefore inappropriate for class treatment because numerous tangible and intangible variables would need to be quantified and would vary from dealer-to-dealer, thereby resulting in a predominance of individualized issues."  (Am. Opinion, at 13-14.)  Based on the facts available at the time and the proffered methodology from Dr. Manuel, this Court disagreed, holding that there were common issues of liability and common damage issues, which together predominated any remaining individual damages issues.  (Id., at 17.)  Based on the actual report of Dr. Manuel and the limited discovery taken after the class certification decision, Ford reasserts its argument that "any trial on plaintiffs' damages claims will be dominated by individual, dealer-specific issues (issues we now know are nowhere addressed in plaintiffs' expert damages methodology)."  (Ford Decert. Br., at 2.)  Ford argues that "the dealers here (many of whom seek millions of dollars worth of damages) are each sophisticated unique businesses that operate in highly competitive local markets and whose ability to earn profits is highly dependent on competition, customer, and employee issues unique to each dealer."  (Id.)  On the other hand, Plaintiffs argue that "Ford seeks decertification because of the presence of

*some* individual issue on damages." (Pls.' Opp'n, at 1 (emphasis added); <u>see also</u> <u>id.</u>, at 14, 21.)

This Court agrees with Ford that "there is no dispute that individual business and market factors affect each dealer's profits." (Ford Decert. Br., at 18.) The issue, then, is whether the evidence now before the Court shows that individual issues predominate over common ones such that decertification is appropriate. As the case presently stands, there are no liability issues–all liability issues having been resolved on summary judgment. Additionally, Dr. Manuel admits that a more thorough investigation of individual dealer factors was not done because, in his opinion, it would have been "inefficient" and because it "wouldn't necessarily [have] be fruitful." (Manuel Dep., Tr. 49:15-50:16.) Plaintiffs also admit that an individual approach would take more work. (<u>See</u> Pls.' Opp'n, at 9.) However, as noted above, a common class-wide method may not be used to short cut the requirement of individual damage proof. For these reasons, this Court finds that Dr. Manuel's methodology, which expressly begins with a national aggregate damage estimate and only uses individual dealer data as a tool to allocate the national number, is not an appropriate common method for the individual damage calculations in this case. This does not mean that Dr. Manuel's opinion is wholly irrelevant, but it does mean that at most his opinion is only one piece of evidence that will play a part in any damages trial. Thus, the common damage issues relied on previously by this Court based on Dr. Manuel's report are minimized, if not negated altogether. His methodology not only was driven by a national estimate, but even to the extent that individual data was considered, it did not include many operational factors which dealers have testified affect their profitability and about which Ford has

a right to further explore and challenge on cross-examination or through other evidence.[5]  See

Barnes, 161 F.3d at 134-35; McLaughlin, 522 F.3d at 232.  For example, Dr. Manuel's report

shows that Elliot-Wilson Ford had a loss in 1998 and then gains in 1999, 2000, and 2001, and

then losses again from 2002 to 2005.  (Manuel Dep., Tr. 119:12-18.)  Dr. Manuel opines that

Elliot-Wilson was "re-injured" by Ford's breach once it again incurred losses.  (Id., at 119:19-

25.)  Ford argues that such losses were related to the downturn in the economy not its breach.

(See id., at 117:10-13; 120:1-3.)  Ford has the right to inquire into such causation questions.

　　　For all of the foregoing reasons, this Court finds that almost none, if any, of the damages

issues can be determined on a class-wide basis.  The damages trial, the only portion of this

litigation that remains, will be comprised mostly, if not completely, of individual issues.  Thus,

based on the facts currently before the Court, this Court finds that individual issues predominate.

As noted above, numerous courts have decertified cases in similar situations where an expert's

prior representations that class-wide proof was possible were not supported by the actual expert

report produced.  See, e.g., In re Methionine Antitrust Litig., 2003 U.S. Dist. LEXIS 14828, at

*10-11.

　　　The Court acknowledges that the presence of individual damages issues does not

automatically preclude a finding that the predominance factor has been satisfied.  See Bogosian

v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).  But, it also is true that having some

common liability issues does not mean that class certification is automatic.  In general under

---

　　　[5] The parties also argue about the appropriate scope of mitigation and how mitigation was
accounted for in Dr. Manuel's report.  Resolution of this issue is not necessary for the present
decision and is best resolved through a pre-trial motion once the parameters of the trial or trials
have been determined.

Rule 23, courts have many options for dealing with individual damages issues including "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001); see also Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994) ("[c]lasses can be certified for certain particularized issues").  However, here, because this Court has also found that typicality and adequacy are not met for the damages class because of intra-class conflicts, the options are limited–decertification is not merely permissible but is required.

Plaintiffs cite to Samuel v. University of Pittsburgh to argue that decertification of a damages class is not appropriate.  See 538 F.2d 991, 995-96 (3d Cir. 1976) ("[T]o decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.  Attorneys will certainly hesitate to bring class actions knowing that after investing time and effort in establishing a violation they may be deprived of an award of counsel fees when the court by decertifying on damages prevents the creation of a benefit fund from which an award can be made.") This Court disagrees.  This case is unlike Samuels.  Ford does not simply move to decertify the damages class because the liability issues have been resolved. In fact, at the time Ford filed its motion for decertification, the liability issues had yet to be fully resolved.  Additionally, even though the liability issues were not resolved, Ford did not move to decertify the entire class.  Ford agreed that, if the Court found summary judgment with regard to

liability proper for the named plaintiffs, the Court's summary judgment decision should be applied to all remaining class members because of the uniform nature of the Agreements at issue and the aligned interests with respect to liability.

Instead, Ford moved for decertification primarily based on the production of Dr. Manuel's report and the new discovery. As discussed above, both of these items show that, while the class may be cohesive with regard to the question of liablity, it is not so with regard to damages–intra-class conflicts with regard to damages exist. In other words, some class members could be prejudiced if the damage class is *not* decertified. Additionally, the dealers here are sophisticated businesses fully capable of litigating their damages claims if they determine it is worthwhile to do so. Finally, in this case, Plaintiffs are not objecting to Ford's suggestion of a bellwether trial of the sixteen dealers who Ford has been permitted more discovery. (See Pls.' Opp'n, at 49.) Plaintiffs admit that such a smaller trial would have "[t]he benefit of . . . [being] more easily understood and addressed by a jury than the individual facts of 100 or 136 dealers." (Id., at 48-49.) They also note that such a trial would likely be the only trial necessary. (Id., at 48.) Thus, they are not arguing that smaller, individual trials are unfair or inefficient. Instead, they are simply arguing that such a trial should take place under the "class" designation. But, as this Court has found, the intra-class conflicts require that such a trial not take place as a class. Therefore, for all of the foregoing reasons, Ford's motion for decertification of the damages class is granted.

## III.   MOTIONS TO STRIKE THE OPINIONS AND REPORTS OF EXPERTS

Plaintiffs state in their opposition brief:

Dr. Manuel's damages opinions in a grouped trial would still rely on evidence of

Ford's historical market share and would still rely on a modified regression, while also using additional dealer specific information. Plaintiffs do accept Ford's point that the expert cases on damages would be somewhat different, and would require a different expert presentation of evidence, if there were a grouped trial as Ford proposes.

(Id., at 9 n.5.) However, Plaintiffs do argue that "evidence of Ford's historical market share is critical to the claims of all dealers, whether the trial is of one, sixteen, or 130 dealers," and that "the class-wide evidence . . . would still be an important part of Plaintiffs' damages case on behalf of a group of sixteen dealers." (Id., at 47.) The opinions of Ford's experts, Mr. Kaplan, Mr. Gustafson, and Mr. Barnes, are offered to rebut Dr. Manuel's opinion. Therefore, it is clear that the motions as presently filed, which are based on Dr. Manuel's class-wide damage model, do not represent the arguments relevant to the appropriateness of expert testimony for individual trials or a grouped trial based on individual proofs. As a result, the Court dismisses the present motions to strike filed by both Plaintiffs and Ford without prejudice to re-file as motions *in limine* after the trial parameters have been determined and in accordance with any corresponding trial scheduling order.

## IV.   **CONCLUSION**

For the foregoing reasons, this Court grants Ford's motion to decertify the damages class. The Court denies without prejudice both parties' motions to strike the expert opinions, reports, and testimony of the various experts. The parties may re-file motions challenging the experts as motions *in limine* in accordance with the trial scheduling order to be issued after a pre-trial conference in this case. An appropriate Order accompanies this Opinion.

DATED: January 29, 2010                           /s/ Jose L. Linares
                                                  Jose L. Linares
                                                  United States District Judge